**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FOOD52, INC.,[1] | Case No. 25-12277 (___) |
| Debtor. | |

**DECLARATION OF ERIKA BADAN IN SUPPORT OF
CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

I, Erika Badan, hereby declare under penalty of perjury to the best of my knowledge, information, and belief:

1. I am the Chief Executive Officer ("**CEO**") of Food52, Inc. (the "**Debtor**" or the "**Company**"), having served in that position since my appointment in April 2024. As CEO, I am familiar with the day-to-day operations, business and financial affairs, and books and records of the Company.

2. Prior to joining the Company, I served as the first Chief Executive Officer of Barstool Sports from 2016 until January 2024. This was a period of explosive and unprecedented growth for the company. During this time, Barstool Sports grew from a regional blog to a national media and cultural powerhouse. Barstool Sports launched over 90 brands during my tenure and the company's revenue grew over 5000% in an eight-year period. In 2023, we sold Barstool Sports to Penn Entertainment for $550 million. This was an intense, challenging, and entertaining chapter in my career which led me to write a business book and receive a myriad of recognitions, including Fast Company's *Most Creative Women in Business* and Forbes' *Most Powerful Women in U.S.*

---

[1] The Debtor in this chapter 11 case is Food52, Inc. and the last four digits of the Debtor's federal tax identification number are 2604. For the purpose of this chapter 11 case, the Debtor's service address is 1 Dock 72 Way, 13th Floor, Brooklyn, New York 11205.

*Sports*.  Prior to joining Barstool Sports, I served as the Chief Marketing Officer of AOL, and held leadership roles at Microsoft, Yahoo!, and Demand Media. I currently serve on the boards of AXON Enterprise (AXON), Vice Media, and the Premiere Lacrosse League.  I hold a bachelor's degree in sociology from Colby College.

3.      Today (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware (the "**Court**"). To facilitate the Debtor's transition into chapter 11, the Debtor has requested certain "first day" relief in various motions and an application filed with the Court (collectively, the "**First Day Motions**").   The First Day Motions, as applicable, seek relief intended to avoid immediate and irreparable harm to the Debtor's estate, preserve its value, and facilitate the only value-maximizing process available to the Debtor. The First Day Motions also seek certain procedural relief that will facilitate the Debtor's orderly transition into chapter 11.

4.      I submit this declaration (this "**Declaration**") to assist the Court and other parties interested in understanding the Company's corporate history, business operations, prepetition corporate and capital structure, and the circumstances leading to the commencement of this chapter 11 case.

5.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Company's management team and the Company's advisors, my review of relevant documents and information concerning the Company's financial affairs and restructuring initiatives, or my opinions based upon my experience and knowledge.  I am authorized to submit this Declaration on behalf of the Debtor,

and, if called as a witness, I could and would testify competently to the statements set forth in this Declaration.

## PRELIMINARY STATEMENT[2]

6.     The Company was founded in 2009 by Amanda Hesser—a former *New York Times* food editor—and Merrill Stubbs—a writer and entrepreneur—as a digital-first food community, centered on cooking, recipes, and storytelling, with a mission of bringing home cooks together to exchange recipes, support each other in the kitchen, and celebrate food as the center of a well-lived life, 52 weeks a year.   Since then, tens of millions of home cooks and others have visited the Company's website, which contains thousands of recipes submitted by the Food52 community. The Company's recipes include submissions by James Beard winners, its cookbooks are *New York Times* bestsellers, its Instagram page is followed by millions, it has over 550,000 followers on TikTok, and its brand reaches approximately 37 million consumers on a monthly basis.   Food52 is a beloved brand in the home, food, and lifestyle space that is known for its visual aesthetic and its passion for cooking, entertaining, and recipe development.

7.     In 2013, the Company launched an e-commerce shop under the Food52.com domain, where users can browse through products for sale and click on links to related topics including articles and recipes.   In 2019, The Chernin Group ("**TCG**"), a private equity firm, acquired a majority stake in the Company for $83 million.   Over the next few years, with over $100 million in additional funding from TCG as well as over $20 million in debt financing, the Company started to develop its own private label products and later acquired two additional home goods brands—Schoolhouse and Dansk Designs.

---

[2]    Capitalized terms used but not defined in this Preliminary Statement have the meanings ascribed to such terms later in this Declaration.

8.      The Company grew exponentially between 2013 and 2022 and, during this time, launched a myriad of products, features, and businesses.  It also built its own custom technology platform. The Company benefitted from the COVID boom, and saw an immense increase in consumer demand as people spent more time at home and had more time to invest in home and food products and activities. During this time, the Company deployed extensive capital on numerous, diverse initiatives to drive growth and capitalize on consumer demand.  It also found itself managing three distinct brands with few synergies, four business models with unique challenges, and two offices 3,000 miles apart.  Like other companies in the home and retail space, Food52 was not immune to the post-COVID downturn. The pivot from growth-at-all-costs to a model of responsible, profitable growth proved elusive to achieve.  During this time, the Company also faced ongoing executive changes, strategy changes, and staff turnover across the brands.

9.      Since my appointment as CEO in 2024, the Company has continued to operate Food52, Schoolhouse, and Dansk Designs as three distinct brands and businesses.  During my nineteen-month tenure, the Company was able to make significant progress in curating the Schoolhouse assortment, growing demand in new parts of the country, elevating staff and systems, and improving the Company's supply chain network. The Company was also successful growing content, building social media presence, and integrating blue-chip brand partners into its content and marketing experiences.

10.     Notwithstanding those efforts, the Company continued to be burdened by high fixed operational costs, unfavorable legacy contracts, outdated technology, and lack of scalable systems.  The Company also took on the responsibility and challenge of amplifying its distinction in design and content, simplifying the Company's operations, streamlining costs, and expanding margin.  Our mission was to put the Company on a path to profitability by late 2025 or early 2026,

and the Company was making steady progress towards that goal, despite a host of external and internal challenges including tariffs, changes in warehousing and fulfillment partners, significant overhead costs, legacy technology and finance issues, burdensome contracts, challenges with alignment in culture and brands, and a limited amount of time and resources to do so.

11.     This past summer, the Company, at the direction of its Board of Directors (the "**Board**"), began to consider strategic alternatives to raise additional capital for the Company, including fundraising efforts or a potential sale of one or more business segments. Additionally, in August 2025, TCG committed to an incremental equity investment into the Company to bridge a sale process.   These funds were incorporated into the Company's financial forecasts.   In September 2025, the Company engaged Core Advisors LLC ("**Core Advisors**") as its investment banker to solicit interest from potential strategic purchasers, and Buchbinder & Co. LLC ("**Buchbinder**") was engaged as an additional investment banker to solicit interest from special situations investors. The goal was to find a home for these great brands and their talented and creative employees, ideally by buyers who would value their heritage and unique potential.

12.     Over the next few months, Core Advisors and Buchbinder contacted over 200 potential strategic purchasers and special situation investors, 35 of whom executed non-disclosure agreements with the Company and were provided access to a confidential data room.   In early December, the Board added an experienced independent director to assist with exploring all strategic alternatives.   On December 11, 2025, the Company received six indications of interest ("**IOIs**") from prospective purchasers, with a seventh IOI submitted on December 15, 2025.[3]   At the time, the Debtor only had one pre-petition secured lender, Avidbank ("**Avid**"), and, based on

---

[3]     Buchbinder's engagement was terminated pre-petition and, as of the date hereof, Core Advisors is the Debtor's only investment banker.

the IOIs and the committed TCG investment, expected to remain in good standing as well as on target to generate sufficient sale proceeds to pay off its $6.3 million obligation to Avid in full by early 2026.

13.    The Company engaged in herculean efforts to drive holiday sales over the Thanksgiving holiday and subsequent Black Friday / Cyber Monday weekend to ensure it would have funding to support the duration of its promising sale process.  The Debtor provided Avid with weekly updates on its sale process, including weekly meetings with management, TCG, and Core Advisors, and Avid was aware of the Debtor's receipt of the IOIs.  On Friday, December 12, 2025, at 5:00 p.m. (ET), the Company had what appeared to be, by any objective observer, a productive meeting with Avid, who acknowledged the progress being made and strategy around next steps to maximize value with the different bidders.

14.    On Monday, December 15, 2025, with no forewarning to the Company, Avid swept substantially all of the Debtor's cash, which was sitting at bank accounts maintained at Avid.  This included the reversal of employee payroll and benefits, as well as sweeping funds held in trust to be remitted to the federal government.[4]  Despite the Company's immediate request for the return of its cash, Avid ultimately only authorized the return of cash to cover employee payroll and 90% of the health insurance premiums.  Avid debited and credited the Debtor's account on an hourly basis for the next few days, making it virtually impossible for the Debtor to determine its cash balance.[5]  The Company has been scrambling to satisfy its fiduciary obligations to its employees ever since.

---

[4]    The Company subsequently paid these taxes with the proceeds of a secured bridge loan from TCG's affiliates, TCG 2.0 Food52, LLC and TCG 3.0 Food52, LLC (together, the "**TCG Lender**"), as discussed below.

[5]    Due to constant changes to the Company's cash balance, the Company was reduced to constantly screenshotting its account balance prior to making any payments before the cash quickly re-evaporated.

15.     Avid's actions had significant and far-reaching consequences, necessitating the immediate termination of the majority of the Debtor's employees during the holidays with no notice, while asking the Debtor's few remaining employees to work around the clock to keep the Company in business.  The Debtor went from operating in the ordinary course with six IOIs in hand and a capital commitment from TCG on December 12, 2025, to a $0 account balance at Avid and lack of clarity on the remaining committed capital by December 15, 2025.

16.     Overnight, the Company found itself scrambling for survival.  The Debtor and its advisors immediately re-engaged with five of the parties that had submitted IOIs and inquired whether such parties would provide emergency funding to support the Company's operations through the closing of a sale.  Of those five parties, only America's Test Kitchen, LP submitted an actionable proposal, through its wholly-owned subsidiary F52, LLC ("**F52**").[6]  F52's proposal includes DIP financing ("**DIP Financing**") in the amount of $3.42 million, $1.92 million of which will be made available on an interim basis, to fund a 35-day sale process pursuant to section 363 of the Bankruptcy Code.  F52 also agreed to serve as the proposed stalking horse bidder (in such capacity, the "**Stalking Horse Bidder**") for that sale process, offering a total purchase price of $6.5 million (a portion of which will be satisfied through a credit bid of the DIP obligations) and certain assumed liabilities.[7]

17.     With no other options, and almost no liquidity whatsoever, the Board determined that it was in the Company's best interest to execute an asset purchase agreement (the "**Stalking Horse Agreement**") and DIP term sheet (the "**DIP Term Sheet**") with F52 and to commence a

---

[6]   The other two parties who submitted IOIs were not engaged because their original offers did not have material cash values.

[7]   As discussed more fully below, following receipt of F52's offer, on December 22, 2025, the TCG Lender provided the Debtor with a $1.505 million secured bridge loan to enable the preparation of this chapter 11 case and the payment of the trust funds to the federal government that had been swept from its accounts by Avid.

35-day sale process pursuant to section 363 of the Bankruptcy Code, consistent with the milestones set forth in the DIP Term Sheet. Contemporaneously herewith, the Debtor filed a motion seeking to designate F52 as the Stalking Horse Bidder and seeking approval of its requested sale timeline, culminating in a sale hearing on or about February 2, 2026.

18.     This was an ugly process and a consuming, painful period for the Company and its employees. It was not a position the Company expected to find itself in given the robust sale process it was in the midst of pursuing. Being blunt, the process proposed to be consummated through this chapter 11 case is far from perfect, but is the only path forward that maximizes value for the Debtor's constituents and preserves the Debtor's business as a going concern given the situation Avid has put the Debtor in. Absent F52's agreement to provide the DIP Financing and willingness to enter into the transaction reflected in the Stalking Horse Agreement—which the Debtor and F52 have worked around the clock to negotiate and document over the past week amid the holidays—the Debtor already would have filed for chapter 7 (or an alternative liquidation proceeding), to the detriment of all constituencies.

19.     To assist the Court and parties in interest in understanding the Company's businesses and the relief the Debtor seeks through the First Day Motions, this Declaration is organized in six (6) parts:

- Part I provides an overview of the Company's corporate structure;

- Part II provide an overview of the Company's business operations;

- Part III describes the Company's prepetition capital structure;

- Part IV describes the circumstances leading to the filing of this chapter 11 case, the Debtor's pre-petition and ongoing marketing and sale process, and the Debtor's efforts to obtain DIP Financing;

- Part V provides support for the Debtor's decision to obtain DIP Financing and enter into the DIP Term Sheet;

- Part VI affirms and incorporates the facts that support the relief requested in the First Day Motions.

## BACKGROUND

### I.    The Debtor's Corporate Structure

20.    The Debtor is a privately-held Delaware corporation that was formed in 2009. TCG's affiliates own approximately 73% of the Company's stock on a fully diluted basis. The Company has approximately 78 other stockholders, none of whom hold an interest of 10% or more. The Debtor has one subsidiary— F52 Flatiron, LLC—which is a dormant entity with no assets.

### II.    The Debtor's Business Operations

21.    As discussed above, the Debtor operates three distinct brands: Food52; Schoolhouse; and Dansk Designs. A brief description of each of these brands is below:

### (a)    Food52

22.    Food52 is a media and commerce platform that unites food, home, and lifestyle through content, community, and curated products, reaching a monthly audience of approximately 37 million. In 2025, Food52's social media posts were viewed approximately 66 million times on TikTok and over 200 million times on Instagram.[8] Food52 has 570,000 email subscribers and over 6 million followers on social media. It receives approximately 6 million views on its website each month. In 2025, Food52 generated 2,500 minutes of original content, including through its 15 recurring series, several of which are described below:

- *Hotline* – A practical, solution-focused series that helps Food52's audience sharpen their kitchen skills.

- *Pour Me Another* – Food52's host explores NYC's most fascinating bars, and the people who make them unforgettable.

---

[8]    These numbers are estimates based on the year-to-date monthly page views as of September 2025.

- *Hotline Home* – Practical, solution-driven tips for tackling everyday home challenges.

- *#Trending* – The Food52 team tests the latest viral trends to see if they are worth the hype.

- *It's Fine* – An unfiltered, lighthearted cooking show that embraces mistakes and celebrates real-life home cooking.

23.    To support its expansive social media presence, Food52 has an in-house creative studio that produces branded content, campaigns, and commerce integrations, and an experiential platform that drives community connection via chef dinners, workshops, and large-scale community activations.  It also has a 41,000 square foot studio in the Brooklyn Navy Yard which features six full test kitchens, photo, video and podcast studios, and multiple functional entertaining spaces, used for events like influencer dinners and thought leadership discussions.

24.    Food52's customers are primarily passionate home cooks, design-forward entertainers, and community driven individuals.  When viewing articles and recipes on Food52's website, they can easily shop on Food52's marketplace through embedded shoppable links, thereby providing seamless integration between inspiration and action and ensuring valuable traffic and repeat engagement.  The marketplace includes kitchen, tabletop, and home essentials designed for cooking, entertaining, and everyday living.

25.    The marketplace predominantly uses a dropship-based model, minimizing inventory risk while maintaining assortment breadth and flexibility.  The Food52 Shop works with over 100 artisanal makers and vendors spanning kitchen, home, and lifestyle, with 70% of its assortment from small or underrepresented brands, providing unique, discovery driven product offerings.  In 2024, Food52 generated approximately $21.5 million in revenue through its marketplace sales.

26.    In addition to the revenue generated through its marketplace, Food52 generates significant revenue through strategic advertising partnerships with Fortune 500 companies and category leaders across hospitality, retail, package goods and wellness, connecting brands with consumers at the exact moment of inspiration.   In 2024, Food52 generated approximately $5.1 million in revenue through advertising partnerships.

**(a)    Schoolhouse**

27.    Schoolhouse is an American lighting and specialty retail brand based in Portland, Oregon that sells heirloom-quality home goods, including lighting, furniture, hardware, décor, and home textiles, several of which are depicted below:



Schoolhouse was founded in 2003 with a goal of creating meaningful pieces that bring purpose, character, and joy to everyday living.  Rooted in timeless design and shaped by a reverence for craft and utility, each piece is thoughtfully made to feel purposeful, intentional, enduring, and full of character.  The Company acquired Schoolhouse in 2021.

28.    Schoolhouse has an ecommerce business, shipping directly to customers via its website and the Food52 marketplace, and also has developed strategic partnerships with premium retailers and specialty stores to expand its retail footprint.   More recently, Schoolhouse has expanded into trade, and has worked with commercial, hospitality, and residential clients.  In 2024,

Schoolhouse generated approximately $44.7 million in revenue, with leading sales in lighting, textiles, and hardware.

(a)    **Dansk Designs**

29.    Dansk Designs is an American cookware and tabletop brand, inspired by Danish designs, established in Great Neck, New York in 1954 by Martha and Ted Nierenberg.  While travelling in Scandinavia in 1954, the Nierenbergs visited a museum where they saw a unique set of cutlery, made of teak and stainless steel, that was created by Jens Quistgaard.  The Nierenbergs subsequently sought out Quistgaard to bring modern Danish designs to the United States.  Over time, Quistgaard crafted more than 4,000 products for Dansk Designs, including items like Fjord flatware, teak ice buckets, Købenstyle pitchers and cookware, Flamestone dishes, and candle holders, among others.

30.    Following several ownership changes beginning in the 1980s, the Company acquired Dansk Designs in 2021.  It remains well-known for its teak serving pieces, brightly-colored enameled iron cookware, and timeless ceramic dinnerware, several of which are depicted below:



31.    Dansk Designs is headquartered in Brooklyn, New York and its annual revenue was approximately $3.4 million in 2024.  The vast majority of Dansk's sales occur on Food52 or Schoolhouse.com.

### III.    Pre-petition Indebtedness

32.    As of the Petition Date, the Debtor's secured funded debt obligations total approximately $1,916,000, consisting of (i) approximately $411,000 owed to Avid pursuant to that certain *Loan and Security Agreement*, dated April 12, 2021 (as amended from time to time, the "**Avid Loan Agreement**"), by and between the Debtor and Avid, and (ii) approximately $1,505,000 owed to the TCG Lender, pursuant to that certain *Secured Promissory Note*, dated December 22, 2025 (the "**TCG Secured Note**"), by and between the Debtor and the TCG Lender, as set forth in more detail below.  The Debtor also has unsecured debt, including a $15 million term loan from Silicon Valley Bank ("**SVB**" and, such loan, the "**SVB Unsecured Loan**"), guaranteed by TCG, and other obligations incurred in the ordinary course of the Debtor's business, including obligations to vendors, suppliers, landlords, taxing authorities, and trade counterparties, among others, totaling approximately $8.3 million as of the Petition Date.

### A.    Avid Loan Agreement

33.    As noted above, the Debtor entered into the Avid Loan Agreement with Avid on April 12, 2021, pursuant to which Avid agreed to provide funding to the Debtor in an aggregate amount of up to $14 million for general working capital purposes, up to $5.25 million of which could be used in connection with the acquisition of Dansk Designs.  The loans under the Avid Loan Agreement (collectively, the "**Avid Secured Loans**") are secured by a first priority lien on substantially all of the Debtor's assets and include (i) a revolving credit facility of up to $5 million, and (ii) a term loan facility of up to $8.5 million, which could be increased to $10.5 million upon the completion of certain performance milestones.  The Avid Loan Agreement has been amended various times, pursuant to which Avid consented to the acquisition of Schoolhouse, waived certain various events of default, and decreased the aggregate borrowing limit to $12,583,300, among other things.

34.    On December 15, 2025, Avid sent the Debtor a letter informing it of purported defaults under the Avid Loan Agreement and its election to exercise remedies and, within hours, swept substantially all of the Debtor's cash from its bank accounts at Avid.  Over the following days, Avid continued to credit and debit the Debtor's accounts sitting at Avid, reversing then reinstating wires previously initiated, all of which resulted in a chaotic scramble and confusion regarding the cash available to the Debtor.  Ultimately, these actions reduced the balance of the Avid Secured Loans to approximately $411,000 as of the Petition Date from approximately $6.3 million on December 12, 2025.

35.    As discussed below, through the DIP Motion (defined below), the Debtor seeks to pay the outstanding Avid Secured Loans, in the amount of up to $411,000, upon entry of the interim order approving the DIP Motion.  The Debtor believes this payment will satisfy its obligations to Avid in full.

**B.    TCG Secured Note**

36.    As discussed above, following Avid's actions on and immediately following December 15, 2025, the TCG Lender provided emergency funding to the Debtor on December 22, 2025, to allow the Debtor to negotiate a value-maximizing transaction with F52, prepare this chapter 11 case, and pay certain taxes (after the funds reserved for such taxes were improperly swept from its accounts by Avid).  As of the Petition Date, the outstanding principal balance under the TCG Secured Note was $1,505,000, and the TCG Secured Note is secured by a second priority lien on substantially all of the Debtor's assets.

**C.    SVB Unsecured Note**

37.    On August 18, 2022, the Debtor entered into that certain *Loan Agreement*, by and between the Debtor and SVB, pursuant to which SVB agreed to provide unsecured funding to the

Debtor in the principal amount of $15 million.  The SVB Unsecured Loan is guaranteed by TCG and, as of the Petition Date, remains outstanding.

## IV.    Events Leading to this Chapter 11 Case

38.    The Debtor commenced this chapter 11 case because Avid unexpectedly swept its cash in the midst of a robust and promising marketing and sale process that had contemplated an out-of-court transaction.

39.    As discussed above, I joined the Company as CEO in April 2024.  Following my appointment, I reviewed the Company's financial situation and implemented measures to diversify revenue, reduce costs, and simplify operations.  At the end of the day, as discussed in detail in the Preliminary Statement above, the efforts made and the liquidity available were not enough to overcome the legacy challenges and burden in the time horizon needed—ultimately resulting in the commencement of a marketing process in September 2025 to solicit interest from potential strategic buyers or equity investors.

40.    In furtherance thereof, in September 2025, the Company retained two investment bankers—Core Advisors and Buchbinder.  The investment bankers prepared detailed marketing materials and assembled due diligence materials for a confidential electronic data room and a confidential information memorandum with the assistance of the Debtor and its other professional advisors.  Core Advisors solicited interest from 135 prospective strategic and financial buyers, and Buchbinder contacted approximately 76 credit funds, special situations groups, and private equity funds, resulting in total outreach to 211 parties.  Core Advisors circulated a detailed "teaser" and description of the opportunity to acquire the Debtor's assets to prospective purchasers.  Ultimately, 35 parties signed NDAs with the Company and were provided access to the data room, including 27 parties from Core Advisors' outreach and 8 parties from Buchbinder's outreach.  Those parties were notified of the December 10, 2025 deadline to submit IOIs.

41.     In early December, as the sale process continued, the Board determined to add an experienced restructuring independent director to assist with exploring all available strategic alternatives and address any potential conflicts that may arise during that process.  Subsequently, Jill Frizzley of Wildrose Partners LLC was added to the Board.

42.     On December 11, 2025, six parties submitted IOIs, with a seventh submitted on December 15, 2025, which included sale timelines that the Debtor believed could be met based on its projected cash flow with additional capital previously committed from TCG.  However, before the Debtor was able to move forward with those prospective buyers, on December 15, 2025, Avid swept the Debtor's cash from its bank accounts, forcing the Debtor to terminate approximately sixty percent of its employees on December 17, 2025, and an additional 20% on December 26, 2025, and requiring the Debtor to identify an emergency solution short of a complete shutdown.

43.     The Debtor and its advisors immediately pivoted, working around the clock to identify any solution that could preserve the Company—or any segment thereof—as a going concern and potentially save jobs and vendor relationships.  Core Advisors immediately reached out to five of the parties who submitted IOIs, and informed them that any actionable bid would need to include financing to fund the Debtor's operations through the closing of a sale transaction on an expedited timeline.  The Debtor also contacted various third-party liquidators regarding the immediate liquidation of inventory as well as the potential sale of certain receivables in exchange up-front cash.  Ultimately, only one party—F52—submitted an actionable bid for the Debtor's assets.

44.     With F52's offer in hand, on December 22, 2025, the Debtor was able to obtain a $1.505 million bridge loan from the TCG Lender—through the TCG Secured Note—to provide the Debtor with funding to engage additional restructuring professionals, negotiate the Stalking

Horse Agreement and DIP Term Sheet with F52, and prepare this chapter 11 case.  The Debtor

retained MERU, LLC as its financial advisor on December 18, 2025, and retained Young Conaway

Stargatt & Taylor, LLP as its restructuring counsel on December 22, 2025.

45.     Faced with severe liquidity issues, the rapid deterioration of the Debtor's business,

and no other actionable offers, and following extensive negotiations between the Debtor and F52

over the past week, on the date hereof, the Board approved entry into the DIP Term Sheet and the

Stalking Horse APA.  The DIP Term Sheet and the Stalking Horse APA each contemplate certain

agreed-upon milestones in connection with this chapter 11 case, including:

- the Debtor shall commence this chapter 11 case on the date hereof;

- the Debtor shall file a motion (the "**DIP Motion**") for approval of the DIP Facility on the Petition Date;

- the Debtor shall file a motion (the "**Bidding Procedures Motion**") for approval of bidding procedures and authority to designate F52 as the Stalking Horse Bidder on the Petition Date;

- the Court shall have entered an interim order authorizing the relief sought under the DIP Motion within two days after the Petition Date;

- the Court shall have entered an order (the "**Bidding Procedures Order**") granting the relief sought in the Bidding Procedures Motion and designating F52 as the Stalking Horse Bidder no later than January 9, 2026;

- the Court shall have entered a final order authorizing the Debtor to enter into the DIP Facility no later than January 22, 2026;

- the Court shall hold a hearing and enter an order approving the sale of the Debtor's assets consistent with the Bidding Procedures Order no later than February 2, 2026; and

- the sale shall close no later than February 6, 2026.

These milestones were the product of extensive, arms'-length negotiations with the DIP Lender

and Stalking Horse Bidder.

46.     The Debtor, having run a fulsome pre-petition marketing and sale process with the

assistance of experienced professionals, seeks to continue its marketing and sale process

post-petition to ensure that the highest or otherwise best offer for the Debtor's assets is obtained, and will seek approval of that offer at the conclusion of the sale process, thereby maximizing value for all interested parties.

## V.    The DIP Financing

47.    I believe that the funding provided under the DIP Term Sheet will provide the Debtor with sufficient liquidity to conduct a value-maximizing sale process in accordance with the milestones set forth in the DIP Term Sheet.  With respect to DIP Financing, the DIP Lender has committed to enter into a non-amortizing, priming, super-priority senior secured term loan facility in an aggregate principal amount not to exceed $3.42 million in term loan commitments.  $1.92 million of this commitment will be available immediately upon entry of an interim order approving the DIP Facility.  Of that amount, upon entry of the interim order, the Debtor seeks to pay its outstanding obligations to Avid, in the amount of up to $411,000, leaving the TCG Lender as the Debtor's only pre-petition secured creditor.  I understand that the TCG Lender consents to its proposed treatment under the DIP Facility, including the priming of the obligations under the TCG Secured Note.

48.    Given its challenging financial position, the Debtor's paramount goal is to maximize the value of its estate for the benefit of its creditor constituencies and other stakeholders. Following careful consideration of all alternatives, the Debtor has determined that implementation of the sale process in accordance with the milestones and other terms set forth in the DIP Term Sheet represents the best way to maximize the value of the Debtor's businesses.

49.    Absent authority from the Court to obtain secured credit, as requested, on an interim basis pending the final hearing, the Debtor will suffer immediate and irreparable harm and would likely be forced to liquidate.  Accordingly, I believe that the interim relief requested is critical to preserving and maintaining the going concern value of the Debtor and facilitating its sale efforts.

## VI.    First Day Motions

50.    Contemporaneously herewith, the Debtor filed a number of First Day Motions, in addition to the DIP Motion, seeking orders granting various forms of relief intended to facilitate the efficient administration of this chapter 11 case and otherwise maximize and preserve the value of the Debtor's estate.  The First Day Motions include:

- *Debtor's Application for Entry of an Order Appointing Kurtzman Carson Consultants, LLC DBA Verita Global as Claims and Noticing Agent, Effective as of the Petition Date;*

- *Debtor's Motion for Interim and Final Orders (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Payment, (III) Establishing Procedures for Determining Additional Adequate Assurance of Payment, and (IV) Setting a Final Hearing Related Thereto;*

- *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Pay Certain Prepetition Taxes and Fees and Related Obligations, (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief;*

- *Debtor's Motion for Interim and Final Orders (I) Authorizing Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with the Debtor's Insurance Programs, Including Payment of Policy Premiums and Broker Fees,; (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief;*

- *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Pay and Honor Certain (A) Prepetition Wages, Benefits, and Other Compensation Obligations; (B) Prepetition Employee Business Expenses; and (C) Workers' Compensation Obligations; (II) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Obligations; and (III) Granting Related Relief;*

- *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Pay Prepetition Claims of Certain (A) Critical Vendors, (B) 503(b)(9) Claimants, and (C) Lien Claimants; (II) Confirming Administrative Expense Priority of Outstanding Orders; (III) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Obligations; and (IV) Granting Related Relief;*

- *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing and Approving Continued Use of Cash Management System, (II) Authorizing Use of Prepetition Bank Accounts and Business Forms, and (III) Granting Certain Related Relief;* and

- *Debtor's Motion for Entry of Interim and Final Orders (I) (A) Authorizing Continuation of, and Payment of Prepetition Amounts Incurred in Connection with, Customer Programs and (B) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto, and (II) Granting Related Relief.*

51.    I am familiar with each First Day Motion, and I believe that the relief sought in each First Day Motion (i) is necessary to minimize disruption due to the commencement of this chapter 11 case and to permit the Debtor to administer this chapter 11 case smoothly, (ii) constitutes a critical element in the Debtor's achievement of its goals in this chapter 11 process, and (iii) best serves the Debtor's estate and its stakeholders' interests.  I have reviewed each First Day Motion, and the facts and descriptions of the relief set forth therein are true and correct to the best of my information and belief with appropriate reliance on the Debtor's relevant advisors and are incorporated herein in their entirety by reference.  If asked to testify as to the facts supporting each of the First Day Motions, I would testify as to such facts.

52.    It is my belief that the relief sought in each of the First Day Motions is necessary to the success of the Debtor's chapter 11 efforts and the maximization of the value of the Debtor's estate through a sale process. It is my further belief that, with respect to those First Day Motions requesting the authority to pay specific prepetition claims, the relief requested is essential to the Debtor's chapter 11 efforts and necessary to avoid immediate and irreparable harm to the Debtor's estate.

53.     I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information, and belief, and respectfully request that all of the relief requested in the First Day Motions be granted, together with such other and further relief as is just and proper.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: December 29, 2025

/s/ *Erika Badan*
Erika Badan
Chief Executive Officer
Food52, Inc.
