## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FOOD52, INC.,[1] | Case No. 25-12277 (___) |
| Debtor. | |

**DEBTOR'S MOTION FOR ENTRY OF (I) AN ORDER
(A) APPROVING BIDDING PROCEDURES IN CONNECTION WITH
THE SALE OF THE DEBTOR'S ASSETS, (B) APPROVING FORM AND
MANNER OF NOTICE, (C) APPROVING DESIGNATION OF STALKING HORSE
BIDDER AND STALKING HORSE BID, (D) SCHEDULING AUCTION AND SALE
HEARING, (E) AUTHORIZING PROCEDURES GOVERNING ASSUMPTION
AND ASSIGNMENT OF CERTAIN CONTRACTS AND UNEXPIRED LEASES, AND
(F) GRANTING RELATED RELIEF; AND (II) AN ORDER (A) APPROVING
PURCHASE AGREEMENT(S), AND (B) AUTHORIZING A SALE FREE AND
CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS**

The above-captioned debtor and debtor in possession (the "**Debtor**") hereby submits this

motion (this "**Motion**") for entry of:  (i) an order, substantially in the form attached hereto as

**Exhibit A** (the "**Bidding Procedures Order**"), (a) approving bidding procedures, substantially

in the form attached as Annex 1 to the Bidding Procedures Order (the "**Bidding Procedures**"),

to govern the marketing and sale of all or substantially all of the Debtor's assets (the "**Assets**"),

(b) authorizing the Debtor to schedule an auction to sell the Assets (the "**Auction**") and

scheduling the hearing to approve a sale of the Assets (the "**Sale Hearing**"), (c) approving the

designation of the Stalking Horse Bidder and the Stalking Horse Bid (each as defined below),

(d) approving the form and manner of notice of the proposed sale transaction, the Bidding

Procedures, the Auction, the Sale Hearing, and related dates and deadlines, (e) authorizing

---

[1]    The Debtor in this chapter 11 case is Food52, Inc. and the last four digits of the Debtor's federal tax
identification number are 2604.  For the purpose of this chapter 11 case, the Debtor's service address is 1 Dock
72 Way, 13th Floor, Brooklyn, New York 11205.

procedures governing the assumption and assignment of certain executory contracts and unexpired leases (the "**Assumed Contracts**") to the prevailing bidder(s) acquiring the Assets (a "**Successful Bidder**"), and (f) granting related relief; and (ii) one or more orders (collectively, the "**Sale Order**") (a) approving the applicable form(s) of purchase agreement between the Debtor and the Stalking Horse Bidder (as defined below) (the "**Stalking Horse Agreement**") or any other Successful Bidder(s), and (b) authorizing the sale(s) (collectively, the "**Sale**") of the Assets and the assumption and assignment of the Assumed Contracts to the Stalking Horse Bidder or such other Successful Bidder free and clear of all liens, claims, encumbrances, and other interests (collectively, the "**Liens**"), other than any permitted Liens as set forth in the applicable form(s) of purchase agreement. In support of this Motion, the Debtor relies upon and incorporates by reference the *Declaration of Erika Badan in Support of Chapter 11 Petition and First Day Motions* (the "**First Day Declaration**"),[2] filed contemporaneously herewith. In further support of this Motion, the Debtor respectfully states as follows:

## JURISDICTION AND VENUE

1. The United States Bankruptcy Court for the District of Delaware (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012 (the "**Amended Standing Order**"). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution. Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409. Pursuant to Rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtor consents to the entry of a final

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration, the Bidding Procedures, or the Stalking Horse Agreement (as defined below), as applicable.

judgment or order with respect to this Motion if it is determined that the Court would lack Article III jurisdiction to enter such final judgment or order absent consent of the parties.

2.      The statutory and legal predicates for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Rules 2002-1 and 6004-1.

## GENERAL BACKGROUND

3.      On the date hereof (the "**Petition Date**"), the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtor is authorized to operate its businesses and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official committees have been appointed in this chapter 11 case and no request has been made for the appointment of a trustee or an examiner.

4.      Additional information regarding the Debtor's businesses, its capital structure, and the circumstances leading to the filing of this chapter 11 case is set forth in the First Day Declaration.

## INTRODUCTION AND BACKGROUND
## REGARDING THE DEBTOR'S MARKETING AND SALE PROCESS

5.      As set forth more fully in the First Day Declaration, the Debtor commenced this chapter 11 case because its prepetition secured lender—Avidbank ("**Avid**")—unexpectedly swept its cash in the midst of a robust and promising marketing and sale process that had contemplated an out-of-court transaction.

6.      This past summer, the Company, at the direction of its Board of Directors (the "**Board**"), began to consider strategic alternatives to raise additional capital for the Company, including fundraising efforts or a potential sale of one or more business segments. In furtherance

33875548.7

thereof, in September 2025, the Company engaged Core Advisors LLC ("**Core Advisors**") as its investment banker to solicit interest from potential strategic purchasers, and Buchbinder & Co. LLC ("**Buchbinder**") was engaged as an additional investment banker to solicit interest from special situations investors.

7.      The investment bankers prepared detailed marketing materials and assembled due diligence materials for a confidential electronic data room and a confidential information memorandum with the assistance of the Debtor and its other professional advisors.  Core Advisors solicited interest from 135 prospective strategic and financial buyers, and Buchbinder contacted approximately 76 credit funds, special situations groups, and private equity funds, resulting in total outreach to 211 parties.  Core Advisors circulated a detailed "teaser" and description of the opportunity to acquire the Debtor's assets to prospective purchasers. Ultimately, 35 parties signed NDAs with the Company and were provided access to the data room, including 27 parties from Core Advisors' outreach and 8 parties from Buchbinder's outreach.  Those parties were notified of the December 10, 2025 deadline to submit IOIs.

8.      On December 11, 2025, six parties submitted IOIs, with a seventh submitted on December 15, 2025, which included sale timelines that the Debtor believed could be met based on its projected cash flow with additional capital previously committed from TCG.  However, before the Debtor was able to move forward with those prospective buyers, on December 15, 2025, Avid swept the Debtor's cash from its bank accounts, forcing the Debtor to terminate approximately 60% of its employees on December 17, 2025, and an additional 20% on December 26, 2025, and requiring the Debtor to identify an emergency solution short of a complete shutdown.

9.      The Debtor and its advisors immediately pivoted, working around the clock to identify any solution that could preserve the Company—or any segment thereof—as a going concern and potentially save jobs and vendor relationships.  Core Advisors immediately reached out to five of the parties who submitted IOIs, and informed them that any actionable bid would need to include financing to fund the Debtor's operations through the closing of a sale transaction on an expedited timeline.  The Debtor also contacted various third-party liquidators regarding the immediate liquidation of inventory as well as the potential sale of certain receivables in exchange up-front cash.  Ultimately, only one party— F52, LLC (the "**Stalking Horse Bidder**")—submitted an actionable bid for the Debtor's assets.

10.      With the Stalking Horse Bidder's willingness to consider funding a debtor in possession loan and serving as the Stalking Horse Bidder, on December 22, 2025, the Debtor was able to obtain a $1.505 million bridge loan from the TCG Lender to provide the Debtor with funding to engage additional restructuring professionals, negotiate the Stalking Horse Agreement and DIP Term Sheet with F52, LLC (in such capacity, the "**DIP Lender**"), and prepare this chapter 11 case.  Faced with severe liquidity issues, the rapid deterioration of the Debtor's business, and no other actionable offers, and following extensive negotiations between the Debtor and F52, LLC over the past week, on the date hereof, the Board approved entry into the DIP Term Sheet and the Stalking Horse Agreement, which provide for a thirty-five day sale process pursuant to section 363 of the Bankruptcy Code.

11.      The Debtor seeks the relief requested in this Motion— including an expedited sale timeline consistent with the DIP Term Sheet and Stalking Horse Agreement—to ensure that a value-maximizing sale process is implemented, and to provide alternative purchasers with as much information as possible as soon as possible.  The Debtor submits that the proposed

procedures set forth herein are reasonable, value-maximizing, and in the best interest of its estate and all interested parties under the circumstances of this chapter 11 case.

THE ASSETS AND THE STALKING HORSE AGREEMENT

I.     **The Assets**

12.     The Assets consist of, without limitation, certain intellectual property, inventory, cash and cash equivalents, accounts receivable, executory contracts and unexpired leases, permits, licenses, customer lists, books and records, claims and causes of action, and other related personal property.  Subject to the terms of the Bidding Procedures, interested parties may bid on the Assets (i) in individual lots; (ii) as a collective whole; or (iii) in any combination.

II.     **The Stalking Horse Agreement**

13.     The following table sets forth a summary of the material terms and conditions of the Stalking Horse Agreement, including required disclosures under Local Rule 6004-1(b)(iv):[3]

| Term (Agreement Citation) | Detail |
|---|---|
| **Seller** **(Recitals)** | Food52, Inc. (the "**Seller**") |
| **Stalking Horse Bidder** **Local Bankr. R. 6004-1(b)(iv)(A)** **(Recitals)** | F52, LLC (the "**Buyer**" or the "**Stalking Horse Bidder**") The Stalking Horse Bidder is not an insider, as defined in section 101(31) of the Bankruptcy Code. |
| **Consideration; Credit Bid** **Local Bankr. R. 6004-1(b)(iv)(N)** **Art. 2, § 2.05** | The aggregate consideration to be paid by Buyer for the Purchased Assets shall be Six Million Five Hundred Thousand Dollars ($6,500,000.00). |

---

[3]    If there are any inconsistencies between the summary set forth herein and the Stalking Horse Agreement, the terms and conditions of the Stalking Horse Agreement shall govern.

| Term (Agreement Citation) | Detail |
|---|---|
| **Agreements with Management**<br><br>**Local Bankr. R. 6004-1(b)(iv)(B)** | The Stalking Horse Bidder has not entered into any agreements with management or key employees regarding compensation or future employment. |
| **Releases**<br><br>**Local Bankr. R. 6004-1(b)(iv)(C)** | N/A |
| **Private Sale/No Competitive Bidding**<br><br>**Local Bankr. R. 6004-1(b)(iv)(D)** | N/A |
| **Closing and Other Deadlines**<br><br>**Local Bankr. R. 6004-1(b)(iv)(E)**<br><br>**Art. IX, § 9.05** | The Stalking Horse Agreement includes bankruptcy milestones, including entry of the Bidding Procedures Order on or before January 9, 2026, entry of a sale order on or before February 2, 2026, and the closing of the sale on or before February 6, 2026. |
| **Good Faith Deposit**<br><br>**Local Bankr. R. 6004-1(b)(iv)(F)** | N/A |
| **Interim Arrangements**<br><br>**Local Bankr. R. 6004-1(b)(iv)(G)** | N/A |
| **Use of Proceeds**<br><br>**Local Bankr. R. 6004-1(b)(iv)(H)** | Upon the closing of the Sale, the Debtor seeks to pay TCG, in the principal amount of $1,505,000 plus accrued fees and interest. |
| **Tax Exemptions**<br><br>**Local Bankr. R. 6004-1(b)(iv)(I)** | N/A |
| **Record Retention**<br><br>**Local Bankr. R. 6004-1(b)(iv)(J)** | From and after the Closing, upon request by Seller, Buyer will permit Seller and Seller's Representatives to have reasonable access during normal business hours, at the sole expense of Seller and in a manner so as not to interfere unreasonably with the normal business operations of |

33875548.7

| Term (Agreement Citation) | Detail |
|---|---|
| Art. VI, § 6.12 | Buyer, to all premises, properties, personnel, books and records, and Contracts for the purposes of (a) preparing Tax Returns and (b) to facilitate the wind down of Seller. |
| **Sale of Avoidance Actions**<br><br>**Local Bankr. R. 6004-1(b)(iv)(K)** | The Stalking Horse Agreement does not contemplate the sale of Avoidance Actions. |
| **No Successor Liability**<br><br>**Local Bankr. R. 6004-1(b)(iv)(L)**<br><br>**Art. IX, § 9.02** | If the Stalking Horse Bidder is the Successful Bidder for the Assets, the Debtor intends to seek entry of a Sale Order that provides, among other things, that the Stalking Horse Bidder is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code and is not a successor to the Debtor. |
| **Free and Clear of Unexpired Leases or Other Rights**<br><br>**Local Bankr. R. 6004-1(b)(iv)(M)**<br><br>**Art. II, § 2.01** | The Stalking Horse Agreement contemplates that all obligations, Liabilities, and Encumbrances against or created by the Seller, any of its Affiliates, or the estates, to the fullest extent permitted by section 363 of the Bankruptcy Code, shall be fully released from and with respect to the Purchased Assets and that on the Closing Date, the Purchased Assets shall be transferred to the Buyer free and clear of all obligations, Liabilities, and Encumbrances (other than any Permitted Encumbrances) to the fullest extent permitted by section 363 of the Bankruptcy Code. |
| **Relief from Bankruptcy Rule 6004(h)**<br><br>**Local Bankr. R. 6004-1(b)(iv)(O)** | The Debtor intends to seek a waiver of Bankruptcy Rule 6004(h) in the Sale Order so the sale may be consummated in accordance with the milestones set forth in the Stalking Horse Agreement, which are also consistent with the Debtor's funding and timeline under the DIP Term Sheet. |

14.    As set forth above, the Stalking Horse Agreement contains certain key provisions, each of which were specifically negotiated for by the Stalking Horse Bidder and which are a condition required by the Stalking Horse Bidder for the deal. The Stalking Horse Agreement additionally contains provisions for (a) an expense reimbursement of the Stalking Horse Bidder not to exceed $200,000 (the "**Expense Reimbursement**") following the termination of the Stalking Horse Agreement under certain circumstances, and (b) a break-up fee equal to $200,000 minus the Expense Reimbursement (the "**Break-Up Fee**," together with the Expense

Reimbursement, the "**Bid Protections**"), payable in certain events, including in the event that the Debtor consummates an Alternative Transaction.

15.    Based on the marketing process and arms'-length negotiations between the Debtor and the Stalking Horse Bidder, the Debtor determined that the key provisions set forth above, including the Bid Protections, were necessary to secure the Stalking Horse Bidder's commitment to the consummation of a sale according to the terms of the Stalking Horse Agreement. The Debtor submits that the Bid Protections are particularly appropriate in this case because the Stalking Horse Bidder—an entirely independent new third party—worked around the clock with the Debtor over the past week—after the Debtor's cash was abruptly swept—to provide the Debtor with an opportunity to continue as a going-concern, and setting a floor to maximize value through a further post-petition marketing process.  In the event the Debtor ultimately obtains a higher or better offer through this process, it will be due to the Stalking Horse Bidder's willingness to provide interim financing and enter into a backstop bid under an immense time crunch to the benefit of all of the Debtor's stakeholders.

## THE PROPOSED SALE TIMELINE AND BIDDING PROCEDURES

16.    To ensure that the highest or otherwise best offer is received for the Assets, the Debtor crafted the proposed Bidding Procedures to govern the submission of competing bids at an Auction, all of which are contemplated and expressly permitted under the Stalking Horse Agreement.  Accordingly, the Debtor seeks the Court's approval of the Bidding Procedures set forth as <u>Annex 1</u> to the Bidding Procedures Order and incorporated herein in their entirety by this reference.

17.     The Debtor's proposed timeline with respect to the Bidding Procedures, the Auction, the Sale Hearing, and the Sale is as follows:[4]

| Event | Date |
|---|---|
| Hearing to Consider Approval of Bidding Procedures | **January 9, 2026, subject to the Court's availability** |
| Service of Sale Notice and Cure Notice | **January 12, 2026** |
| Contract Objection Deadline | **January 26, 2026 at 4:00 p.m. (ET); Fourteen (14) days after service of a Cure Notice for Previously Omitted Contracts** |
| Sale Objection Deadline | **January 26, 2026 at 4:00 p.m. (ET)** |
| Bid Deadline | **January 26, 2026 at 4:00 p.m. (ET)** |
| Auction (if applicable) | **January 29, 2026 at 10:00 a.m. (ET)** |
| Deadline to file Notice of Successful Bidder | **Within twenty-four (24) hours of the conclusion of the Auction (if applicable)** |
| Buyer Specific Objection Deadline | **January 31, 2026 at 4:00 p.m. (ET)** |
| Sale Hearing | **February 2, 2026, subject to the Court's availability** |

18.     The Debtor proposes the following notice and objection timeline as it relates to the Sale, the Auction, and the Sale Hearing (the "**Sale Notice Procedures**"), and requests notice of the Sale, the Auction, the Sale Hearing, and the Bidding Procedures Order be deemed adequate and sufficient if:

> No later than one (1) business day after the entry of the Bidding Procedures Order, the Debtor (or its agent) shall serve by email or, if email is unavailable, by first class mail, a notice regarding the Sale (the "**Sale Notice**"), substantially in the form attached to the Proposed Order as **Annex 2**, on the following entities; *provided*, *however*, that the Debtor need not serve the Sale Notice on any party for whom the Debtor is unable to obtain, after reasonable diligence, an email or physical address as of the entry of the Bidding Procedures Order; *provided, further* that the Debtor shall not be obligated to provide supplemental service of

---

[4]     The dates in this timeline are subject to the terms of the Bidding Procedures Order and the Bidding Procedures.

the Sale Notice with respect to any Sale Notice that is returned to the Debtor as undeliverable so long as the Debtor has confirmed that any such Sale Notice was sent to the applicable email or physical address on file in the Debtor's books and records and no other email or physical address could be obtained after reasonable diligence:

(a)     the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**");

(b)     proposed counsel for any official committee (the "**Committee**") appointed in this chapter 11 case;

(c)     counsel for the Stalking Horse Bidder and the DIP Lender;

(d)     counsel to TCG;

(e)     counsel to Avid;

(f)     the United States Attorney for the District of Delaware;

(g)     the attorneys general for each of the states in which the Debtor conducts business operations;

(h)     the Internal Revenue Service;

(i)     all known taxing authorities for the jurisdictions to which the Debtor is subject;

(j)     all environmental authorities having jurisdiction over any of the Assets;

(k)     all entities known or reasonably believed to have asserted a Lien or other Encumbrance on any of the Assets;

(l)     counterparties to the Debtor's executory contracts and unexpired leases;

(m)    all persons that have expressed to the Debtor an interest in a transaction with respect to the Assets during the past six (6) months;

(n)     all of the Debtor's other known creditors and equity security holders;

(o)     the office of unclaimed property for each state in which the Debtor conducts business; and

(p)     those parties who have formally filed a request for notice in this chapter 11 case pursuant to Bankruptcy Rule 2002.

19.     In addition, the Debtor will upload an electronic copy of the Sale Notice and the

Bidding Procedures Order (which will include the Bidding Procedures) to the data room

maintained by Core Advisors. The Debtor will also post the Sale Notice and the Bidding Procedures Order on the website of the Debtor's proposed claims and noticing agent, Kurtzman Carson Consultants, LLC dba Verita Global ("**Verita**"), available at **https://www.veritaglobal.net/Food52**.

20.    The Debtor also requests the establishment of an objection deadline prior to the Sale Hearing such that any objections related to the proposed Sale be served upon (so as to be <u>actually received</u> by) the following parties (the "**Objection Notice Parties**") on or before **4:00 p.m. (prevailing Eastern time) on January 26, 2026** (the "**Sale Objection Deadline**"):

(a)    proposed counsel to the Debtor, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: Michael R. Nestor, Esq. (mnestor@ycst.com), Kara Hammond Coyle, Esq. (kcoyle@ycst.com), Elizabeth S. Justison, Esq. (ejustison@ycst.com), S. Alexander Faris, Esq. (afaris@ycst.com), and Andrew M. Lee, Esq. (alee@ycst.com);

(b)    the U.S. Trustee, 844 King Street, Room 2207, Wilmington, Delaware 19801, Attn: Benjamin A. Hackman, Esq. (Benjamin.A.Hackman@usdoj.gov);

(c)    counsel to the Stalking Horse Bidder and the DIP Lender, Moore & Van Allen PLLC, 100 N. Tryon Street, Suite 4700, Charlotte, North Carolina 28202, Attn: James R. Langdon, Esq. (jimlangdon@mvlaw.com) and C. Cowden W. Rayburn, Esq. (cowdenrayburn@mvlaw.com), and Chipman Brown Cicero & Cole, LLP, 1313 N. Market Street, Wilmington, Delaware 19801, Attn: William E. Chipman Jr., Esq. (chipman@chipmanbrown.com); and

(d)    proposed counsel to any Committee appointed in this chapter 11 case.

21.    Certain of the key terms of the Bidding Procedures are highlighted below, in accordance with Local Rule 6004-1(c)[5]:

---

[5]    If there are any inconsistencies between the summary set forth herein and the Bidding Procedures, the terms and conditions of the Bidding Procedures shall govern. Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures.

33875548.7

| Term | Detail |
|---|---|
| **Qualification of Bidders**<br><br>**Local Bankr. R. 6004-1(c)(i)(A)** | To participate in the bidding process or otherwise be considered for any purpose under the Bidding Procedures, a person or entity (other than any Stalking Horse Bidder) interested in consummating a Sale (a "**Potential Bidder**") must deliver or have previously delivered:<br><br>• an executed confidentiality agreement on terms acceptable to the Debtor to the extent not already executed;<br><br>• information demonstrating (in the Debtor's reasonable business judgment) that the Potential Bidder has the financial capability to consummate the applicable Sale, including, but not limited to, the most current audited and latest unaudited financial statements (the "**Financials**") of the Potential Bidder (or such other form of financial disclosure acceptable to the Debtor in its discretion) (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtor, in consultation with (a) the legal and financial advisors for the Committee, if any, and (b) solely to the extent they are not an active or prospective bidder with respect to the relevant Assets, or are participating in any way in any active or prospective bid with respect to such relevant Assets, the legal advisors for TCG (collectively, the "**Consultation Parties**").<br><br>A "**Qualified Bidder**" is a Potential Bidder whose Financials, or the Financials of its equity holder(s), as applicable, demonstrate the financial capability to consummate the applicable Sale and whose Bid is a Qualified Bid (as defined below), that the Debtor, in consultation with the Consultation Parties, determines should be considered a Qualified Bidder.  Prior to the commencement of the Auction, the Debtor's advisors will (i) notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder; and (ii) provide to the Qualified Bidders for such Assets copies of all Qualified Bids with respect to such Assets.  The Stalking Horse Bidder shall be deemed a Qualified Bidder at all times and for all purposes with respect to the Assets to which its Bid (the "**Stalking Horse Bid**") relates and shall be included in the use of the term "Qualified Bidder". |
| **Qualification of Bids**<br><br>**Local Bankr. R. 6004-1(c)(i)(B)** | A proposal, solicitation, or offer (each, a "**Bid**") by a Qualified Bidder that is submitted in writing and satisfies each of the following requirements as determined by the Debtor, in consultation with the Consultation Parties, shall constitute a "**Qualified Bid**").    The |

| Term | Detail |
|---|---|
|  | Stalking Horse Bid will be deemed a Qualified Bid for all purposes without any further action required by the Stalking Horse Bidder. |
|  | (a) **Identification of Bidder**.  Each Bid must fully disclose the following:  (i) the legal identity of each person or entity bidding for the Assets and/or otherwise sponsoring, financing (including through the issuance of debt in connection with such Bid) or participating in (including through license or similar arrangement with respect to the Assets to be acquired in connection with such Bid) the Auction in connection with such Bid and the complete terms of any such participation; and (ii) any past or present connections or agreements with the Debtor, any Stalking Horse Bidder, any other known Potential Bidder or Qualified Bidder, or any officer or director of any of the foregoing (including any current or former officer or director of the Debtor). |
|  | (b) **Assets**.  Each Bid must clearly state which Assets (including any executory contracts and unexpired leases) and liabilities of the Debtor the Qualified Bidders are agreeing to purchase and assume.  For the avoidance of doubt, a Bid may be on the Assets in either (i) individual lots, (ii) as a collective whole, or (iii) in any combination. |
|  | (c) **Purchase Price**.  Each Bid must clearly set forth the cash purchase price to be paid for the applicable Asset Category (the "**Purchase Price**"), *provided, however,* that the Stalking Horse Bidder be entitled to credit bid any portion of its outstanding secured obligations consistent with section 363(k) of the Bankruptcy Code with respect to any assets on which it holds liens in accordance with an order approving the Debtor's post-petition financing.  Each Bid must also specify how the Purchase Price is allocated among the Assets. |
|  | (d) **Minimum Bid**.  The Minimum Bid for the Assets subject to the Stalking Horse Bid is $7,150,000, equal to the Staking Horse Bid amount of $6.5 million, plus the Minimum Overbid Increment of $650,000. |
|  | (e) **Deposit**.  Each Bid, other than the Stalking Horse Bid, must be accompanied by a cash deposit in the amount equal to 10% of the Purchase Price of the Bid, to be held in a segregated account to be identified and established by the Debtor (the "**Deposit**").  The Debtor reserves the right to increase the Deposit requirement. |
|  | (f) **Assumption of Obligations**.  Each Bid must identify the obligations contemplated to be assumed by such Bid, and be on terms in the aggregate (together with the other consideration contemplated in such Bid) no less favorable to the Debtor than the Stalking Horse Agreement (if any), as determined in the Debtor's business judgment, and after consultation with the Consultation Parties.  Other than the obligations to be assumed, |

| Term | Detail |
|------|--------|
| | the Assets shall be sold free and clear of all liens, claims, interests, and encumbrances (collectively, the "**Encumbrances**"), and any Encumbrances shall attach to the net proceeds of the Sales. |
| | (g) **The Same or Better Terms**.  In addition to meeting or exceeding the applicable Minimum Bid, each Bid must be on terms that are no less favorable in the aggregate (together with the other consideration contemplated in such Bid), in the Debtor's business judgment and after consultation with the Consultation Parties, than the terms of the Stalking Horse Agreement.    Each  Bid  must  include  duly  executed, non-contingent  purchase  agreement  and  other  transaction documents necessary to effectuate the transactions contemplated in the Bid and shall include a schedule of assumed contracts to the extent applicable to the Bid.  Each Bid should be based on the form of the Stalking Horse Agreement and must include a copy of the Stalking Horse Agreement clearly marked to show all changes requested by the Qualified Bidder, including those relating  to  the  respective  Purchase  Price  and  assets  to  be acquired by such Qualified Bidder, as well as all other material documents integral to such bid, including a form of sale order marked against the applicable sale order. |
| | (h) **Committed Financing / Adequate Assurance Information**. To the extent that a Bid is not accompanied by evidence of the Qualified Bidder's capacity to consummate the Sale set forth in its Bid with cash on hand, each Bid must include committed financing  documents  to  the  satisfaction  of  the  Debtor  (in consultation with the Consultation Parties) that demonstrate that the Qualified Bidder has: (i) received sufficient debt and/or equity  funding  commitments  to  satisfy  the  Qualified  Bidder's Purchase  Price  and  other  obligations  under  its  Bid;  and (ii) adequate working capital financing or resources to finance going  concern  operations  for  the  Assets  and  the  proposed transactions. |
| | In  addition  to  evidence  of  financial  wherewithal  to  timely consummate  the  transaction,  a  Bid  must  include  adequate assurance information with respect to any executory contracts or unexpired leases included or that may be included in the Bid in a form that allows the Debtor to serve such information on any counterparties  to  any  contracts  or  leases  being  assumed  and assigned in connection with the Sale that have requested, in writing, such information. |
| | (i) **Contingencies; No Financing or Diligence Outs**.  A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing  of  specified  representations  and  warranties  or  the satisfaction at the closing of specified conditions, which shall not |

| Term | Detail |
|------|--------|
| | be more burdensome, in the Debtor's business judgment, and after consultation with the Consultation Parties, than those set forth in the Stalking Horse Agreement (if any). |
| | (j) **Demonstrated Financial Capacity**. A Qualified Bidder must have, in the Debtor's business judgment (in consultation with the Consultation Parties) the necessary financial capacity to consummate the proposed transactions required by its Bid (including, if necessary, to obtain transfer of any of the Debtor's licenses, permits and to obtain any necessary surety bonds or other financial assurances) and provide adequate assurance of future performance under all contracts proposed to be assumed by such Bid. |
| | (k) **Time Frame for Closing**. Closing of the Sale as to any Asset related to a Bid by a Qualified Bidder (a "**Closing**") must be reasonably likely (based on availability of financing, antitrust, or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, on or before February 6, 2026. |
| | (l) **Binding and Irrevocable**. Except as provided herein, a Qualified Bidder's Bid for the Assets shall be irrevocable unless and until the Debtor (in consultation with the Consultation Parties) accepts a higher Bid for such Assets and such Qualified Bidder is not selected as the Backup Bidder for such Assets. If selected as Backup Bidder, such Bid shall be irrevocable until the Closing of a Successful Bid for such Assets. |
| | (m) **Expenses; Disclaimer of Fees**. Each Bid, other than the Stalking Horse Bid, must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. |
| | (n) **Authorization**. Each Bid must contain evidence that the Qualified Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtor) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid. |
| | (o) **As-Is, Where-Is**. Each Bid must include a written acknowledgement and representation that the Qualified Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidder's Bid or accompanying asset |

| Term | Detail |
|---|---|
| | purchase agreement. |
| | (p) **Adherence to Bid Procedures**.  By submitting its Bid, each Qualified Bidder is agreeing to abide by and honor the terms of the Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction. |
| | (q) **Regulatory Approvals and Covenants**.  A Bid must set forth each regulatory and third-party approval required for the Qualified Bidder to consummate the applicable Sale, if any, and the time period within which the Qualified Bidder expects to receive such regulatory and third-party approvals (provided that any such regulatory or third-party approval must occur before February 6, 2026) and any undertakings that will be required by the Debtor in connection with such regulatory and third party approvals.  For the avoidance of doubt, each Bid must acknowledge that consummation of such Bid shall not be contingent on obtaining government, regulatory, or other third-party approvals. |
| | (r) **Consent to Jurisdiction**.  The Qualified Bidder must submit to the jurisdiction of and entry of final orders by the Court and waive any right to a jury trial in connection with any disputes relating to the Debtor's qualification of bids, the Auction, the construction and enforcement of these Bidding Procedures, the transaction documents related to the Sale, and the Closing, as applicable. |
| | (s) **Bid Deadline**.  Each Bid must be transmitted via email (in .pdf or similar format) so as to be <u>actually received</u> on or before 4:00 p.m. (prevailing Eastern Time) on January 26, 2026 (the "**Bid Deadline**") by the Objection Notice Parties. |
| **No-Shop or No-Solicitation Provisions**<br><br>**Local Bankr. R. 6004-1(c)(i)(C)(1)** | N/A |
| **Breakup Fee/Expense Reimbursement**<br><br>**Local Bankr. R. 6004-1(c)(i)(C)(2)** | The Debtor has agreed to pay the Stalking Horse Bidder, under the conditions and in the amount set forth in the Bidding Procedures Order, the Break-Up Fee in the amount $200,000 plus the Expense Reimbursement in the amount of up to $200,000, payable pursuant to the terms of the Stalking Horse Agreement.  For the avoidance of doubt, the Stalking Horse Bidder is <u>not</u> entitled to the Break-Up Fee or the Expense Reimbursement if the Stalking Horse Bidder is the Successful Bidder on a portion of the Assets, but not all of the Assets. |
| **Bidding Increments**<br><br>**Local Bankr. R. 6004-1(c)(i)(C)(3)** | The initial Overbid for the Assets subject to the Stalking Horse Bid, if any, shall provide for total consideration to the Debtor with a value that exceeds the value of the consideration under the Minimum Bid for the Assets by an incremental amount that is not less than $250,000 in cash or credit bid. |

| Term | Detail |
|---|---|
| **Treatment of Break-Up and Topping Fees at Auction**<br><br>**Local Bankr. R. 6004-1(c)(i)(C)(4)** | If any Overbid is made as to the Assets subject to the Stalking Horse Agreement, the Stalking Horse Bidder shall be entitled to a dollar for-dollar credit against the Minimum Overbid equal to the amount of the Stalking Horse Bidder's Break-Up Fee and Expense Reimbursement pursuant to the Stalking Horse Agreement to take into account that, if the Stalking Horse Bidder is the Successful Bidder, no payment of the Stalking Horse Bidder's Break-Up Fee or Expense Reimbursement will be required.  Conversely, if a Bidder other than the Stalking Horse Bidder is the Successful Bidder as to the Assets subject to the Stalking Horse Agreement, the net proceeds available to the Debtor for any such Assets will be reduced by the amount of the Break-Up Fee and the Expense Reimbursement of the Stalking Horse Bidder under the Stalking Horse Agreement and paid to the Stalking Horse Bidder at closing of such Bidder's Bid. |
| **Modifications of Bidding Procedures**<br><br>**Local Bankr. R. 6004-1(c)(i)(D)** | The Debtor reserves its rights to modify the Bidding Procedures in its reasonable business judgment, and in consultation with the Consultation Parties and with the consent of the Stalking Horse Bidder, in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Assets. |
| **Back-Up Bidder**<br><br>**Local Bankr. R. 6004-1(c)(i)(E)** | If an Auction is conducted for the Assets, the Qualified Bidder with the next-highest or otherwise second-best Bid at the Auction for such Assets, as determined by the Debtor in the exercise of its reasonable business judgment, and in consultation with the Consultation Parties (the "**Backup Bid**"), shall be required to serve as a backup bidder (the "**Backup Bidder**") for such Assets, and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtor.<br><br>The identity of the Backup Bidder and the amount and material terms of the Backup Bid shall be announced by the Debtor at the conclusion of the Auction at the same time the Debtor announces the identity of the Successful Bidder.  The Backup Bidder shall be required to keep its Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable until the closing of the transaction with the applicable Successful Bidder or as otherwise provided in the Stalking Horse Agreement.  The Backup Bidder's Deposit shall be held in escrow until the closing of the transaction with the applicable Successful Bidder or as otherwise provided in the Stalking Horse Agreement.<br><br>If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtor may select the applicable Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes.  The Debtor will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party.  The defaulting Successful Bidder's Deposit shall be forfeited to the Debtor, and the |

| Term | Detail |
|---|---|
| | Debtor specifically reserves the right to seek all remedies available against the defaulting Successful Bidder, including specific performance, if applicable, unless otherwise provided in the Stalking Horse Agreement should the Stalking Horse Bidder be the Successful Bidder.  For the avoidance of doubt, if the Deposit becomes property of the Debtor's estate, the Deposit shall be subject to the liens and super-priority claims granted in favor of the DIP Lender under the interim order authorizing the Debtor to obtain postpetition financing and related relief and the final order thereon. |

## THE PROPOSED ASSUMPTION PROCEDURES

22.     To facilitate and effect the Sale of the Assets, the Debtor seeks authority to assume and assign the Assumed Contracts, consistent with the procedures established in the Bidding Procedures Order and the Stalking Horse Agreement (the "**Assumption Procedures**"). The Debtor proposes that the Assumption Procedures apply whether the Stalking Horse Bidder or any other party or parties are the Successful Bidders.

23.     The proposed Assumption Procedures are as follows:

(a)     <u>Notice</u>.  Within one (1) business day from the entry of the Bidding Procedures Order, or as soon as practicable thereafter, the Debtor shall file and serve by email or, if email is unavailable, by first class mail, on all counterparties (the "**Counterparties**") to its executory contracts and unexpired leases (the "**Contracts**") a notice, substantially in the form attached to the Proposed Order as **Annex 3** (the "**Cure Notice**"); *provided*, *however*, that the Debtor need not serve the Cure Notice on any party for whom the Debtor is unable to obtain, after reasonable diligence, an email or address as of the entry of the Bidding Procedures Order; *provided*, *further* that the Debtor shall not be obligated to provide supplemental service of the Cure Notice with respect to any Cure Notice that is returned to the Debtor as undeliverable so long as the Debtor has confirmed that any such Cure Notice was sent to the applicable email or physical address on file in the Debtor's books and records and no other email or physical address could be obtained after reasonable diligence.

(b)     <u>Content of the Cure Notice</u>.  The Cure Notice will include the following information on a schedule attached thereto (the "**Executory Contracts Schedule**"): (a) the potential assumption by the Debtor and assignment to the Successful Bidder(s) of the Contracts, and (b) the proposed amount necessary, under section 365(b)(1) of the Bankruptcy Code, to cure any outstanding monetary defaults and compensate the Counterparties for any pecuniary losses in connection with such assumption and assignment (the "**Proposed Cure Amounts**").

(c)    <u>Previously Omitted Contracts</u>.  If at any time after the issuance of the Cure Notice but prior to the Sale Hearing it is discovered that a Contract should have been listed on the Executory Contracts Schedule but was not (any such Contract, a "**Previously Omitted Contract**"), the Debtor shall, promptly following discovery thereof (but in no event later than two (2) business days following discovery thereof), file and serve a notice on the non-Debtor counterparty(ies) to such Previously Omitted Contract notifying such counterparties of the Debtor's intention to assume and assign such Previously Omitted Contract to the Successful Bidder, including the Proposed Cure Amounts relating thereto (the "**Previously Omitted Contract Notice**").

(d)    <u>Objections</u>.  Each Counterparty shall have until 4:00 p.m. (prevailing Eastern time) on the date that is fourteen (14) days after the filing and service by the Debtor to the Counterparty of the Cure Notice or the Previously Omitted Contract Notice (as applicable) (the "**Contract Objection Deadline**") to object to the assumption and assignment of its Contract on any grounds, including, without limitation, the amount of the Proposed Cure Amounts (and must state, in its objection, with specificity, what cure amount is required with appropriate documentation in support thereof) and the provision of adequate assurance of future performance by the Stalking Horse Bidder.  Any unresolved objections shall be heard at the Sale Hearing, unless otherwise agreed by the parties; provided that the Debtor shall have the right to adjourn any Sale Hearing without the consent of any objecting party.  If any objections to the amount of Proposed Cure Amounts remain unresolved as of the date of the Closing of the Sale, the Debtor may (but are not required to) deposit the disputed amount of Proposed Cure Amounts in a segregated account to hold pending resolution of such objections.

Each Counterparty may raise objections as to adequate assurance of future performance by, or on the basis of the identity of, the Successful Bidder, other than the Stalking Horse Bidder, until 4:00 p.m. (prevailing Eastern time) on January 31, 2026 (the "**Buyer Specific Objection Deadline**").  Any such objection must be filed and served on the Debtor and its counsel, the Committee and its counsel, and the applicable Successful Bidder or Stalking Horse Bidder, as applicable, and its counsel, so as to be actually received by the Buyer Specific Objection Deadline.  Any such unresolved objections shall be heard at the Sale Hearing, unless otherwise agreed by the parties.

## <u>RELIEF REQUESTED</u>

24.    By this Motion, the Debtor requests entry of:  (a) the proposed Bidding Procedures Order, (i) approving Bidding Procedures to govern the marketing and sale of the Assets, (ii) authorizing the Debtor to schedule the Auction and scheduling the Sale Hearing, (iii) approving the designation of the Stalking Horse Bidder and the Stalking Horse Bid;

(iv) approving the form and manner of notice of the proposed Sale, the Bidding Procedures, the Auction, the Sale Hearing, and related dates and deadlines, (v) authorizing procedures governing the assumption and assignment of the Contracts to the Successful Bidder(s), and (vi) granting related relief; and (b) the Sale Order (i) approving the applicable form(s) of purchase agreement between the Debtor and the Stalking Horse Bidder or any other Successful Bidder(s), and (ii) authorizing the Sale of the Assets and the assumption and assignment of the Assumed Contracts to the Stalking Horse Bidder or such other Successful Bidder free and clear of all Liens, other than any permitted Liens as set forth in the applicable form(s) of purchase agreement.

## BASIS FOR RELIEF

### THE SALE OF THE ASSETS REFLECTS A SOUND EXERCISE OF THE DEBTOR'S BUSINESS JUDGMENT.

25.    Selling the Assets as proposed herein is critical to maximizing value in this chapter 11 case and, therefore, should be approved as reflecting a sound exercise of the Debtor's business judgment.  Section 363(b) of the Bankruptcy Code provides, in relevant part, that a debtor "may use, sell, or lease, other than in the ordinary course of business, property of the estate" after notice and a hearing.  11 U.S.C. § 363(b)(1).  Generally, the debtor is only required to "show that a sound business purpose" justifies the proposed use of property.  *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *see also In re Phoenix Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (requiring "good business reason" for use under section 363(b) of the Bankruptcy Code).  This standard prohibits other parties from second-guessing the debtor's business judgment if the debtor has shown that the proposed use will benefit the debtor's estate.  *See In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as

distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.").

26.    The Debtor determined to undertake a sale of substantially all of its Assets after careful consideration of all potential alternatives.  Of the available alternatives, the Sale was and remains the only means to obtaining the greatest value for the Assets and distributing that value to the Debtor's stakeholders in accordance with their legal priorities.  The Debtor already has a baseline Stalking Horse Bid and now seeks to continue the marketing process with the added benefit of a Court-approved section 363 sale process.  As discussed above, Core Advisors is continuing the Debtor's pre-petition marketing process and is scouring the market for potentially interested bidders.  After this market check, coupled with the Debtor's prepetition marketing efforts, the Debtor, its creditors, and other parties in interest can be confident that the Debtor will have obtained the highest and best value for the Assets.

**APPROVAL OF THE SALE NOTICE PROCEDURES AND BIDDING PROCEDURES IS APPROPRIATE AND IN THE BEST INTERESTS OF THE DEBTOR'S ESTATE.**

**A.    The Proposed Notice of Sale, Bidding Procedures, Auction and Sale Hearing, and the Sale Objection Deadline Are Appropriate.**

27.    As described above, the Debtor submits that the Sale Notice Procedures and the Sale Objection Deadline comply with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Bidding Procedures, the Auction, the Sale Hearing, and the Sale to the Debtor's creditors and other parties in interest, and, if the Debtor believes that additional entities have a legitimate interest, then also to those who have expressed an interest, or may express an interest, in bidding on the Assets.  Based upon the foregoing, the Debtor

respectfully requests that the Court approve the Sale Notice Procedures and the Sale Objection Deadline proposed above.

**B.    The Bidding Procedures Are Appropriate and Will Maximize the Value of the Assets.**

28.    Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets from the estate.  *See, e.g.*, *In re Efoora, Inc.*, 472 B.R. 481, 488 (Bankr. N.D. Ill. 2012) ("A trustee has considerable discretion when it comes to the sale of estate assets, and that discretion is entitled to great judicial deference as long as a sound business reason is given.") (internal quotations and citations omitted).

29.    The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See, e.g.*, *Corp. Assets, Inc. v. Paloian*, 368 F.3d 761, 765 (7th Cir. 2004) (in a bankruptcy sale, the "governing principle . . . is to secure the highest price for the benefit of the estate and creditors").

30.    To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy sales.  *See, e.g.*, *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999); *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (observing that bidding procedures "encourage bidding and . . . maximize the value of the debtor's assets.").

31.    The Debtor believes that the Bidding Procedures will establish sound parameters by which the proffered sale price of the Assets under the Stalking Horse Agreement may be tested and evaluated as described herein.  Such procedures will increase the likelihood that the Debtor will receive the greatest possible consideration for the Assets because they will ensure a

competitive and fair bidding process.  The Bidding Procedures will also allow the Debtor to undertake the Auction process in an orderly fashion, which the Debtor believes is essential to maintaining and maximizing the value of its estate.

32.     The Debtor believes that the Auction and proposed Bidding Procedures will allow the Debtor to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction. The Debtor also believes that the Bidding Procedures will encourage active bidding for the Assets, are consistent with other procedures previously approved by courts in this and other circuits, and are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.

33.     Thus, the proposed Bidding Procedures are reasonable, appropriate, and within the Debtor's sound business judgment under the circumstances because they will serve to maximize the value that the Debtor will obtain on account of the Sale of the Assets.

**THE INITIAL AND SUBSEQUENT OVERBID AMOUNTS ARE APPROPRIATE.**

34.     The Debtor submits that the proposed requirements for a Minimum Bid and Overbid are appropriate and should be approved.  Courts frequently authorize debtors to require bidders to submit minimum initial bids to ensure that the debtors receive the highest and best offers possible in asset sales.  In addition, the Debtor intends to conduct the Auction such that each bid at the Auction is higher or otherwise better than the previous bid.  To this end, incorporating the concept of overbids in the Bidding Procedures is reasonable under the circumstances and will enable the Debtor to maximize the value for the sale of its assets while limiting any chilling effect on the Sale process.  *See, e.g.*, *In re Phasebio Pharm., Inc.*, Case No. 22-10995 (LSS) (Bankr. D. Del. Nov. 28, 2022) (authorizing bidding procedures with an initial overbid increment of $1,000,000 or 2.5% of purchase price, plus break-up fees and

33875548.7

expense reimbursements in the amount of $2,750,000); *In re Avadim Health, Inc.*, Case No. 21-10883 (CTG) (Bankr. D. Del. June 23, 2021) (authorizing bidding procedures with an initial overbid increment of $250,000); *In re Ruby Pipeline*, Case No. 22-10278 (CTG) (Bankr D. Del. Sept. 8, 2022) (authorizing bidding procedures requiring minimum overbid amount to be announced by the debtor at auction); *In re Sequential Brands Grp., Inc.*, Case No. 21-11194 (JTD) (Bankr. D. Del. Sept. 24, 2021) (same).

### THE PROPOSED ASSUMPTION PROCEDURES ARE APPROPRIATE.

35.    In connection with the Sale, the Debtor believes it is necessary to establish a process by which:  (a) the Debtor and Counterparties can reconcile the Proposed Cure Costs, if any, in accordance with section 365 of the Bankruptcy Code; and (b) Counterparties can object to the assumption and assignment of the Contracts or related Proposed Cure Costs.  As described above, the proposed Assumption Procedures comply with Bankruptcy Rule 2002 and provide all Counterparties with due and adequate notice of the potential assumption and assignment of their Contracts, the Contract Objection Deadline and the Buyer Specific Objection Deadline, and the time and place for the Sale Hearing.

36.    Therefore, the Debtor respectfully requests that the Court approve the Assumption Procedures.

### APPROVAL OF THE PROPOSED SALE TRANSACTION IS APPROPRIATE AND IN THE BEST INTERESTS OF THE DEBTOR'S ESTATE.

37.    In accordance with Bankruptcy Rule 6004(f)(1), sales of property rights outside the ordinary course of business may be by private sale or public auction.  The Debtor determined that a public Auction of the Assets will enable the Debtor to obtain the highest or otherwise best offer in a Sale of its Assets at this time and is in the best interests of the Debtor, its estate, and its creditors.  However, if after the Bid Deadline, the Debtor has not received a Bid that is

actionable or exceeds the value of the Stalking Horse Agreement, the Debtor will file a certification of counsel or notice with the Court indicating that the Debtor has not received a bid that is higher or otherwise better than the Stalking Horse Agreement, and the Debtor will request that the Court approve the Stalking Horse Bid at the Sale Hearing (or earlier).  In light of the Debtor's pre-petition marketing and sale process, the Debtor believes that potential bidders have had ample time to engage with the Debtor, conduct diligence, and secure financing, and that a process that provides the Debtor the opportunity to test the market for the Assets postpetition, but also maintains optionality to pivot from a public auction process to a private sale with the Stalking Horse Bidder will best achieve value for all stakeholders and eliminate unnecessary administrative expenses.

A.    **The Sale of Assets and Assumed Contracts Free and Clear of Liens Is Authorized by Section 363(f) of the Bankruptcy Code.**

38.    The Debtor further submits that it is appropriate to sell the Assets and to assign the Assumed Contracts free and clear of all Liens, other than Assumed Liabilities and permitted Liens, as set forth in the Stalking Horse Agreement or in the purchase agreement with the Successful Bidder(s) pursuant to section 363(f) of the Bankruptcy Code, with any such Liens attaching to the net sale proceeds of the Assets, as and to the extent applicable.

39.    Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances if:

> (a) applicable nonbankruptcy law permits sale of such property free and clear of such interests;
>
> (b) such entity consents;
>
> (c) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (d) such interest is in *bona fide* dispute; or

(e) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

40.     The Debtor believes that one or more of the tests of section 363(f) are satisfied with respect to the transfer of the Assets and the assignment of the Assumed Contracts pursuant to the Stalking Horse Agreement or an applicable purchase agreement of another Successful Bidder.  In particular, the Debtor believes that section 363(f)(2) of the Bankruptcy Code will be met because the DIP Lender (who is the Stalking Horse Bidder) and TCG are supportive of the Debtor's sale process and expected to consent to the sale,[6] and the Debtor intends to pay Avid's secured claim from the DIP loan proceeds.  Moreover, with respect to any other parties asserting a Lien, claim, or Encumbrance against the Assets, the Debtor anticipates that they will be able to satisfy one or more of the conditions set forth in section 363(f) of the Bankruptcy Code.  In particular, known lienholders will receive notice and will be given sufficient opportunity to object to the relief requested.  Such lienholders that do not object to the Sale should be deemed to have consented.[7]  Furthermore, the Debtor proposes that any Liens asserted against the Assets be transferred to and attach to the proceeds of the Sale.

**B.      The Stalking Horse Bidder Is a Good Faith Purchaser and Is Entitled to the Full Protections of the Bankruptcy Code.**

41.     The Debtor believes that the Stalking Horse Agreement has been submitted in good faith and has been, and will continue to be, negotiated in good faith and at arm's-length.

---

[6]   TCG has consented to the sale to the Stalking Horse Bidder on the terms set forth in the Stalking Horse Agreement but reserves the right to withhold consent to any other sales.

[7]   *See FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285-86 (7th Cir. 2002) ("[L]ack of objection (provided of course there is notice) counts as consent.  It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); *Hargrave v. Twp. of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (holding that creditor's failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); *In re Elliot*, 94 B.R. at 345 (same).

33875548.7

27

Thus, the Stalking Horse Bidder is entitled to the full protections of section 363(m) of Bankruptcy Code, which provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

42.    While the Bankruptcy Code does not define "good faith," several Circuit Courts have determined that:

> The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

*In re Andy Frain Servs., Inc.*, 798 F.2d 1113, 1125 (7th Cir. 1986) (quoting *In re Rock Indus. Machinery Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978); *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986). There has been no fraud, improper insider dealing, or collusion in connection with the negotiation or submission of the Stalking Horse Agreement.

43.    The Stalking Horse Bidder or other Successful Bidder(s) should receive the protections afforded good faith purchasers by section 363(m) of the Bankruptcy Code and the Court should find that section 363(n) of the Bankruptcy Code does not apply. Accordingly, the Debtor requests that the Court make a finding at the Sale Hearing and in the Sale Order that the purchase agreement reached with the Stalking Horse Bidder or any other Successful Bidder(s) was at arm's-length and is entitled to the full protections of section 363(m) of the Bankruptcy Code.

### C.       The Court Should Approve the Bid Protections.

44.       The Court should also approve the proposed Bid Protections for the Stalking

Horse Agreement.  The Bid Protections are a necessary condition for the Stalking Horse Bidder

to enter into the Stalking Horse Agreement. The use of a stalking horse in a public auction

process for sales pursuant to section 363 of the Bankruptcy Code is a customary practice in

chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to

maximize value in an auction process by "establish[ing] a framework for competitive bidding

and facilitat[ing] a realization of that value."  *Official Comm. of Unsecured Creditors v.*

*Interforum Holding LLC*, 2011 WL 2671254, No. 11-219, *1 (E.D. Wis. July 7, 2011).  As a

result, stalking horse bidders typically require break-up fees and, in many cases, other forms of

bid protections as an inducement for "setting the floor at auction, exposing its bid to competing

bidders, and providing other bidders with access to the due diligence necessary to enter into an

asset purchase agreement."  *Id.* (internal citations omitted).   Absent approval of the Bid

Protections for the Stalking Horse Bidder, the Debtor may lose the opportunity to obtain the

highest and otherwise best offer for the Assets through the Auction process.

45.       "The Third Circuit has expressly recognized as an administrative claim a stalking

horse bidder's claim for a break-up fee and expense reimbursement if granting such a claim

provides a benefit to the estate." *In re Women First Healthcare, Inc.*, 332 B.R. 115, 121 (Bankr.

D. Del. 2005).  Such payments may be necessary to preserve the value of a debtor's estate if

assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that

otherwise would not have been made and without which bidding would have been limited." *In re*

*O'Brien Envtl. Energy, Inc*., 181 F.3d at 533.  Further, if the availability of such payments were

to induce a bidder to research the value of the debtor and convert the value to a dollar figure on

which other bidders can rely, the bidder may have provided a benefit to the estate by increasing

the likelihood that the price at which the debtor is sold will reflect its true worth. *See id*.; *see also In re Reliant Energy Channel View L*P, 594 F.3d 200, 206-08 (3d Cir. 2010) (reasoning that a break-up fee should be approved if it is necessary to entice a party to make the first bid or if it would induce a stalking horse bidder to remain committed to a purchase).

46.     In *O'Brien*, the Third Circuit reviewed the following nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee:

a.     the presence of self-dealing or manipulation in negotiating the break-up fee;

b.     whether the fee harms, rather than encourages, bidding;

c.     the reasonableness of the break-up fee relative to the purchase price;

d.     whether the unsuccessful bidder placed the estate property in a "sale configuration mode" to attract other bidders to the Auction;

e.     the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders or attract additional bidders;

f.     the correlation of the fee to a maximum value of the debtor's estate;

g.     the support of the principal secured creditors and creditors' committees of the break-up fee;

h.     the benefits of the safeguards to the debtor's estate; and

i.     the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

*See In re O'Brien Envtl. Energy, Inc*., 181 F.3d at 536.

47.     While none of the factors are dispositive, an application of the facts to several of such factors supports the approval of the Bid Protections here.  First, the Stalking Horse Bidder would not enter into the Stalking Horse Agreement without the Bid Protections. In addition, the Stalking Horse Bid attracts additional bidders because, among other things, additional bidders will be able to save considerable time and expense because they can use many of the documents

that the Stalking Horse Bidder heavily negotiated, including, among other things, the Stalking Horse Agreement and the schedules thereto, in making their bid. In sum, if the Assets are sold to a Successful Bidder other than the Stalking Horse Bidder, the sale likely will be the result of the Stalking Horse Bidder's crucial role as an initial bidder generating interest in the Assets and establishing an acceptable price and offer against which other parties can bid. Indeed, the Debtor receives substantial value through the Stalking Horse Bid because it establishes not only a floor value for the Assets but also a path to monetize those assets without any additional material representations or warranties by the Debtor.

48.     Moreover, this Court has on several recent occasions approved the grant of superpriority administrative expense status to claims for break-up fees and expense reimbursements. *See, e.g.*, *In re Exide Holdings, Inc*., No. 20-11157 (CSS) (Bankr. D. Del. June 19, 2020) (authorizing priority expense status for break-up fee and expense reimbursement); *In re Bumble Bee Parent, Inc*., No. 19-12502 (LSS) (Bankr. D. Del. Dec. 19, 2019) (same). In addition, the Debtor submits that the proposed Break-Up Fee of $200,000 plus the Expense Reimbursement of up to $200,000 is reasonable given the total amount of the Sale and the complexity associated therewith. *See, e.g.*, *iSun, Inc.*, Case No. 24-11144 (TMH) (Bankr. D. Del. July 10, 2024 [Docket No. 183] (approving a break-up fee of $750,000 and an expense reimbursement of up to $250,000 on a stalking horse sale price of $10 million plus assumed liabilities). Here, the Bid Protections are reasonable and appropriate and are not expected to chill bidding.

49.     The Stalking Horse Bidder requires the Bid Protections as a precondition to entering into the Stalking Horse Agreement, and the Debtor believes offering the Bid Protections to the Stalking Horse Bidder will maximize the realizable value of the Assets for the benefit of

the Debtor's estate, its creditors, and other parties in interest. Accordingly, the Debtor believes

that the Bid Protections are fair and appropriate under the circumstances and should be approved.

**D.      Credit Bidding Should Be Authorized Under Section 363(k) of the Bankruptcy Code.**

50.      A secured creditor is allowed to "credit bid" the amount of its claim in a sale.

Section 363(k) of the Bankruptcy Code provides, in relevant part, that unless the court for cause

orders otherwise, the holder of a claim secured by property that is the subject of the sale "may

bid at such sale, and, if the holder of such claim purchases such property, such holder may offset

such claim against the purchase price of such property." 11 U.S.C. § 363(k). Even if a secured

creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy

Code, section 363(k) allows such secured creditor to bid the total face value of its claim and does

not limit the credit bid to the claim's economic value.

51.      The Bidding Procedures allow the Stalking Horse Bidder to credit bid up to the

full amount of its secured debt and otherwise preserve the Stalking Horse Bidder's right to credit

bid pursuant to section 363(k) of the Bankruptcy Code, and this aspect of the Bidding Procedures

should therefore be approved.

**E.      Assumption and Assignment of the Assumed Contracts Is Authorized by the Bankruptcy Code.**

52.      Sections 365(a) and (b) of the Bankruptcy Code authorize a debtor-in-possession

to assume, subject to the court's approval, executory contracts or unexpired leases of the debtor.

Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may

assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).

Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an

unexpired lease or executory contract of a debtor, providing that:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee —
>
> (A)    cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
>
> (B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

53.    The standard applied by courts to determine whether an executory contract or unexpired lease should be assumed is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate. *See ReGen Capital I, Inc. v. UAL Corp. (In re UAL Corp.)*, 635 F.3d 312, 319 (7th Cir. 2011) ("The bankruptcy court reviews the debtor's business judgment with respect to the proposed assumption to determine if it would be beneficial or burdensome to assume the executory contract by evaluating whether assumption would serve the reorganization or whether it would take away funds available to other creditors.") (citing *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993)); *In re Network Access Sols., Corp.*, 330 B.R. 67, 75 (Bankr. D. Del. 2005).

54.    As set forth above, the Sale will yield the maximum value for the Debtor's estate and the Debtor expects that value may be achieved through the assumption, assignment, and sale of the Assumed Contracts.  In addition, under section 365(k) of the Bankruptcy Code, a debtor's assignment of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment."  11 U.S.C. § 365(k).  Thus,

following an assignment to a Successful Bidder of an Assumed Contract, the Debtor will be relieved from any liability for any subsequent breach associated therewith.

55.     Furthermore, section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Assumed Contracts be cured or that adequate assurance be provided that such defaults will be promptly cured.  11 U.S.C. § 365(b)(1).  The Debtor proposes to file with the Court, and serve on each Counterparty to a Contract, a Cure Notice that indicates the Proposed Cure Amount for each such contract.  As such, each Counterparty will have the opportunity to object to the proposed assumption and assignment to the Successful Bidder and to the Proposed Cure Amount, if applicable.  Moreover, the payment or reserve of the applicable Proposed Cure Amounts, as provided for in the Bidding Procedures, will be a condition to the Debtor's assumption and assignment of any Assumed Contracts.

56.     Relatedly, section 365(f)(2) of the Bankruptcy Code provides that a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided."  11 U.S.C. § 365(f)(2).  The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in light of the facts and circumstances of the proposed assumption.[8]  Specifically, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.[9]

---

[8]     *See In re Fleming Cos., Inc.*, 499 F.3d 300, 307 (3d Cir. 2007) (internal citation omitted); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (same*); see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (finding that adequate assurance of future performance does not mean absolute assurance that debtor will thrive and profit); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

[9]     *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (holding that adequate assurance of future performance is given where the assignee of lease has financial resources and expressed a willingness to devote sufficient funding to the business to ensure its success, and that in the leasing context, the chief determinant of adequate assurance is whether rent will be paid).

57.     Here, any Successful Bidder will have provided adequate assurance of future performance with respect to any Assumed Contract.  For a bid to be deemed a Qualifying Bid, each Qualifying Bidder will be required to provide evidence supporting its ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code.  Furthermore, given that the Debtor will submit evidence at the Sale Hearing that all requirements for the assumption and assignment of the Contracts have been satisfied, the Court and other interested parties will have the opportunity to evaluate the ability of the Successful Bidder to provide adequate assurance of future performance.

58.     Therefore, the Debtor respectfully requests that the Court approve the proposed assumption and assignment of the Assumed Contracts.

59.     In addition, to assist in the assumption, assignment, and sale of the Assumed Contracts, the Debtor also requests that the Sale Order provide that anti-assignment provisions in the Assumed Contracts shall not restrict, limit, or prohibit the assumption, assignment, and sale of the Assumed Contracts and are deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

## NOTICE

60.     Notice of this Motion will be given to:  (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the DIP Lender; (c) counsel to The Chernin Group; (d) counsel to Avidbank; (e) the creditors listed on the Debtor's list of twenty (20) creditors holding the largest unsecured claims against the Debtor; (f) the United States Attorney for the District of Delaware; (g) the Internal Revenue Service; (h) the state attorneys general for states in which the Debtor conducts business; (i) all parties who have asserted liens against the Assets;

and (h) all parties entitled to notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is necessary.

**WHEREFORE**, the Debtor respectfully requests that the Court enter the proposed Bidding Procedures Order granting the relief requested in this Motion and such other and further relief as may be just and proper.

Dated:   December 29, 2025
       Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Andrew M. Lee*
Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
Elizabeth S. Justison (No. 5911)
S. Alexander Faris (No. 6278)
Andrew M. Lee (No. 7078)
Brynna M. Gaffney (No. 7402)
Rodney Square
1000 N. King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Emails:  mnestor@ycst.com
        kcoyle@ycst.com
        ejustison@ycst.com
        afaris@ycst.com
        alee@ycst.com
        bgaffney@ycst.com

*Proposed Counsel for the Debtor*
*and Debtor in Possession*

## **EXHIBIT A**

### **Proposed Bidding Procedures Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FOOD52, INC.,[1] | Case No. 25-12277 (___) |
| Debtor. | **Ref. Docket No. __** |

## ORDER (I) APPROVING BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF THE DEBTOR'S ASSETS; (II) APPROVING FORM AND MANNER OF NOTICE; (III) APPROVING DESIGNATION OF STALKING HORSE BIDDER AND STALKING HORSE BID; (IV) SCHEDULING AUCTION AND SALE HEARING; (V) AUTHORIZING PROCEDURES GOVERNING ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS AND UNEXPIRED LEASES; AND (VI) GRANTING RELATED RELIEF

Upon consideration of the motion (the "**Motion**")[2] of the Debtor, for the entry of an order (this "**Order**"):  (i) approving bidding procedures, substantially in the form attached as **Annex 1** hereto (the "**Bidding Procedures**"), to govern the marketing and sale of all or substantially all of the Debtor's assets (the "**Assets**"); (ii) authorizing the Debtor to schedule an auction to sell the Assets (the "**Auction**") and scheduling the hearing to approve a sale of the Assets (the "**Sale Hearing**"); (iii) approving designation of Stalking Horse Bidder and Stalking Horse Bid; (iv) approving the form and manner of notice of the proposed sale transactions, the Bidding Procedures, the Auction, the Sale Hearing, and related dates and deadlines; (v) authorizing procedures governing the assumption and assignment of certain executory contracts and unexpired leases (the "**Assumed Contracts**") to the prevailing bidder(s) acquiring the Assets

---

[1]     The Debtor in this chapter 11 case is Food52, Inc. and the last four digits of the Debtor's federal tax identification number are 2604.  For the purpose of this chapter 11 case, the Debtor's service address is 1 Dock 72 Way, 13th Floor, Brooklyn, New York 11205.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Stalking Horse Agreement and the Motion, as applicable, and to the extent of any inconsistency in the defined terms, the Stalking Horse Agreement shall govern.

(each, a "**Successful Bidder**"); and (vi) granting related relief, as more fully described in the Motion; and the Court having reviewed the Motion and the First Day Declaration; and upon consideration of the First Day Declaration and the record of this chapter 11 case; and due and proper notice of the Motion having been given; and it appearing that no other or further notice of the Motion is required except as otherwise provided herein; and it appearing that this Court has jurisdiction to consider the Motion in accordance with 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order; and it appearing that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and it appearing that venue of this proceeding and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having reviewed the Motion and having heard the statements in support of the relief requested in the Motion at a hearing before this Court, if any; and it appearing that the relief requested in the Motion and provided for herein is in the best interest of the Debtor, its estate, and its creditors; and after due deliberation and sufficient cause appearing therefore, **IT IS HEREBY FOUND AND CONCLUDED THAT**:[3]

A.      The statutory bases for the relief requested in the Motion are sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), Rules 2002, 3007, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rules 2002-1 and 6004-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware.

B.      Good and sufficient notice of the Motion was given and no further notice is required except as otherwise provided for herein.  A reasonable opportunity to object or be heard

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

regarding the relief granted by this Order has been afforded to those parties entitled to notice pursuant to Bankruptcy Rule 2002 and all other interested parties.

C.      The Debtor and its advisors, including former pre-petition advisors, engaged in a sale process before the commencement of this chapter 11 case to solicit and develop offers for the Assets.

D.      The Debtor has articulated good and sufficient reasons for the Court to grant the relief requested in the Motion regarding the sale process and Bidding Procedures, including (a) the scheduling of the Bid Deadline (as defined in the Bidding Procedures), the Auction, and the Sale Hearing with respect to the proposed sale of the Assets; (b) the establishment of procedures to fix the Proposed Cure Amounts (as defined below) to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption, assignment, and/or transfer of the Assumed Contracts; (c) designation of the Stalking Horse Bidder and Stalking Horse Bid; and (d) approval and authorization to serve the Sale Notice.

E.      The Sale Notice (in substantially the form annexed hereto as **Annex 2**), is reasonably calculated to provide all interested parties with timely and proper notice of the Bidding Procedures, the Auction, the Sale Hearing, and the Sale and any and all objection deadlines related thereto.

F.      The Cure Notice (in substantially the form annexed hereto as **Annex 3**) is reasonably calculated to provide all non-Debtor counterparties (the "**Counterparties**") to the Debtor's executory contracts and unexpired leases (each, a "**Contract**" and, collectively, the "**Contracts**") with reasonable and proper notice of the potential assumption and assignment of their Contract and any cure amounts relating thereto, although the mere listing of any Contract on the Cure Notice does not require or guarantee that such Contract will be assumed and

assigned and all rights of the Debtor and Stalking Horse Bidder with respect to such Contracts are reserved (including, but not limited to, with respect to whether any Contract constitutes an executory contract and whether any Contract shall be an Assumed Contract under the Stalking Horse Agreement.

G.      The Stalking Horse Agreement was negotiated by the Debtor, its advisors, the Stalking Horse Bidder, and its advisors, in good faith and at arms'-length.  The Stalking Horse Bid represents the highest or best offer the Debtor received during the pre-petition sale process and provides the Debtor with the opportunity to sell the Assets in a competitive auction process while continuing certain of the Debtor's operations while minimizing disruption to the Debtor's businesses, and, accordingly, will provide a clear benefit to the Debtor's estate, its creditors, and all other parties in interest. Without the Stalking Horse Bid, the Debtor would likely realize a lower price for the Assets. As such, the contributions of the Stalking Horse Bidder to the process have indisputably provided a substantial benefit to the Debtor, its estates, and creditors in this chapter 11 case.

H.      The Stalking Horse Bidder shall act as the "stalking horse bidder" pursuant to the Stalking Horse Agreement and the Stalking Horse Bid shall be subject to higher or better offers in accordance with the Bidding Procedures.  The Stalking Horse Bidder is not an "insider" or "affiliate" of the Debtor, as those terms are defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders exists between the Stalking Horse Bidder and the Debtor.  Pursuit of the Stalking Horse Bidder as a "stalking-horse" bidder and its Stalking Horse Bid as a "stalking-horse" purchase agreement is in the best interests of the Debtor and the Debtor's estate and creditors, and it reflects a sound exercise of the Debtor's business judgment.

I.      The Bidding Procedures are fair, reasonable, and appropriate under the circumstances and designed to maximize the recovery on, and realizable value of, the Assets, as determined by the Debtor's sound business judgment.  The Bidding Procedures were negotiated in good faith and at arms'-length and are reasonably designed to promote a competitive and robust bidding process to generate the greatest level of interest in the Debtor's businesses resulting in the highest or otherwise best offer.  The Bidding Procedures comply with the requirements of Local Rule 6004-1.

J.      The entry of this Order is in the best interests of the Debtor, its estates, its creditors, and other parties in interest.

**IT IS HEREBY ORDERED THAT**:

1.      The Motion is **GRANTED** as set forth herein.

### Bidding Procedures

2.      The Bidding Procedures, substantially in the form attached hereto as **Annex 1**, are hereby approved and fully incorporated herein.  The Debtor is authorized, but not directed, to take any and all actions necessary or appropriate to implement the Bidding Procedures.

3.      All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are overruled except as otherwise set forth herein.

### Stalking Horse Bid and Stalking Horse Bidder

4.      The Debtor is authorized to enter into the Stalking Horse Agreement, subject to higher or otherwise better offers, in accordance with this Order and the terms and procedures of the Bidding Procedures.

33875549.4

5.      The Stalking Horse Bidder is a Qualified Bidder and the bid reflected in the Stalking Horse Bid (including as may be increased at the Auction (if any)) is a Qualified Bid, as set forth in the Bidding Procedures.

6.      The Stalking Horse Bidder is designated as such for purposes of the Bidding Procedures.

### Notice Procedures

7.      The Sale Notice, substantially in the form attached hereto as **Annex 2**, is hereby approved and shall be filed and served not later than January 12, 2026, upon the Notice Parties identified in the Motion.  Service of the Sale Notice as described in the Motion shall be sufficient and proper notice of the Sale and sale process contemplated by this Order with respect to all known interested parties.  In addition to effectuating service upon the Notice Parties, the Debtor shall file a copy of the Sale Notice on the docket.

### Assignment Procedures

8.      The Cure Notice, substantially in the form attached hereto as **Annex 3**, is hereby approved.  The Cure Notice shall identify the Contracts of the Debtor that may be assumed and assigned in connection with the sale of the Assets and provide the corresponding cure amounts that the Debtor believe must be paid to cure all defaults under each of the Contracts as contemplated by section 365 of the Bankruptcy Code (the "**Proposed Cure Amounts**").  No later than January 12, 2026, the Debtor shall file and serve the Cure Notice at the notice address set forth in the applicable lease or contract, on all Counterparties, and their counsel of record, if known.  If at any time after the issuance of the Cure Notice but prior to the Sale Hearing it is discovered that a Contract should have been listed on the Executory Contracts Schedule but was not (any such Contract, a "**Previously Omitted Contract**"), the Debtor shall, promptly following discovery thereof (but in no event later than two (2) business days following discovery

33875549.4

thereof), file and serve a notice on the non-Debtor counterparty(ies) to such Previously Omitted

Contract at the notice address in the lease or contract, and their counsel of record, if known,

notifying such counterparties of the Debtor's intention to assume and assign such Previously

Omitted Contract to the Successful Bidder, including the Proposed Cure Amounts relating

thereto (the "**Previously Omitted Contract Notice**").

9.        No later than January 19, 2026, the Debtor shall provide the Stalking Horse

Bidder's adequate assurance information to the Counterparties, and their counsel of record, if

known, whose unexpired leases are listed on the Executory Contract Schedule.    Adequate

assurance information for other Qualified Bidders shall be provided to the Counterparties, and

their counsel of record, if known, whose unexpired leases are listed on the Cure Notice, or a

Previously Omitted Contract Notice, no later than twenty-four (24) hours after the Bid Deadline.

## Objection Procedures

10.        Notwithstanding anything to the contrary in the Motion, any objection to any

aspect of the relief requested in the Motion must:  (i) be in writing and filed with this Court;

(ii) comply with the Bankruptcy Rules; (iii) set forth the name of the objecting party, the nature

and amount of any claims or interests held or asserted against the Debtor's estate or properties,

the basis for the objection, and the specific grounds therefor; and (iv) be served upon (so as to be

received by) the following parties (collectively, the "**Objection Notice Parties**") by the

applicable deadline established in this Order:

(a)        proposed counsel for the Debtor, Young Conaway Stargatt & Taylor, LLP,
Rodney Square, 1000 North King Street, Wilmington, Delaware 19801,
Attn: Michael R. Nestor, Esq. (mnestor@ycst.com), Kara Hammond Coyle, Esq.
(kcoyle@ycst.com), Elizabeth S. Justison, Esq. (ejustison@ycst.com),
S. Alexander Faris, Esq. (afaris@ycst.com), and Andrew M. Lee, Esq.
(alee@ycst.com);

(b)    the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware, 19801, Attn: Benjamin A. Hackman, Esq. (Benjamin.A.Hackman@usdoj.gov);

(c)    counsel to the Stalking Horse Bidder and the DIP Lender, Moore & Van Allen PLLC, 100 N. Tryon Street, Suite 4700, Charlotte, North Carolina 28202, Attn: James R. Langdon, Esq. (jimlangdon@mvlaw.com) and C. Cowden W. Rayburn, Esq. (cowdenrayburn@mvlaw.com), and Chipman Brown Cicero & Cole, LLP, 1313 N. Market Street, Wilmington, Delaware 19801, Attn: William E. Chipman Jr., Esq. (chipman@chipmanbrown.com); and

(d)    counsel to any official committee of creditors.

11.    Objections, if any, to the relief requested in the Motion, other than objections made pursuant to paragraph 12, below, shall be considered at the Sale Hearing, and must be served upon (such as to be received by) the Objection Notice Parties, **on or before 4:00 p.m. (prevailing Eastern Time) on January 26, 2026 (the "Sale Objection Deadline")**; *provided, however,* that objections as to (i) adequate assurance of future performance by the Successful Bidder, other than the Stalking Horse Bidder, (ii) on the basis of the identity of the Successful Bidder, other than the Stalking Horse Bidder, or (iii) material modifications to the form of Sale Order with a Successful Bidder and to the form of asset purchase agreement with a Successful Bidder, other than the Stalking Horse Bidder, must be made by 4:00 p.m. (ET) on January 31, 2026 (the **"Buyer Specific Objection Deadline"**).  Any such objection must be filed and served on the Debtor and its counsel and the applicable Successful Bidder or Stalking Horse Bidder, as applicable, and its counsel, so as to be actually received by the Buyer Specific Objection Deadline.  Any such unresolved objections shall be heard at the Sale Hearing, unless otherwise agreed by the parties.

12.    Each Counterparty shall have until 4:00 p.m. (prevailing Eastern time) on the date that is fourteen (14) days after the filing and service by the Debtor to the Counterparty of the Cure Notice or the Previously Omitted Contract Notice (as applicable) (the "**Contract Objection**

33875549.4

**Deadline**") to object to the assumption and assignment of its Contract on any grounds, including, without limitation, (a) the amount of the Proposed Cure Amounts (and must state, in its objection, with specificity, what cure amount is required with appropriate documentation in support thereof) and (b) the provision of adequate assurance of future performance by the Stalking Horse Bidder.  Any unresolved objections shall be heard at the Sale Hearing, unless otherwise agreed by the parties; provided that the Debtor shall have the right to adjourn any Sale Hearing without the consent of any objecting party.

13.    Unless the Counterparty to any Contract timely files an objection to its Cure Amount or to the assumption and assignment of its Contract and timely serves a copy of such objection in accordance with this Order, such Counterparty shall forever be barred and estopped from objecting (a) to the Cure Amount as the amount to cure all defaults to satisfy section 365 of the Bankruptcy Code and from asserting that any additional amounts are due or defaults exist as of the Contract Objection Deadline; (b) that any conditions to assumption and assignment must be satisfied under such Contract before it can be assumed and assigned or that any required consent to assignment has not been given; or (c) that the Successful Bidder has not provided adequate assurance of future performance as contemplated by section 365 of the Bankruptcy Code.  For the avoidance of doubt, Counterparties may seek Cure Amounts with respect to defaults or any since accrued and unpaid amounts that occur between the deadline to object to Proposed Cure Amounts and the assumption of the underlying Contract, if any.

14.    The inclusion of a Contract or other agreement on the Cure Notice shall not constitute or be deemed a determination or admission by the Debtor and its estate or any other party in interest that such Contract or other agreement is, in fact, an executory contract or

unexpired lease within the meaning of the Bankruptcy Code, and any and all rights of the Debtor and its estates with respect thereto are hereby reserved.

15.     If a Counterparty does not timely object to: (a) the Proposed Cure Amount for its Contracts; (b) the ability of the Successful Bidders(s) (including the Stalking Horse Bidder or such other Successful Bidders(s)) to provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code; or (c) any other matter pertaining to assumption or assignment, then the Proposed Cure Amounts owed to such Counterparty shall be paid as soon as reasonably practicable after the effective date of the assumption and assignment of such Assumed Contract or as the Counterparty and Successful Bidder may otherwise agree.

16.     In the event of a timely filed objection by a Counterparty regarding any Cure Amount with respect to any of the Contracts, the Cure Amounts owed to such Counterparty shall be paid as soon as reasonably practicable after the later of (i) the effective date of the assumption and assignment of such Assumed Contract, and (ii) the entry of a final order that resolves the dispute and approves the assumption and assignment of such Assumed Contract.

**<u>Auction and Sale Hearing</u>**

17.     The Debtor shall file a notice identifying all Qualified Bidders (the "**Qualified Bid Notice**") within twenty-four (24) hours after the Debtor determines which Bids (if any) are Qualified Bids.  The Debtor shall serve the Qualified Bid Notice on all parties that have requested notice pursuant to Bankruptcy Rule 2002.

18.     The Debtor is authorized to conduct the Auction as set forth in the Bidding Procedures.  To the extent the Stalking Horse Bidder is the only Qualified Bid, the Debtor shall cancel the Auction and seek approval of the Stalking Horse Bid at the Sale Hearing.

19.     The Debtor is authorized to conduct the Sale without the necessity of complying with any state or local bulk transfer laws or requirements.

33875549.4

20.     Each bidder participating at the Auction shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale.

21.     No entity, other than the Stalking Horse Bidder, shall be entitled to any expense reimbursement, break-up fee, "topping," termination, contribution, or other similar fee or payment.

22.     **The Bid Deadline is January 26, 2026 at 4:00 p.m. (Prevailing Eastern Time). The Auction shall commence on January 29, 2026 at 10:00 a.m. (Prevailing Eastern Time). The Sale Hearing will be conducted on February 2, 2026 at [●] (Prevailing Eastern Time)**. The Debtor will seek the entry of an order of this Court at the Sale Hearing approving and authorizing the Sale to the Stalking Horse Bidder or, if there is an Auction, the highest or otherwise best offer(s) at the Auction, as applicable, on terms and conditions consistent with the applicable purchase agreement.  The Sale Hearing may be adjourned or rescheduled with the consent of the DIP Lender without notice to other parties other than a notice or hearing agenda filed with the Court or by an announcement of the adjourned date at the Sale Hearing.

23.     The Debtor shall file a notice identifying the Successful Bidder and the material terms of the Successful Bidder's bid within twenty-four (24) hours of the conclusion of the Auction, if any.

<u>**Approval of Bid Protections**</u>

24.     The Break-Up Fee is approved in the amount of $200,000 plus the Expense Reimbursement, and the Expense Reimbursement is approved in the amount of up to $200,000. The Break-Up Fee and Expense Reimbursement shall be paid pursuant to the terms of the Stalking Horse Agreement and will be paid prior to payment of any amounts to TCG 2.0 Food52, LLC, the Debtor's prepetition secured lender.  For the avoidance of doubt, the Stalking Horse Bidder is not entitled to the Break-Up Fee or the Expense Reimbursement if the Stalking Horse

33875549.4

Bidder is the Successful Bidder on a portion of the Assets, but not all of the Assets and the sale transaction to the Stalking Horse is actually consummated.

25.     The obligation of the Debtor to pay the Bid Protections: (i) shall be entitled to administrative expense status under sections 503(b) and 507(a)(2) of the Bankruptcy Code; *provided further* that the Bid Protections shall be payable directly out of the proceeds of, and as a precondition to an Alternative Transaction (as defined in the Stalking Horse Agreement); (ii) shall survive the termination of the Stalking Horse Agreement; and (iii) shall be payable in accordance with the terms set forth in the Stalking Horse Agreement, as modified herein.

26.     The Debtor's obligations under this Order, the provisions of this Order and the portions of the Stalking Horse Agreement pertaining to the Bidding Procedures, including Bid Protections, shall survive conversion of this chapter 11 case to a case under chapter 7 of the Bankruptcy Code, confirmation of any plan of reorganization or liquidation, or discharge of claims thereunder and shall be binding upon the Debtor, any chapter 7 trustee, the reorganized or reconstituted debtors, as the case may be, after the effective date of a confirmed plan or plans in the Debtor's case (including any order entered after any conversion of the Debtor's case to a case under chapter 7 of the Bankruptcy Code).

## Miscellaneous Provisions

27.     The DIP Lender is allowed, but not required, to credit bid, pursuant to section 363(k) of the Bankruptcy Code, with respect to any assets on which they hold liens, up to the full amount of its secured debt at any Auction.  Nothing herein shall prejudice or impair the right of DIP Lender to increase the amount of its credit bid and the DIP Lender's rights under section 363(k) of the Bankruptcy Code are expressly reserved.

28.     Notice of the Motion as provided therein shall be deemed good and sufficient notice, and the requirements of Bankruptcy Rule 6004(a) are satisfied by such notice or otherwise deemed waived.

29.     Notwithstanding Bankruptcy Rule 6004(h), 6006(d), 7062, 9014, or any other provisions of the Bankruptcy Rules of the Local Rules stating the contrary, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

30.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

31.     The Debtor is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

32.     Attached hereto as **Schedule A** is a summary of the key dates established by this Order.

33.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

33875549.4

**SCHEDULE A**

| Event | Date |
|---|---|
| Hearing to Consider Approval of Bidding Procedures | **January 9, 2026 at [●] (ET)** |
| Service of Sale Notice and Cure Notice | **January 12, 2026** |
| Service of Stalking Horse Bidder's Adequate Assurance Information | **January 19, 2026** |
| Deadline to File Form of Sale Order | **January 19, 2026 or one week prior to the Sale Objection Deadline** |
| Contract Objection Deadline | **January 26, 2026 at 4:00 p.m. (ET); Fourteen (14) days after service of a Cure Notice for Previously Omitted Contracts** |
| Sale Objection Deadline | **January 26, 2026 at 4:00 p.m. (ET)** |
| Bid Deadline | **January 26, 2026 at 4:00 p.m. (ET)** |
| Service of Qualified Bidder's, Other than the Stalking Horse Bidder's, Adequate Assurance Information | **Within 24 Hours of Bid Deadline** |
| Auction (if applicable) | **January 29, 2026 at 10:00 a.m. (ET)** |
| Deadline to file Notice of Successful Bidder | **Within twenty-four (24) hours of the conclusion of the Auction (if applicable)** |
| Buyer Specific Objection Deadline | **January 31, 2026 at 4:00 p.m. (ET)** |
| Sale Hearing | **February 2, 2026 at [●] (ET)** |

**<u>Annex 1</u>**

**Bidding Procedures**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FOOD52, INC.,[1] | Case No. 25-12277 (___) |
| Debtor. | |

## BIDDING PROCEDURES FOR THE SALE OF THE DEBTOR'S ASSETS

On [●], the United States Bankruptcy Court for the District of Delaware (the "**Court**") entered the *Order (I) Approving Bidding Procedures in Connection with Sale of the Debtor's Assets; (II) Approving Form and Manner of Notice; (III) Scheduling Auction and Sale Hearing; (IV) Authorizing Procedures Governing Assumption and Assignment of Certain Contracts and Unexpired Leases; and (V) Granting Related Relief* [Docket No. [●]] (the "**Bidding Procedures Order**"),[2] by which the Court approved the following procedures (these "**Bidding Procedures**"). These Bidding Procedures set forth the process by which the Debtor is authorized to conduct an auction (the "**Auction**") for the sale (the "**Sale**") of substantially all of the Debtor's assets (collectively, the "**Assets**").

Subject to the terms of these Bidding Procedures, interested parties may bid on the Assets (i) in individual lots, (ii) as a collective whole, or (iii) in any combination.

I.     **Submissions to the Debtor.**

All submissions to the Debtor required to be made under these Bidding Procedures must be directed to each of the following persons unless otherwise provided (collectively, the "**Notice Parties**"):

A.     **Debtor's Chief Executive Officer.**  Food52, Inc., 1 Dock 72 Way, 13th Floor, Brooklyn, New York 11205, Attn:  Erika Ayers Badan (erika@food52.com).

B.     **Debtor's Proposed Counsel.**  Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, Delaware 19801, Attn: Michael R. Nestor, Esq. (mnestor@ycst.com), Kara Hammond Coyle, Esq. (kcoyle@ycst.com), Elizabeth S. Justison, Esq. (ejustison@ycst.com), S. Alexander Faris, Esq. (afaris@ycst.com), and Andrew M. Lee, Esq. (alee@ycst.com).

---

[1]    The Debtor in this chapter 11 case is Food52, Inc. and the last four digits of the Debtor's federal tax identification number are 2604.  For the purpose of this chapter 11 case, the Debtor's service address is 1 Dock 72 Way, 13th Floor, Brooklyn, New York 11205.

[2]    All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order.

C. **Debtor's Proposed Investment Banker.** Core Advisors, LLC, 48 Bank Street, New York, New York 10014, Attn: Blake Saunders (bsaunders@coreadvs.com), Sam McCartney (smccartney@coreadvs.com), and Yiting Sun (ysun@coreadvs.com).

D. **Counsel for the DIP Lender.** Moore & Van Allen PLLC, 100 N. Tryon Street, Suite 4700, Charlotte, North Carolina 28202, Attn: James R. Langdon, Esq. (jimlangdon@mvlaw.com) and C. Cowden W. Rayburn, Esq. (cowdenrayburn@mvlaw.com), and Chipman Brown Cicero & Cole, LLP, 1313 N. Market Street, Wilmington, Delaware 19801, Attn: William E. Chipman Jr., Esq. (chipman@chipmanbrown.com).

## II. Potential Bidders.

To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity (other than the Stalking Horse Bidder) interested in consummating a Sale (a "**Potential Bidder**") must deliver or have previously delivered:

(i) an executed confidentiality agreement on terms acceptable to the Debtor (a "**Confidentiality Agreement**"), to the extent not already executed; and

(ii) information demonstrating (in the Debtor's reasonable business judgment) that the Potential Bidder has the financial capability to consummate the applicable Sale, including, but not limited to, the most current audited and latest unaudited financial statements (the "**Financials**") of the Potential Bidder (or such other form of financial disclosure acceptable to the Debtor in its discretion) (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtor, in consultation with (a) the legal and financial advisors for the Committee, if any, and (b), solely to the extent they are not an active or prospective bidder with respect to the relevant Assets, or are participating in any way in any active or prospective bid with respect to such relevant Assets, the legal advisors for The Chernin Group (the "**Consultation Parties**").

To the extent any of the Consultation Parties are or become potential bidders, such Consultation Party shall immediately cease being a Consultation Party and, in the case of the Committee, shall immediately be walled off from any discussions with the Committee's advisors in their capacity as Consultation Parties, until such time as their bid may be withdrawn.

## III. Stalking Horse Bidder.

The Debtor has entered into (as more fully described in the Stalking Horse Agreement) a purchase agreement (the "**Stalking Horse Agreement**") with F52, LLC, the entity currently identified to make the Stalking Horse Bid (the "**Stalking Horse Bidder**") for certain of the Assets, as set forth in the Stalking Horse Agreement. The Stalking Horse Bidder is deemed a Qualified

Bidder without needing to comply with any of the requirements set forth in these Bidding Procedures.

## IV.    Qualified Bidders.

(a)    A "**Qualified Bidder**" is a Potential Bidder whose Financials, or the Financials of its equity holder(s), as applicable, demonstrate the financial capability to consummate the applicable Sale and whose Bid is a Qualified Bid (as defined below), that the Debtor, in consultation with the Consultation Parties, determine should be considered a Qualified Bidder. Prior to the commencement of the Auction, the Debtor's advisors will (i) notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder and (ii) provide to the Qualified Bidders for such Assets copies of all Qualified Bids with respect to such Assets. The Stalking Horse Bidder shall be deemed a Qualified Bidder at all times and for all purposes with respect to the Assets to which its Bid (the "**Stalking Horse Bid**") relates, and notwithstanding anything in these Bidding Procedures, the Stalking Horse Bid shall be deemed a Qualified Bid for all purposes and the Stalking Horse Bidder shall be included in the use of the term "Qualified Bidder".

(b)    The Debtor shall provide regular updates to the Consultation Parties on Potential Bidders and shall specifically identify any Potential Bidder who did not qualify to be a Qualified Bidder and the Debtor's basis for such determination. If any Potential Bidder is determined by the Debtor, in consultation with Consultation Parties, not to be a Qualified Bidder, the Debtor will refund such Qualified Bidder's Deposit and all accumulated interest thereon promptly after the Bid Deadline.

(c)    Between the date that the Debtor notifies a Potential Bidder that it is a Qualified Bidder and the Auction, the Debtor may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. Except as otherwise set forth in the Stalking Horse Agreement, without the written consent of the Debtor, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided that* any Qualified Bid may be improved at the Auction as set forth herein. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

## V.    Due Diligence.

Potential Bidders shall be eligible to receive due diligence information and access to the Debtor's electronic data room (the "**Data Room**") and to additional non-public information regarding the Debtor. In addition, the Debtor will provide to Potential Bidders reasonable due diligence information, as requested by such Potential Bidders in writing, as soon as reasonably practicable after such request, and the Debtor shall post to the Data Room all written due diligence provided to any Potential Bidder. For all Potential Bidders other than the Stalking Horse Bidder, the due diligence period will end on the Bid Deadline, and subsequent to the expiration of the due diligence period, the Debtor shall have no obligation to furnish any due diligence information. The Stalking Horse Bidder's due diligence period with respect to its Stalking Horse Bid has expired or will expire in accordance with the Stalking Horse Agreement; *provided, however*, that the Stalking

Horse Bidder shall retain access to the Data Room and shall receive all other due diligence information provided to any Potential Bidders on the same terms and timing that such Data Room access and due diligence information are made available to other Potential Bidders.

The Debtor shall not furnish any confidential information relating to the Assets, liabilities of the Debtor, or a Sale to any person except to the Stalking Horse Bidder, a Potential Bidder or to such Potential Bidder's duly authorized representatives to the extent expressly permitted by the applicable Confidentiality Agreement.  The Debtor and its advisors shall coordinate all reasonable requests from Potential Bidders for additional information and due diligence access; *provided that*, the Debtor may decline to provide such information to Potential Bidders who, at such time and in the Debtor's reasonable business judgment after consultation with the Consultation Parties, have not established, or who have raised doubt, that such Potential Bidder intends in good faith to, or has the capacity to, consummate the applicable Sale.

The Debtor also reserves the right, subject to the terms of the Stalking Horse Agreement and after consultation with the Consultation Parties, to withhold any diligence materials that the Debtor determine are sensitive after notifying the Potential Bidder requesting such materials of such determination.  Neither the Debtor nor its representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Potential Bidder in accordance with these Bidding Procedures.

**ALL DUE DILIGENCE REQUESTS MUST BE DIRECTED TO CORE ADVISORS, LLC**

A.     **Communications with Potential Bidders.**

Notwithstanding anything to the contrary in these Bidding Procedures, all direct communications between and amongst Potential Bidders regarding the Debtor or its Assets shall involve the Debtor and the Debtor's advisors.  No Potential Bidder shall communicate with any other Potential Bidder absent prior written consent from the Debtor.

B.     **Due Diligence from Potential Bidders.**

Each Potential Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtor or its advisors regarding the ability of the Potential Bidder to consummate the applicable Sale.  Failure by a Potential Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtor to determine, in consultation with the Consultation Parties, that such bidder is no longer a Potential Bidder or that a bid made by such Potential Bidder is not a Qualified Bid.

The Debtor and each of its respective advisors and representatives shall be obligated to maintain in confidence any such confidential information in accordance with any applicable confidentiality agreement, except as otherwise set forth in these Bidding Procedures or with the prior written consent of such bidder.  Each recipient of confidential information agrees to use, and to instruct their advisors and representatives to use, such confidential information only in connection with the evaluation of Bids during the bidding process or in accordance with the terms of any applicable confidentiality agreement.

## VI.    Bid Requirements.

A proposal, solicitation, or offer (each, a "**Bid**") by a Qualified Bidder that is submitted in writing and satisfies each of the following requirements as determined by the Debtor, in consultation with the Consultation Parties, shall constitute a "**Qualified Bid**").  The Stalking Horse Bid will be deemed a Qualified Bid for all purposes without any further action required by the Stalking Horse Bidder.

(a)    **Identification of Bidder.**  Each Bid must fully disclose the following: (i) the legal identity of each person or entity bidding for the Assets and/or otherwise sponsoring, financing (including through the issuance of debt in connection with such Bid) or participating in (including through license or similar arrangement with respect to the Assets to be acquired in connection with such Bid) the Auction in connection with such Bid and the complete terms of any such participation; and (ii) any past or present connections or agreements with the Debtor, any Stalking Horse Bidder, any other known Potential Bidder or Qualified Bidder, or any officer or director of any of the foregoing (including any current or former officer or director of the Debtor).

(b)    **Assets.**  Each Bid must clearly state which Assets (including any executory contracts and unexpired leases) and liabilities of the Debtor the Qualified Bidders are agreeing to purchase and assume.  For the avoidance of doubt, a Bid may be on the Assets in either (i) individual lots, (ii) as a collective whole, or (iii) in any combination.

(c)    **Purchase Price.**  Each Bid must clearly set forth the cash purchase price to be paid for the applicable Asset Category (the "**Purchase Price**"), *provided*, *however,* that the Stalking Horse Bidder shall be entitled to credit bid any portion of their outstanding secured obligations consistent with section 363(k) of the Bankruptcy Code with respect to any assets on which they hold liens in accordance with the final order approving the Debtor's post-petition financing.  Each Bid must also specify how the Purchase Price is allocated among the Assets.

(d)    **Minimum Bid.**  The Minimum Bid for the Assets subject to the Stalking Horse Bid is $7,150,000 equal to the Stalking Horse Bid amount of $6,500,000, plus the Minimum Overbid Increment of $650,000.

(e)    **Deposit.**  Each Bid, other than the Stalking Horse Bid, must be accompanied by a cash deposit in the amount equal to 10% of the Purchase Price of the Bid, to be held in a segregated account to be identified and established by the Debtor (the "**Deposit**").  The Debtor reserves the right to increase the Deposit requirement.

(f)    **Assumption of Obligations.**  Each Bid must identify the obligations contemplated to be assumed by such Bid and be on terms in the aggregate (together with the other consideration contemplated in such Bid) no less favorable to the Debtor than the Stalking Horse Agreement (if any), as determined in the Debtor's business judgment, and after consultation with the Consultation Parties.  Other than the obligations to be assumed, the Assets shall be sold free and clear of all liens, claims, interests, and encumbrances (collectively, the "**Encumbrances**"), and any Encumbrances shall attach to the net proceeds of the Sales.

(g)    **The Same or Better Terms.**  In addition to meeting or exceeding the applicable Minimum Bid, each Bid must be on terms that are no less favorable in the aggregate (together with

the other consideration contemplated in such Bid), in the Debtor's business judgment and after consultation with the Consultation Parties, than the terms of the Stalking Horse Agreement. Each Bid must include duly executed, non-contingent purchase agreement and other transaction documents necessary to effectuate the transactions contemplated in the Bid and shall include a schedule of assumed contracts to the extent applicable to the Bid. Each Bid should be based on the form of the Stalking Horse Agreement, which is available in Word format in the Data Room, and must include a copy of the Stalking Horse Agreement clearly marked to show all changes requested by the Qualified Bidder, including those relating to the respective Purchase Price and assets to be acquired by such Qualified Bidder, as well as all other material documents integral to such bid, including a form of sale order marked against the applicable sale order (collectively, the "**Qualified Bid Documents**").

(h)     **Committed Financing / Adequate Assurance Information.** To the extent that a Bid is not accompanied by evidence of the Qualified Bidder's capacity to consummate the Sale set forth in its Bid with cash on hand, each Bid must include committed financing documents to the satisfaction of the Debtor (in consultation with the Consultation Parties) that demonstrate that the Qualified Bidder has: (i) received sufficient debt and/or equity funding commitments to satisfy the Qualified Bidder's Purchase Price and other obligations under its Bid; and (ii) adequate working capital financing or resources to finance going concern operations for the Assets and the proposed transactions. Such funding commitments or other financing must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have only those covenants and conditions acceptable to the Debtor, in consultation with the Consultation Parties. In addition to evidence of financial wherewithal to timely consummate the transaction, a Bid must include adequate assurance information with respect to any executory contracts or unexpired leases included or that may be included in the Bid in a form that allows the Debtor to serve such information on any counterparties to any contracts or leases being assumed and assigned in connection with the Sale. Each Bid must be accompanied by adequate assurance of future performance under all Assumed Contracts, which may include any or all of the following: audited and unaudited financial statements for the past three (3) years, including all supplements or amendments thereto; tax returns; bank account statements; and a description of the business to be conducted at the premises; the specific name of the proposed assignee/tenant, if different from the prospective purchaser, and the proposed name under which the assignee intends to operate the store if not a current trade-name of the Debtor; the potential assignee's intended use for the space if different from the present retail operation; cash flow projections for the proposed assignee; the proposed assignee's most recent business plan; all cash flow projections for the lease(s) subject to the assignment request, and any financial projections, calculations and/or pro-formas prepared in contemplation of purchasing the lease(s); all documents and other evidence of the potential assignee's retail experience and experience operating stores in a shopping center; a contact person for the proposed assignee that Landlords may directly contact in connection with the adequate assurance of future performance; and/or such other documentation as the Debtor may request. Should the prospective bidder be a newly formed entity ("**Newco**"), written evidence of adequate assurance of future performance should also include when such Newco was formed, how it will be financed, together with evidence of any financial commitments, and identify what credit enhancements, if any, will be available to guarantee or secure the obligations under the leases.

(i)     **Contingencies; No Financing or Diligence Outs.** A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or

review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions, which shall not be more burdensome, in the Debtor's business judgment, and after consultation with the Consultation Parties, than those set forth in the Stalking Horse Agreement (if any).

(j)     **Demonstrated Financial Capacity.**     A Qualified Bidder must have, in the Debtor's business judgment (in consultation with the Consultation Parties) the necessary financial capacity to consummate the proposed transactions required by its Bid (including, if necessary, to obtain transfer of any of the Debtor's licenses, permits, and to obtain any necessary surety bonds or other financial assurances) and provide adequate assurance of future performance under all contracts proposed to be assumed by such Bid.

(k)     **Time Frame for Closing.**     Closing of the Sale as to any Asset related to a Bid by a Qualified Bidder (a "**Closing**") must be reasonably likely (based on availability of financing, antitrust, or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, on or before February 6, 2026.

(l)     **Binding and Irrevocable.**     Except as provided herein, a Qualified Bidder's Bid for the Assets shall be irrevocable unless and until the Debtor (in consultation with the Consultation Parties) accept a higher Bid for such Assets and such Qualified Bidder is not selected as the Backup Bidder for such Assets.   If selected as Backup Bidder, such Bid shall be irrevocable until the Closing of a Successful Bid for such Assets.

(m)     **Expenses; Disclaimer of Fees**.     Each Bid, other than the Stalking Horse Bid, must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation.   For the avoidance of doubt, no Qualified Bidder, except the Stalking Horse Bidder, will be permitted to request, nor be granted by the Debtor, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

(n)     **Authorization.**     Each Bid must contain evidence that the Qualified Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtor) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

(o)     **As-Is, Where-Is.**     Each Bid must include a written acknowledgement and representation that the Qualified Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidder's Bid or accompanying asset purchase agreement.

(p)    **Adherence to Bid Procedures.**  By submitting its Bid, each Qualified Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

(q)    **Regulatory Approvals and Covenants.**  A Bid must set forth each regulatory and third-party approval required for the Qualified Bidder to consummate the applicable Sale, if any, and the time period within which the Qualified Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to be completed prior to February 6, 2026 and any undertakings that will be required by the Debtor in connection with such regulatory and third party approvals.  For the avoidance of doubt, each Bidder must acknowledge that consummation of such Bidders' Bid shall not be contingent on obtaining government, regulatory, or other third-party approvals.

(r)    **Consent to Jurisdiction.**  The Qualified Bidder must submit to the jurisdiction of and entry of final orders by the Court and waive any right to a jury trial in connection with any disputes relating to Debtor's qualification of bids, the Auction, the construction and enforcement of these Bidding Procedures, the transaction documents related to the Sale, and the Closing, as applicable.

(s)    **Bid Deadline.**  Each Bid must be transmitted via email (in .pdf or similar format) so as to be <u>actually received</u> on or before January 26, 2026 at 4:00 p.m. (prevailing Eastern Time) (the "**Bid Deadline**") by the Notice Parties.

## VII.    Auction.

If the Debtor receives a Qualified Bid for the Assets, in addition to the Stalking Horse Bid for such Assets, if any, the Debtor will conduct the Auction to determine the Successful Bidder with respect to such Assets.  If the Debtor does not receive a Qualified Bid for the Assets (other than the Stalking Horse Bid for such Assets), the Debtor will not conduct the Auction as to such Assets and shall designate the Stalking Horse Bidder's Bid for such Assets as the Successful Bid for such Assets and shall seek approval of the Stalking Horse Bid at the Sale Hearing.

Prior to the commencement of the Auction, the Debtor will notify each Qualified Bidder of the highest or otherwise best Qualified Bid for the Assets for which such Qualified Bidder submitted a Bid, as determined in the Debtor's reasonable business judgment, in consultation with the Consultation Parties (the "**Baseline Bid**"), and provide copies of the applicable Qualified Bid Documents supporting the applicable Baseline Bid to each Qualified Bidder.  The Debtor shall consult with the Consultation Parties as to how the Debtor is valuing the Bids made by Qualified Bidders during the Auction.

The Auction shall take place at the offices of Young Conaway Stargatt & Taylor, LLP on January 29, 2026 at 10:00 a.m. (prevailing Eastern Time), or such later date and time as selected by the Debtor and acceptable to the DIP Lender.  For the avoidance of doubt, the Stalking Horse Bidder is deemed to have participated in the Auction for all purposes, whether or not the Stalking Horse Bidder makes a bid at the Auction.

The Debtor will file a notice of any change to the time or location of the Auction and will serve such notice on all bidders and all parties requesting service under Bankruptcy Rule 2002 at

least twenty-four (24) hours prior to the Auction or as soon as the Debtor become aware of such change.

The Auction shall be conducted in a timely fashion according to the following procedures:

### A.    The Debtor Shall Conduct the Auction.

The Debtor and its advisors shall direct and preside over the Auction.  At the start of the Auction, the Debtor shall describe the terms of the Baseline Bid for the Assets.  All incremental Bids made thereafter shall be Overbids (defined below) for such Assets and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders who submitted Bids on such Assets.  The Debtor shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid, all applicable Overbids, and the Successful Bid.

Only the Debtor, the Qualified Bidders, the DIP Lender, members of any appointed official committee of creditors, and each such parties' respective legal and financial advisors, shall be entitled to attend the Auction, along with any other creditor, and any other party the Debtor deem appropriate; *provided, however,* that any party other than the Qualified Bidders, the DIP Lender, members of any appointed official committee of creditors, and each such parties' respective legal and financial advisors shall be required to provide notice to the Debtor at least two (2) days prior to the auction by sending an email to Beth Olivere, paralegal for counsel to the Debtor, at bolivere@ycst.com; the Debtor will provide copies of any such notices to the Qualified Bidders, the DIP Lender, members of any appointed official committee of creditors, and each such parties' respective legal and financial advisors within one (1) day of receipt.  The Qualified Bidders shall appear at the Auction in person and may speak or bid themselves or through duly authorized representatives.  Only Qualified Bidders shall be entitled to bid at the Auction.

### B.    Terms of Overbids.

"**Overbid**" means any bid made at the Auction by a Qualified Bidder subsequent to the Debtor's announcement of the Baseline Bid and accepted by the Debtor, in consultation with the Consultation Parties, as a higher or otherwise better bid.  Each applicable Overbid must comply with the following conditions:

> (i)    **Minimum Overbid Increment.**  The initial Overbid for the Assets subject to the Stalking Horse Bid, if any, shall provide for total consideration to the Debtor with a value that exceeds the value of the consideration under the Minimum Bid for the subject Assets by an incremental amount that is not less than $250,000 in cash or credit bid (the "**Minimum Overbid Increment**").  Except as may be otherwise provided in the Stalking Horse Agreement, the Debtor reserves the right, after consultation with the Consultation Parties, to announce reductions or increases in the Minimum Overbid Increment for the Assets at any time during the Auction.

> (ii)    **Conclusion of Each Overbid Round.**  Upon the solicitation of each round of applicable Overbids, the Debtor may announce a deadline by which time any Overbids must be submitted to the Debtor.

(iii)  **Overbid Alterations.**  An applicable Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable in the aggregate to the Debtor's estate than any prior Bid or Overbid, as determined in the Debtor's reasonable business judgment, but shall otherwise comply with the terms of these Bidding Procedures.

## C.    Closing the Auction.

(i)  The Auction shall continue until there is only one Bid for the Assets that the Debtor determine, in its reasonable business judgment, in consultation with the Consultation Parties, to be the highest or otherwise best Bid for such Assets.  Such Bid shall be declared the "**Successful Bid**," for such Assets and such Qualified Bidder, the "**Successful Bidder**" for such Assets at which point the Auction will be closed as to such Assets.  Such acceptance by the Debtor of the Successful Bid is conditioned upon approval by the Court of the Successful Bid.

(ii)  The Debtor shall have no obligation to consider any Bids or Overbids submitted after the conclusion of the Auction, and any such Bids or Overbids shall be deemed untimely and shall not constitute a Qualified Bid.

(iii)  Within twenty-four (24) hours after closing the Auction, the Debtor shall cause the Qualified Bid Documents for each Successful Bid and Backup Bid to be filed with the Court.

## D.    No Collusion; Good-Faith *Bona Fide* Offer.

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that: (i) it has not engaged in any collusion with respect to the bidding, and (ii) its Bid is a good-faith *bona fide* offer and it intends to consummate the proposed transaction on the terms of its Qualified Bid if selected as the Successful Bidder.

## VIII.  Backup Bidder.

(a)  Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted for the Assets, the Qualified Bidder with the next-highest or otherwise second-best Bid at the Auction for such Assets, as determined by the Debtor in the exercise of its reasonable business judgment, and in consultation with the Consultation Parties (the "**Backup Bid**"), shall be required to serve as a backup bidder (the "**Backup Bidder**") for such Assets, and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtor.

(b)  The identity of the Backup Bidder and the amount and material terms of the Backup Bid shall be announced by the Debtor at the conclusion of the Auction at the same time the Debtor announces the identity of the

Successful Bidder. The Backup Bidder shall be required to keep its Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable until the closing of the transaction with the applicable Successful Bidder or as otherwise provided in the Stalking Horse Agreement. The Backup Bidder's Deposit shall be held in escrow until the closing of the transaction with the applicable Successful Bidder or as otherwise provided in the Stalking Horse Agreement.

(c)     If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtor, in consultation with the Consultation Parties, may select the applicable Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes. The Debtor shall (1) provide written notice to the Backup Bidder and file and serve a notice disclosing the Debtor's intent to proceed with the Backup Bidder (the "**Notice of Backup Bidder**"), which shall establish a seven (7) day period for Counterparties to executory contracts or unexpired leases to object to assumption and assignment of the Assumed Contracts to the Backup Bidder, and (2) to the extent any responses to the Notice of Backup Bidder are received, schedule a telephonic status conference, which may be expedited, upon reasonable notice under the circumstances, at which time a hearing will be held with respect to any unresolved responses. To the extent no responses are received, the Debtor may submit a form of sale order approving the sale to the Backup Bidder under certification of counsel. The defaulting Successful Bidder's Deposit shall be forfeited to the Debtor, and the Debtor specifically reserves the right to seek all remedies available against the defaulting Successful Bidder, including specific performance, if applicable, unless otherwise provided in the Stalking Horse Agreement should the Stalking Horse Bidder be the Successful Bidder. For the avoidance of doubt, if the Deposit becomes property of the Debtor's estate, the Deposit shall be subject to the liens and super-priority claims granted in favor of the DIP Lender under the interim authorizing the Debtor to obtain post-petition financing and related relief and the final order thereon.

## IX.    Reservation of Rights.

The Debtor reserves its right to modify these Bidding Procedures in its reasonable business judgment, in a manner acceptable to the DIP Lender, and in consultation with the Consultation Parties, at or prior to the Auction, with respect to: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) cancelling the Auction; and (e) rejecting any or all bids or Bids; *provided, however*, that nothing in this Section shall limit any rights or remedies of the Stalking Horse Bidder under the Stalking Horse Agreement with respect to material modifications to these Bidding Procedures, the Bidding Procedures Order or the agreed form of sale order; *provided further* that any modification of these Bidding Procedures shall not be inconsistent with the Stalking Horse Agreement, the Bidding Procedures Order, or any other

order of the Bankruptcy Court entered in the Debtor's chapter 11 case, and shall be disclosed to each Qualified Bidder at the Auction.

## X.        Sale Hearing.

A hearing to consider approval of the Sale of the Assets to the Successful Bidders (or to approve the Stalking Horse Agreement, as applicable, if no Auction is held) (the "**Sale Hearing**") is currently scheduled to take place at __:00 __.m. (prevailing Eastern time) on February [2], 2026 before the Honorable [●] in the United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, [●] Floor, Courtroom No. [●], Wilmington, Delaware 19801.

**THE SALE HEARING MAY BE CONTINUED TO A LATER DATE BY THE DEBTOR, WITH THE CONSENT OF THE DIP LENDER, BY FILING A HEARING AGENDA AND/OR SENDING NOTICE PRIOR TO, OR MAKING AN ANNOUNCEMENT AT, THE SALE HEARING.  NO FURTHER NOTICE OF ANY SUCH CONTINUANCE WILL BE REQUIRED TO BE PROVIDED TO ANY PARTY (EXCLUDING THE STALKING HORSE BIDDER).**

At the Sale Hearing, the Debtor shall present the Successful Bids to the Court for approval.

## XI.       Return of Deposit; Remedies.

The Deposit of the Successful Bidder shall be applied to the respective Purchase Price of such transaction at closing.  The Deposits for each Qualified Bidder shall be held in one or more interest-bearing escrow accounts on terms acceptable to the Debtor (in consultation with the Consultation Parties) and shall be returned (other than with respect to the Successful Bidder, and the Backup Bidder) on or within five (5) business days after the Auction, including the Deposit of the Stalking Horse Bidder if it is not the Successful Bidder or Backup Bidder.  Upon the return of the Deposits, their respective owners shall receive any and all interest that will have accrued thereon.

If a Successful Bidder fails to consummate a proposed transaction because of a breach by such Successful Bidder, and except as otherwise provided in the Stalking Horse Agreement, the Debtor will not have any obligation to return the Deposit deposited by such Successful Bidder, which may be retained by the Debtor as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtor (except, in the case of a Stalking Horse Bidder, as otherwise provided in the Stalking Horse Agreement), and the Debtor shall be free to consummate the proposed transaction with the applicable Backup Bidder without the need for an additional hearing or order of the Court, *provided* that nothing herein shall prohibit any party from seeking an additional hearing or order of the Court.

## XII.      Fiduciary Out.

Nothing in these Bidding Procedures shall require the board of directors, board of managers, or similar governing body of the Debtor to take any action, or to refrain from taking any action, with respect to these Bidding Procedures, to the extent such board of directors, board of managers, or such similar governing body determines, or based on the advice of counsel, that

taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law.

## XIII.    Contract Procedures.

By no later than January 12, 2026, the Debtor shall file and serve on all counterparties (the "**Counterparties**") to their executory contracts and unexpired leases (the "**Contracts**") a notice (the "**Cure Notice**") of (a) the potential assumption by the Debtor and assignment to the Successful Bidder(s) of the Contracts, and (b) the proposed amount necessary, under section 365(b)(1) of the Bankruptcy Code, to cure any outstanding monetary defaults and compensate the Counterparties for any pecuniary losses in connection with such assumption and assignment (the "**Proposed Cure Amounts**"), which shall be included on a schedule attached to the Cure Notice (the "**Executory Contracts Schedule**").

If at any time after the issuance of the Cure Notice but prior to the Sale Hearing it is discovered that a Contract should have been listed on the Executory Contracts Schedule but was not (any such Contract, a "**Previously Omitted Contract**"), the Debtor shall, promptly following discovery thereof (but in no event later than two (2) business days following discovery thereof), file and serve a notice on the non-Debtor counterparty(ies) to such Previously Omitted Contract notifying such counterparties of the Debtor's intention to assume and assign such Previously Omitted Contract to the Successful Bidder, including the Proposed Cure Amounts relating thereto (the "**Previously Omitted Contract Notice**").

No later than January 19, 2026, the Debtor shall provide the Stalking Horse Bidder's adequate assurance information to the Counterparties, and their counsel of record, if known, whose unexpired leases are listed on the Executory Contract Schedule or Previously Omitted Contract Notice.  Adequate assurance information for other Qualified Bidders shall be provided to the Counterparties whose unexpired leases are listed on the Cure Notice, or a Previously Omitted Contract Notice, no later than twenty-four (24) hours after the Bid Deadline.

Each Counterparty shall have until 4:00 p.m. (prevailing Eastern time) on the date that is fourteen (14) days after the filing and service by the Debtor to the Counterparty of the Cure Notice or the Previously Omitted Contract Notice (as applicable) to object to the assumption and assignment of its Contract on any grounds, including, without limitation, (a) the amount of the Proposed Cure Amounts (and must state, in its objection, with specificity, what cure amount is required with appropriate documentation in support thereof) and (b) the provision of adequate assurance of future performance by the Stalking Horse Bidder.  Any unresolved objections shall be heard at the Sale Hearing, unless otherwise agreed by the parties; *provided* that the Debtor shall have the right to adjourn any Sale Hearing without the consent of any objecting party.  If any objections to the amount of Proposed Cure Amounts remain unresolved as of the date of the Closing of the Sale of any Assets, the Debtor may (but are not required to) deposit the disputed amount of Proposed Cure Amounts relating to such Asset(s) in a segregated account to hold pending resolution of such objections.  The Debtor's proposed investment banker, Core Advisors, LLC, shall facilitate communications between Qualified Bidders and the Counterparties in connection with such Qualified Bidder's Bid, the Proposed Cure Amounts, and the terms of assumption and assignment of the Contracts.

Each Counterparty may raise objections as to adequate assurance of future performance by, or on the basis of the identity of, the Successful Bidder, other than the Stalking Horse Bidder, until January 31, 2026 at 4:00 p.m. (ET) (the "**Buyer Specific Objection Deadline**").  Any such objection must be filed and served on the Debtor and its counsel, the Committee and its counsel, and the applicable Successful Bidder or Stalking Horse Bidder (if any), as applicable, and its counsel, so as to be actually received by the Buyer Specific Objection Deadline.  Any such unresolved objections shall be heard at the Sale Hearing, unless otherwise agreed by the parties.

*[Remainder of Page Intentionally Left Blank]*

33875550.5

14

**<u>Annex 2</u>**

**Sale Notice**

33875549.4

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FOOD52, INC.,[1] | Case No. 25-12277 (___) |
| Debtor. | |

## NOTICE OF SALE, BIDDING PROCEDURES,
## AUCTION, SALE HEARING, AND OBJECTION DEADLINE

**PLEASE TAKE NOTICE THAT**, on December [●], 2025, the above-captioned debtor and debtor in possession (the "**Debtor**") filed with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") its motion (the "**Motion**")[2] for entry of (i) an order (a) approving bidding procedures, substantially in the form attached as <u>Annex 1</u> to the Bidding Procedures Order (the "**Bidding Procedures**"), to govern the marketing and sale of all or substantially all of the Debtor's assets (the "**Assets**"), (b) authorizing the Debtor to schedule an auction to sell the Assets (the "**Auction**"), (c) scheduling the hearing to approve a sale of the Assets (the "**Sale Hearing**"), (d) designating the Stalking Horse Bidder and Stalking Horse Bid, (e) approving the form and manner of notice of the proposed sale transactions, the Bidding Procedures, the Auction, the Sale Hearing, and related dates and deadlines, and (f) authorizing procedures governing the assumption and assignment of certain executory contracts and unexpired leases (the "**Assumed Contracts**") to the prevailing bidder(s) acquiring the Assets (each, a "**Successful Bidder**"); and (ii) one or more orders (collectively, the "**Sale Order**") (a) approving the applicable form(s) of purchase agreement between the Debtor and the Stalking Horse Bidder (as defined below) or any other Successful Bidder(s), and (b) authorizing the sale(s) (collectively, the "**Sale**") of the Assets and the assumption and assignment of the Assumed Contracts to the Stalking Horse Bidder or such other Successful Bidder free and clear of all liens, claims, encumbrances, and other interests (collectively, "**Liens**"), other than any permitted Liens as set forth in the applicable form(s) of purchase agreement.

**PLEASE TAKE FURTHER NOTICE THAT**, on [●], the Bankruptcy Court entered the *Order (I) Approving Bidding Procedures in Connection with Sale of the Debtor's Assets; (II) Approving Form and Manner of Notice; (III) Approving Designation of Stalking Horse Bidder and Stalking Horse Bid; (IV) Scheduling Auction and Sale Hearing; (V) Authorizing Procedures*

---

[1]    The Debtor in this chapter 11 case is Food52, Inc. and the last four digits of the Debtor's federal tax identification number are 2604. For the purpose of this chapter 11 case, the Debtor's service address is 1 Dock 72 Way, 13th Floor, Brooklyn, New York 11205.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or in the Bidding Procedures. Any summary of the Bidding Procedures Order or the Bidding Procedures contained herein is qualified in its entirety by the actual terms and conditions thereof. To the extent that there is any conflict between any such summary and such actual terms and conditions, the actual terms and conditions shall control.

*Governing Assumption and Assignment of Certain Contracts and Unexpired Leases; and (VI) Granting Related Relief* [Docket No. [●]] (the "**Bidding Procedures Order**") and approved the Bidding Procedures attached thereto as **Annex 1**.  Pursuant to the Bidding Procedures Order, the Auction shall be held at the offices of Young Conaway Stargatt & Taylor, LLP, on January 29, 2026 at 10:00 a.m. (prevailing Eastern Time).  Only Qualified Bidders (including the Stalking Horse Bidder) shall be entitled to make any bids at the Auction.

**PLEASE TAKE FURTHER NOTICE THAT** to participate in the bidding process or otherwise be considered for any purpose under the Bidding Procedures, a person or entity interested in consummating a Sale (a "**Potential Bidder**") must deliver or have previously delivered, if determined to be necessary by the Debtor in its sole discretion, among other things:

(i) an executed confidentiality agreement on terms acceptable to the Debtor, to the extent not already executed; and

(ii) information demonstrating (in the Debtor's reasonable business judgment) that the Potential Bidder has the financial capability to consummate the applicable Sale, including, but not limited to, the most current audited and latest unaudited financial statements (the "**Financials**") of the Potential Bidder (or such other form of financial disclosure acceptable to the Debtor in its discretion) (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtor, in consultation with (a) the legal and financial advisors for the Committee, if any, and (b) solely to the extent they are not an active or prospective bidder with respect to the relevant Assets, or are participating in any way in any active or prospective bid with respect to such relevant Assets, the legal advisors for The Chernin Group (the "**Consultation Parties**").

Each Bid must be transmitted via email (in .pdf or similar format) so as to be <u>actually received</u> by the Notice Parties on or before 4:00 p.m. (prevailing Eastern Time) on January 26, 2026 (the "**Bid Deadline**").

The Prevailing Bid will be subject to Bankruptcy Court approval.  The Sale Hearing to approve the Sale to the Successful Bidder(s), free and clear of all liens, claims, interests, charges, and encumbrances (with any such liens, claims, interests, charges, and encumbrances attaching to the net proceeds of the Sale with the same rights and priorities therein as in the sold Assets), shall take place at **__:00__ .m. (prevailing Eastern time) on February [2], 2026**, before the Honorable [●] in the United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, [●] Floor, Courtroom No. [●], Wilmington, Delaware 19801.  If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtor, in consultation with the Consultation Parties, may select the applicable Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes. The Debtor shall (1) provide written notice to the Backup Bidder and file and serve a notice disclosing the Debtor's intent to proceed with the Backup Bidder (the "**Notice of Backup Bidder**"), which shall establish a seven (7) day period for Counterparties to executory contracts or unexpired leases to object to assumption and assignment of the Assumed Contracts to the

Backup Bidder, and (2) to the extent any responses to the Notice of Backup Bidder are received, schedule a telephonic status conference, which may be expedited, upon reasonable notice under the circumstances, at which time a hearing will be held with respect to any unresolved responses. To the extent no responses are received, the Debtor may submit a form of sale order approving the sale to the Backup Bidder under certification of counsel.  The Sale Hearing may be adjourned by the Debtor with the consent of the DIP Lender from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing or by filing a notice or hearing agenda on the docket of the Debtor's chapter 11 case.

**PLEASE TAKE FURTHER NOTICE THAT** any objections to the Sale or the relief requested in connection with the Sale (a "**Sale Objection**") must:  (a) be in writing; (b) comply with the Bankruptcy Rules; (c) set forth the specific basis for the Sale Objection; and (d) be served upon (such as to be <u>actually received</u> by) the following parties (the "**Objection Notice Parties**") on or before **4:00 p.m. (prevailing Eastern Time) on January 26, 2026** (the "**Sale Objection Deadline**").

(a)     proposed counsel for the Debtor, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: Michael R. Nestor, Esq. (mnestor@ycst.com), Kara Hammond Coyle, Esq. (kcoyle@ycst.com), Elizabeth S. Justison, Esq. (ejustison@ycst.com), S. Alexander Faris, Esq. (afaris@ycst.com), and Andrew M. Lee, Esq. (alee@ycst.com);

(b)     counsel for the DIP Lender, Moore & Van Allen PLLC, 100 N. Tryon Street, Suite 4700, Charlotte, North Carolina 28202, Attn: James R. Langdon, Esq. (jimlangdon@mvlaw.com) and C. Cowden W. Rayburn, Esq. (cowdenrayburn@mvlaw.com), and Chipman Brown Cicero & Cole, LLP, 1313 N. Market Street, Wilmington, Delaware 19801, Attn:  William E. Chipman Jr., Esq. (chipman@chipmanbrown.com);

(c)     the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware, 19801, Attn: Benjamin A. Hackman, Esq. (Benjamin.A.Hackman@usdoj.gov); and

(d)     counsel to the Committee, if any.

Objections, if any, to the form of asset purchase agreement with a Successful Bidder other than the Stalking Horse Bidder, must be made by the Buyer Specific Objection Deadline, which is January 31, 2026 at 4:00 p.m. (ET).   For the avoidance of doubt, objections to approval of the Stalking Horse Agreement must be made by the Sale Objection Deadline.

> **If a Sale Objection is not filed and served in accordance with the foregoing requirements, the objecting party shall be barred from objecting to the Sale and shall not be heard at the Sale Hearing, and the Bankruptcy Court may enter the Sale Order without further notice to such party.**

33875551.3

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain copies of the Motion, the Bidding Procedures, the Bidding Procedures Order, the applicable underlying agreements, or any other pleadings or orders of the Bankruptcy Court, they are publicly available, for a fee via PACER at: http:/www.deb.uscourts.gov, or free of charge from the claims agent at **https://www.veritaglobal.net/Food52**.  Such documents and pleadings may also be obtained by calling the Debtor's restructuring hotline at 866-967-1780 (toll-free) or +1 310-751-2680 (international).

Dated:   December [•], 2025
      Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/*_____
Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
Elizabeth S. Justison (No. 5911)
S. Alexander Faris (No. 6278)
Andrew M. Lee (No. 7078)
Brynna M. Gaffney (No. 7402)
Rodney Square
1000 N. King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Emails:  mnestor@ycst.com
        kcoyle@ycst.com
        ejustison@ycst.com
        afaris@ycst.com
        alee@ycst.com
        bgaffney@ycst.com

*Proposed Counsel for the Debtor
and Debtor in Possession*

**<u>Annex 3</u>**

**Cure Notice**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| FOOD52, INC.,[1] | Case No. 25-12277(___) |
| Debtor. | |

### NOTICE OF POSSIBLE ASSUMPTION AND
### ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
### AND UNEXPIRED LEASES IN CONNECTION WITH SALE

**PLEASE TAKE NOTICE THAT** on December [●], 2025, the above-captioned debtor and debtor in possession (the "**Debtor**") filed with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") its motion (the "**Motion**")[2] for entry of (i) an order (a) approving bidding procedures, substantially in the form attached as Annex 1 to the Bidding Procedures Order (the "**Bidding Procedures**"), to govern the marketing and sale of all or substantially all of the Debtor's assets (the "**Assets**"), (b) authorizing the Debtor to schedule an auction to sell the Assets (the "**Auction**"), (c) scheduling the hearing to approve a sale of the Assets (the "**Sale Hearing**"), (d) designating the Stalking Horse Bidder and Stalking Horse Bid, (e) approving the form and manner of notice of the proposed sale transactions, the Bidding Procedures, the Auction, the Sale Hearing, and related dates and deadlines, and (f) authorizing procedures governing the assumption and assignment of certain executory contracts and unexpired leases (the "**Assigned Contracts**") to the prevailing bidder(s) acquiring the Assets (each, a "**Successful Bidder**"); and (ii) one or more orders (collectively, the "**Sale Order**") (a) approving the applicable form(s) of purchase agreement between the Debtor and the Stalking Horse Bidder (as defined below) or any other Successful Bidder(s), and (b) authorizing the sale(s) (collectively, the "**Sale**") of the Assets and the assumption and assignment of the Assigned Contracts to the Stalking Horse Bidder or such other Successful Bidder free and clear of all liens, claims, encumbrances, and other interests (collectively, "**Liens**"), other than any permitted Liens as set forth in the applicable form(s) of purchase agreement.

**PLEASE TAKE FURTHER NOTICE THAT** the Sale Hearing to approve the Sale to the Successful Bidder, free and clear of all Liens (with any such Liens attaching to the net proceeds of the Sale with the same rights and priorities therein as in the sold Assets), shall take place at

---

[1] The Debtor in this chapter 11 case is Food52, Inc. and the last four digits of the Debtor's federal tax identification number are 2604. For the purpose of this chapter 11 case, the Debtor's service address is 1 Dock 72 Way, 13th Floor, Brooklyn, New York 11205.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or in the Bidding Procedures. Any summary of the Bidding Procedures Order or the Bidding Procedures contained herein is qualified in its entirety by the actual terms and conditions thereof. To the extent that there is any conflict between any such summary and such actual terms and conditions, the actual terms and conditions shall control.

**  :00    .m. (prevailing Eastern time) on February [2], 2026**, before the Honorable [●] in the United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, 6th Floor, Courtroom No. 3, Wilmington, Delaware 19801.

**PLEASE TAKE FURTHER NOTICE THAT**, pursuant to the Bidding Procedures Order, the Auction shall be held at the offices of Young Conaway Stargatt & Taylor, LLP on January 29, 2026 at 10:00 a.m. (prevailing Eastern Time).  Only Qualified Bidders (including the Stalking Horse Bidder) shall be entitled to bid at the Auction.  If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtor, in consultation with the Consultation Parties, may select the applicable Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes. The Debtor shall (1) provide written notice to the Backup Bidder and file and serve a notice disclosing the Debtor's intent to proceed with the Backup Bidder (the "**Notice of Backup Bidder**"), which shall establish a seven (7) day period for Counterparties to executory contracts or unexpired leases to object to assumption and assignment of the Assumed Contracts to the Backup Bidder, and (2) to the extent any responses to the Notice of Backup Bidder are received, schedule a telephonic status conference, which may be expedited, upon reasonable notice under the circumstances, at which time a hearing will be held with respect to any unresolved responses. To the extent no responses are received, the Debtor may submit a form of sale order approving the sale to the Backup Bidder under certification of counsel.  The Sale Hearing may be adjourned by the Debtor with the consent of the DIP Lender from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing or by filing a notice or hearing agenda on the docket of the Debtor's chapter 11 case.

**PLEASE TAKE FURTHER NOTICE THAT**, to facilitate the Sale, the Debtor is seeking to assume and assign to the Successful Bidder the Assumed Contracts in accordance with the Bidding Procedures Order.  The Assumed Contracts that the Debtor may, but is not required to, seek to assume and assign in connection with the Sale and the corresponding cure amount (each, a "**Proposed Cure Amount**"), if any, that the Debtor believes is required to be paid to the applicable counterparty (each, a "**Counterparty**," and collectively, the "**Counterparties**") to each of the Assumed Contracts under sections 365(b)(1)(A) and (B) of the Bankruptcy Code are identified on **Exhibit 1** attached hereto.

**PLEASE TAKE FURTHER NOTICE THAT** each Counterparty shall have until **4:00 p.m. (prevailing Eastern time) on January 26, 2026** (the "**Contract Objection Deadline**") to object to the assumption and assignment of its Contract on any grounds, including, without limitation, (a) the amount of the Proposed Cure Amounts (and must state, in its objection, with specificity, what cure amount is required with appropriate documentation in support thereof) and (b) the provision of adequate assurance of future performance by the Stalking Horse Bidder (each, a "**Contract Objection**").  Any such objection must be filed and served on the following parties (collectively, the "**Objection Notice Parties**"), so as to be actually received by the Contract Objection Deadline:

> (a)    proposed counsel for the Debtor, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: Michael R.

Nestor, Esq. (mnestor@ycst.com), Kara Hammond Coyle, Esq. (kcoyle@ycst.com), Elizabeth S. Justison, Esq. (ejustison@ycst.com), S. Alexander Faris, Esq. (afaris@ycst.com), and Andrew M. Lee, Esq. (alee@ycst.com);

(b)    counsel for the DIP Lender, Moore & Van Allen PLLC, 100 N. Tryon Street, Suite 4700, Charlotte, North Carolina 28202, Attn: James R. Langdon, Esq. (jimlangdon@mvlaw.com) and C. Cowden W. Rayburn, Esq. (cowdenrayburn@mvlaw.com), and Chipman Brown Cicero & Cole, LLP, 1313 N. Market Street, Wilmington, Delaware 19801, Attn: William E. Chipman Jr., Esq. (chipman@chipmanbrown.com);

(c)    the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware, 19801, Attn: Benjamin A. Hackman, Esq. (Benjamin.A.Hackman@usdoj.gov); and

(d)    counsel to the Committee, if any.

Any unresolved Contract Objections shall be heard at the Sale Hearing, unless otherwise agreed by the parties; *provided that*, the Debtor shall have the right to adjourn any Sale Hearing without the consent of any objecting party. If any objections to the amount of the Proposed Cure Amounts remain unresolved as of the date of the Closing of the Sale of the Assets, the Debtor may (but is not required to) deposit the disputed amount of Proposed Cure Amounts relating to such Asset(s) in a segregated account to hold pending resolution of such objections.

**PLEASE TAKE FURTHER NOTICE THAT**, pursuant to the Bidding Procedures Order, each Counterparty may raise objections as to adequate assurance of future performance by, or on the basis of the identity of, the Successful Bidder, other than the Stalking Horse Bidder, until January 31, 2026 at 4:00 p.m. (ET) (the "**Buyer Specific Objection Deadline**"). Any such objection must be filed and served on the Objection Notice Parties, so as to be actually received by the Buyer Specific Objection Deadline. Any such objection must be filed and served on the Debtor and its counsel and the applicable Successful Bidder or Stalking Horse Bidder (if any), as applicable, and its counsel, so as to actually be received by the Buyer Specific Objection Deadline. Any such unresolved objections shall be heard at the Sale Hearing, unless otherwise agreed by the parties.

**PLEASE TAKE FURTHER NOTICE THAT**, at the Sale Hearing, the Debtor will seek Court approval of the assumption and assignment to the Successful Bidder of only those Assumed Contracts that have actually been selected by the Successful Bidder to be assumed and assigned (collectively, the "**Assumed Contracts**"). The Debtor and its estate reserve any and all rights with respect to any Assumed Contracts that are not ultimately designated as Assumed Contracts.

**PLEASE TAKE FURTHER NOTICE THAT nothing contained in this notice or on the exhibits hereto shall constitute a waiver of any rights of the Debtor and its estate or an admission with respect to the Debtor's chapter 11 case, including, but not limited to, any issues involving objections to claims, setoff or recoupment, equitable subordination or recharacterization of debt, defenses, characterization or re-characterization of contracts,**

leases and claims, assumption or rejection of contracts and leases and/or causes of action arising under the Bankruptcy Code or any other applicable laws.

> **If no Contract Objection is timely received with respect to an Assumed Contract: (i) the Counterparty to such Assumed Contract shall be deemed to have consented to the assumption by the Debtor and assignment to the Successful Bidder of the Assumed Contract, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the Successful Bidder); (ii) any and all defaults under the Assumed Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code upon payment of the Proposed Cure Amount set forth in this Cure Notice for such Assumed Contract; and (iii) the Proposed Cure Amount set forth in this Cure Notice for such Assumed Contract shall be controlling, notwithstanding anything to the contrary in such Assumed Contract, or any other related document, and the Counterparty shall be deemed to have consented to the Proposed Cure Amount and shall be forever barred from asserting any other claims related to such Assumed Contract against the Debtor and its estate or the Successful Bidder, or the property of any of them, that existed prior to the entry of the order resolving the Contract Objections.**

      **PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain copies of the Motion, the Bidding Procedures, the Bidding Procedures Order, the applicable underlying agreements, or any other pleadings or orders of the Bankruptcy Court, they are publicly available, for a fee via PACER at: http://www.deb.uscourts.gov, or free of charge from the claims agent at **https://www.veritaglobal.net/Food52**. Such documents and pleadings may also be obtained by calling the Debtor's restructuring hotline at 866-967-1780 (toll-free) or +1 310-751-2680 (international).

*[Remainder of Page Intentionally Left Blank]*

Dated:   December [•], 2025
         Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/* _____

Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
Elizabeth S. Justison (No. 5911)
S. Alexander Faris (No. 6278)
Andrew M. Lee (No. 7078)
Brynna M. Gaffney (No. 7402)
Rodney Square
1000 N. King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Emails:  mnestor@ycst.com
         kcoyle@ycst.com
         ejustison@ycst.com
         afaris@ycst.com
         alee@ycst.com
         bgaffney@ycst.com

*Proposed Counsel for the Debtor
and Debtor in Possession*

33875552.3

**EXHIBIT 1**

**Proposed Cure Amounts**

## EXHIBIT B

**Stalking Horse Agreement**

*Execution Version*

**ASSET PURCHASE AGREEMENT**

by and among

**F52, LLC,**

as Buyer;

and

**FOOD52, INC.**

as Seller

**Dated as of December 29, 2025**

# TABLE OF CONTENTS

Page

Article I        DEFINITIONS .................................................................................................... 3

Article II       PURCHASE AND SALE ..................................................................................... 9

Article III       CLOSING ........................................................................................................... 13

Article IV       REPRESENTATIONS AND WARRANTIES OF SELLER .............................. 14

Article V        REPRESENTATIONS AND WARRANTIES OF BUYER .............................. 21

Article VI       COVENANTS .................................................................................................... 23

Article VII      CONDITIONS TO CLOSING ........................................................................... 27

Article VIII     TERMINATION................................................................................................. 28

Article IX       BANKRUPTCY MATTERS.............................................................................. 29

Article X        MISCELLANEOUS .......................................................................................... 31

Exhibits

Exhibit A            Purchased Assets
Exhibit B            Excluded Liabilities

Schedules

Disclosure Schedules

1

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "<u>Agreement</u>") is dated as of December 29, 2025 (the "<u>Effective Date</u>"), and is entered into by and among F52, LLC, a Delaware limited liability company ("<u>Buyer</u>"); FOOD52, INC., a Delaware Corporation ("<u>Seller</u>").  Each of Buyer and Seller are at times referred to herein individually as a "<u>Party</u>" and together as the "<u>Parties</u>".

## RECITALS

WHEREAS, Seller is engaged in the business of managing and creating multi-media assets in the food and home verticals, creating content around recipes, cooking, cookware and other relevant topics that are distributed on its website and social platforms for the purpose of driving advertising and brand awareness under certain specified brands and trademarks as further described herein (the "<u>Business</u>");

WHEREAS, on December 29, 2025, Seller commenced bankruptcy case __-_____ (---) (the "<u>Bankruptcy Case</u>") under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>");

WHEREAS, in connection with the Bankruptcy Case, Seller desires to sell, transfer, convey, assign and deliver to Buyer, all of the Purchased Assets, and Buyer desires to: (i) purchase, acquire and assume all of the Purchased Assets and all of the Assumed Liabilities (and no other liabilities) (each as defined herein); and (ii) consummate such other transactions as are contemplated by this Agreement and the other Transaction Documents (as defined herein), in each case upon the terms and conditions set forth in this Agreement (with all such transactions referred to as the "<u>Transaction</u>");

WHEREAS, the Parties intend to effectuate the Transaction through a sale of the Purchased Assets pursuant to Sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code, Rules 2002, 6004, 6006 and 9007 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and Rules 2002-1 and 6004-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware, all on the terms and subject to the conditions set forth in this Agreement and in the Sale Order (as defined herein); and

WHEREAS, Seller's and Buyer's willingness to consummate the Transaction set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

The following terms have the meanings specified or referred to in this <u>Article I</u>:

"2025 Media Receivables" means all of Seller's media and programmatic sales and accounts receivables generated through December 31, 2025.

"Accounts" means all social media accounts, usernames and handles used in the Business.

"Action" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.  The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Allocation Schedule" has the meaning set forth in Section 2.07.

"Alternative Transaction" means a sale, transfer, or other disposition, whether direct or indirect, whether by means of an asset sale, sale of stock, amalgamation, reorganization, or otherwise of (a) beneficial ownership of a majority of the equity interests or voting power of Seller or (b) any material portion of the Purchased Assets, in a transaction or a series of transactions with a Third Party.

"Annual Financial Statements" has the meaning set forth in Section 4.04.

"Assigned Contracts" means the contracts set forth on Exhibit A to be assigned to Buyer at the Closing in accordance with this Agreement and the Sale Order.

"Assignment and Assumption Agreement" has the meaning set forth in Section 3.02(a)(iii).

"Assumed Liabilities" has the meaning set forth in Section 2.03(a).

"Balance Sheet" has the meaning set forth in Section 4.04.

"Balance Sheet Date" has the meaning set forth in Section 4.04.

"Bankruptcy Case" has the meaning set forth in the recitals.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bankruptcy Court Milestone" has the meaning set forth in Section 9.05(a).

"Bankruptcy Rules" has the meaning set forth in the recitals.

3

"<u>Bankruptcy Sale</u>" means the sale of the Purchased Assets by Seller to Buyer in the Bankruptcy Case pursuant to this Agreement and the Sale Order.

"<u>Benefit Plan</u>" means all employee benefit plans (within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA) and all employment agreements, cash or equity-based bonus or incentive arrangements, severance or retention arrangements, vacation policies, pension or retirement plans, change in control, post-employment, disability or health and welfare plans, sponsored, maintained or contributed to by Seller or any of its Affiliates for the benefit of any employee of Seller, other than any plan, program or arrangement sponsored by a Governmental Authority, mandated by and maintained solely pursuant to any collective bargaining agreement or any "multiemployer plan" within the meaning of Section 3(37) of ERISA.

"<u>Bidding Procedures</u>" has the meaning set forth in <u>Section 9.05(a)(ii)</u>.

"<u>Bill of Sale</u>" has the meaning set forth in <u>Section 3.02(a)(i)</u>.

"<u>Break Up Fee</u>" has the meaning set forth in <u>Section 9.06(a)</u>.

"<u>Business</u>" has the meaning set forth in the recitals.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or a day on which commercial banks located in New York, New York are authorized or required by Law to be closed for business.

"<u>Buyer</u>" has the meaning set forth in the preamble.

"<u>Cash Component</u>" has the meaning set forth in <u>Section 2.05(a)</u>.

"<u>CBA</u>" means the Contract, dated January 1, 2024, by and between Seller and the International Brotherhood of Electrical Workers Local Union 48.

"<u>Closing</u>" has the meaning set forth in <u>Section 3.01</u>.

"<u>Closing Payment</u>" has the meaning set forth in <u>Section 2.05(b)</u>.

"<u>Closing Date</u>" has the meaning set forth in <u>Section 3.01</u>.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Confidential Information</u>" means (a) all of Seller's information that is a trade secret under applicable trade secret or other Law and (b) all other non-public information of Seller. Confidential Information includes, but is not limited to, all proprietary software code, productive and other processes, designs, sketches, photographs, graphs, drawings, financial statements, projections, samples, technical know-how, inventions and ideas, past, current and planned research and development, list of customers, price lists, market studies, and business plans.

4

"Contracts" means all contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures and all other agreements, commitments and legally binding arrangements, whether written or oral.

"Consumer Data" means Personal Information pertaining to current or former consumers, or prospective consumers, used in, or collected in connection with, the Business, including email addresses and other contact information, loyalty and rewards program information and customer lists.

"Copyrights" means all copyrights, whether in published or unpublished works, which include: (a) literary works and any other original works of authorship fixed in any tangible medium of expression; (b) databases, data collections (including all Consumer Data) and rights therein, software (including all source code, object code), specifications (including tech packs for all product designs), firmware, models, algorithms, methodologies and implementations thereof and web site content and Digital Properties; (c) rights to compilations, collective works and derivative works of any of the foregoing; and (d) registrations and applications for registration for any of the foregoing and any renewals or extensions thereof.

"Corporate HQ Lease" means the Agreement of Lease by and between Seller and BNY Tower Associates LLC, dated as of October 19, 2021.

"Credit Bid" means a credit bid by Buyer, pursuant to 363(k) of the Bankruptcy Code, equal to the Credit Bid Amount.

"Credit Bid Amount" means the DIP Loan Claims, in the amount of Buyer's secured debt against the Seller in an amount equal to $3,420,000 plus accrued interest and fees under the DIP, consisting of $3,420,000 of DIP Loan Claims.

"Cure Cost Assigned Contracts" means those Assigned Contracts set forth under the heading "Cure Cost Assigned Contracts" on Exhibit A.

"Cure Costs" means all monetary Liabilities that must be paid or otherwise satisfied in order to cure any monetary defaults required to be cured under section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, including the assumption of the Assigned Contracts.

"Cure Costs Cap" means $150,000.

"Dansk" means that certain home goods brand known as "Dansk Designs", acquired and operated by Seller since 2021.

"Designated Buyer" means the Buyer's designee.

"Digital Properties" means websites, mobile apps, Accounts, Domain Names, and related content.

"DIP" means that certain debtor in possession financing facility reflected by the DIP Term Sheet, Interim Financing Order and Final Financing Order and which facility was approved by the

Bankruptcy Court pursuant to the Interim Financing Order and Final Financing Order, together with any documents and agreements required or otherwise contemplated by the DIP Term Sheet, Interim Financing Order and Final Financing Order.

"DIP Lender" means Buyer in its capacity as lender under the DIP.

"DIP Loan Claims" means any and all claims against the Seller arising from or based upon the DIP, including, without limitation, all accrued but unpaid principal, interest, premiums, costs, fees, expenses and indemnities.

"DIP Term Sheet" means that certain debtor in possession credit facility term sheet approved by the Bankruptcy Court pursuant to the Interim Financing Order and Final Financing Order.

"Disclosure Schedules" means the Disclosure Schedules delivered by Seller and attached to this Agreement.

"Dollars" or "$" means the lawful currency of the United States.

"Domain Names" means Internet electronic addresses, uniform resource locators and alphanumeric designations associated therewith registered with or assigned by any domain name registrar, domain name registry or other domain name registration authority as part of an electronic address on the Internet and all applications for any of the foregoing.

"Effective Date" has the meaning set forth in the preamble.

"Encumbrance" means any charge, claim, community property interest, pledge, condition, equitable interest, lien (statutory or other), security interest, purchase option, right of first refusal or offer, mortgage, easement, encroachment, right of way or other similar encumbrance.

"Environmental Law" means any applicable Law, and any Governmental Order or binding agreement with any Governmental Authority:  (a) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata); or (b) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any hazardous materials.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"Excluded Assets" has the meaning set forth in Section 2.02.

"Excluded Liabilities" has the meaning set forth in Section 2.04.

"Expense Reimbursement" has the meaning set forth in Section 9.06(b).

"Final Financing Order" means that certain final order, dated on or about December 31, 2025, as may be subsequently amended by the Bankruptcy Court, approving the DIP on a final basis.

"Financial Statements" has the meaning set forth in Section 4.04.

"Fundamental Representations" means the representations and warranties in Section 4.01 (Organization and Qualification of Seller), Section 4.02 (Authority of Seller), Section 4.06 (Material Contracts), Section 4.07 (Title to Assets), Section 4.08 (Sufficiency of Assets), Section 4.14 (Relationships with Related Persons), Section 4.15 (Brokers), and Section 4.17 (Intellectual Property).

"GAAP" means United States generally accepted accounting principles in effect from time to time.

"Governmental Authority" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"Intellectual Property" means all intellectual property rights in any jurisdiction, whether registered or unregistered, including such rights in and to the following (a) Copyrights, (b) Domain Names, (c) Patents, (d) Trademarks, (e) Trade Secrets, (f) advertising and marketing materials, (g) product archives, or (h) embodiments of any of the foregoing (a)-(g), and (i) all rights and claims for damages, restitution and injunctive and other legal and equitable relief, including the rights to and claims to sue for past, present and future infringement, misappropriation, dilution, misuse, breach or default, passing off, unfair competition and/or deceptive trade practices related to the foregoing or other violation thereof and all other related claims and causes of action, with the right but no obligation to sue for such legal and equitable relief and to collect, or otherwise recover, any such damages.

"Interim Balance Sheet" has the meaning set forth in Section 4.04.

"Interim Balance Sheet Date" has the meaning set forth in Section 4.04.

"Interim Financial Statements" has the meaning set forth in Section 4.04.

"Interim Financing Order" means that certain interim order, dated on or about December 31, 2025, by the Bankruptcy Court approving the DIP on an interim basis.

"Inventory" has the meaning set forth in Section 2.01.

"Inventory Payment" has the meaning set forth in Section 2.06(a).

"<u>Knowledge of Seller</u>" or any other similar knowledge qualification, means, the actual knowledge of Erika Badan, Heidi Robinson, Clifford Endo, and Emily Mejer after reasonable investigation and inquiry.

"<u>Law</u>" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"<u>Liabilities</u>" means, with respect to any Person, any liability or obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise, and whether or not the same is required to be accrued on the financial statements of such Person.

"<u>Material Adverse Effect</u>" means any event, occurrence, fact, condition or change that is, or could reasonably be expected to become, individually or in the aggregate, (a) has had, or could reasonably be expected to have, a materially adverse effect on the condition (financial or otherwise) of the Business, Purchased Assets or the Assumed Liabilities, taken as a whole, or (b) prevents, materially impedes or materially delays or would reasonably be expected to prevent, materially impede or materially delay, the consummation by the Seller of the transactions contemplated by this Agreement; *provided* that solely with respect to clause (a), "Material Adverse Effect" shall not include any event, occurrence, fact, condition or change arising out of or attributable to (i) economic or political conditions generally, (ii) conditions generally affecting the industry in which the Business operates, (iii) changes in financial, banking or securities markets generally; (iv) national or international political or social conditions, including the engagement by any country in hostilities, whether commenced before or after the date hereof and whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack; (v) the occurrence of any act of God or other calamity or force majeure events (whether or not declared as such), including any strike, labor dispute, civil disturbance, embargo, natural disaster, fire, flood, hurricane, tornado, or other weather event; (vi) changes in Law or GAAP; (vii) the taking of any action expressly required by this Agreement or taken (or omitted to be taken) with the prior written consent of Buyer; (vii) any effects or changes as a result of the announcement, pendency, or completion of the purchase and sale of the Purchased Assets or the assumption of the Assumed Liabilities, in each case as contemplated by this Agreement, including losses or threatened losses of employees, customers, suppliers, distributors, or others having relationships with Seller, except in each case to the extent such event, occurrence, fact, condition or change disproportionately affects the Business or the Purchased Assets relative to the business and operations of other Persons engaged in the same industry in which the Business operates.

"<u>Material Contracts</u>" has the meaning set forth in <u>Section 4.06(a)</u>.

"<u>Material Customer</u>" has the meaning set forth <u>in Section 4.10(a)</u>.

"<u>Material Vendor</u>" has the meaning set forth in <u>Section 4.10(b)</u>.

"<u>Online Platforms</u>" has the meaning set forth in <u>Section 6.11</u>.

"<u>Outside Date</u>" has the meaning set forth in <u>Section 8.01(a)(iv)</u>.

"<u>Patents</u>" means all patents, industrial and utility models, industrial designs, petty patents, patents of importation, patents of addition, certificates of invention and any other indicia of invention ownership issued or granted by any Governmental Authority, including all provisional applications, priority and other applications, divisionals, continuations (in whole or in part), extensions, reissues, re-examinations or equivalents or counterparts of any of the foregoing.

"<u>Permits</u>" means all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained, or required to be obtained, from Governmental Authorities.

"<u>Permitted Encumbrances</u>" means:  (a) liens for Taxes not yet due and payable as of the Closing Date; and (b)  mechanics', carriers', workmen's, repairmen's, or other like liens arising or incurred in the ordinary course of business consistent with past practice or in connection with amounts that are not delinquent and which are not, individually or in the aggregate, material to the Purchased Assets.

"<u>Person</u>" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"<u>Personal Information</u>" has the meaning set forth in <u>Section 4.16</u>.

"<u>Pre-Closing Tax Period</u>" means any taxable period ending on or before the Closing Date and, with respect to any taxable period beginning on or before and ending after the Closing Date, the portion of such taxable period ending on and including the Closing Date.

"<u>Purchase Price</u>" has the meaning set forth in <u>Section 2.05(a).</u>

"<u>Purchased Assets</u>" has the meaning set forth in <u>Section 2.01</u>.

"<u>Related Person</u>" means, with respect to any entity, (i) any Person that directly or indirectly controls, is directly or indirectly controlled by or is directly or indirectly under common control with such specified Person; (ii) any Person that holds a Material Interest in such specified Person; (iii) each Person that serves as a director, officer, partner, executor or trustee of such specified Person (or in a similar capacity); (iv) any Person in which such specified Person holds a Material Interest; (v) any Person with respect to which such specified Person serves as a general partner or a trustee (or in a similar capacity); and (vi) any Related Person of such Person described in clauses (i) through (v).  For purposes of this definition, "control" (including "controlling," "controlled by," and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise; and "Material Interest" means direct or indirect beneficial ownership (as defined in Rule 13d-3 under the Exchange Act) of voting securities or other voting interests representing at least ten percent (10%) of the outstanding voting power of a Person or equity securities representing at least ten percent (10%) of the outstanding equity securities in a Person.

"Representative" means, with respect to any Person, any and all directors, managers, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"Sale Motion" means the motion filed with the Bankruptcy Court by Seller seeking (a) approval of the terms and conditions of this Agreement and the Transaction Documents, and (b) authorization for the sale of the Purchased Assets pursuant to Section 363 of the Bankruptcy Code, free and clear of all Encumbrances.

"Sale Order" means the order of the Bankruptcy Court granting the relief requested in the Sale Motion and authorizing the sale of the Purchased Assets pursuant to Section 363 of the Bankruptcy Code, free and clear of all Encumbrances, claims and interests in form and substance reasonably acceptable to Buyer; which, in all events, must, (i) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by Seller of this Agreement and the terms of this Agreement in all respects, (B) the sale of the Purchased Assets to Buyer on the terms set forth herein and free and clear of all Encumbrances, and (C) the performance by Seller of their respective obligations under this Agreement; (ii) authorize and empower Seller to assume and assign to Buyer the Assigned Contracts; (iii) enjoin and forever bar any creditors or any other person from bringing any claims or asserting any liens against Buyer or the Purchased Assets other than for Assumed Liabilities; and (iv) find that (A) the consideration provided by Buyer pursuant to this Agreement represents the highest or otherwise best offer for the Purchased Assets and constitutes reasonably equivalent value and fair consideration for the Purchased Assets, (B) as of the Closing, the transactions contemplated by this Agreement effect a legal, valid, enforceable and effective sale and transfer of the Purchased Assets, (C) Seller gave due and proper notice of the transactions contemplated by this Agreement to each party entitled to such notice, (D) this Agreement was negotiated and entered into at arms' length and Buyer is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code and grants Buyer the protections of Section 363(m) of the Bankruptcy Code, (E) the provisions of Section 363(n) of the Bankruptcy Code have not been violated and (F) Buyer is not a successor to the Seller.

"Schoolhouse" means that certain home goods brand engaged in the sale of heirloom-quality home goods, including the ecommerce business related thereto, acquired and operated by Seller since 2021

"Schoolhouse Facility Lease" means the Office Lease by and between Seller and Schoolhouse Factory LLC, dated January 1, 2020.

"Seller Intellectual Property" has the meaning set forth in Section 4.17(a).

"Seller" has the meaning set forth in the preamble.

"Tax Return" means any return, declaration, report, claim for refund, property rendition, information return or statement or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Taxes" means (a) all federal, state, local, or foreign income, gross receipts, sales, use, production, ad valorem, transfer, documentary, franchise, registration, profits, license, lease,

service, service use, escheat, withholding, social security (or similar), payroll, employment, unemployment, disability, estimated, excise, severance, environmental, stamp, transfer, value added, alternative or add-on minimum, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments, charges, or other tax of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties, or (b) any Liabilities for the payment of any taxes, interest, penalty, addition to tax or like additional amount resulting from the application of Treasury Regulations Section 1.1502-6 or comparable federal, state or local Law.

"Third Party" means any Person other than the Seller, Buyer or any of their respective Affiliates.

"Trademarks" means (a) trademarks, service marks, fictional business names, trade names, commercial names, certification marks, collective marks and other proprietary rights to any words, names, slogans, symbols, logos, devices or combinations thereof used to identify, distinguish and indicate the source or origin of goods or services used in the Business; (b) registrations, renewals, applications for registration, equivalents and counterparts of the foregoing; and (c) the goodwill of the business associated with each of the foregoing.

"Trade Secrets" means anything that would constitute a "trade secret" under applicable Law, know-how, customer and supplier lists, and other confidential or proprietary information, including inventions, discoveries, processes, procedures, systems, business methods, business plans, confidential business information and other proprietary information and rights.

"Transaction" has the meaning set forth in the recitals.

"Transaction Documents" means this Agreement, the Assignment and Assumption Agreement, the IP Assignment and Assumption Agreement, the Bill of Sale and the other agreements, instruments and documents required to be delivered at the Closing.

"Treasury Regulations" means the regulations promulgated by the United States Treasury Department under the Code.

"USPTO" means the United States Patent and Trademark Office.

## ARTICLE II
## PURCHASE AND SALE

**Section 2.01    Purchased Assets.**  On the terms and subject to the conditions set forth in this Agreement, and subject in all respects to the valid approval of the Bankruptcy Court, at the Closing Seller shall sell, transfer, deliver, and assign to Buyer, and Buyer shall purchase and acquire from Seller, free and clear of any Encumbrances, all of Seller's right, title and interest in, to and under all of the tangible and intangible assets, properties, and, to the extent transferable, rights owned by Seller (other than the Excluded Assets), including, without limitation, any and all Intellectual Property owned by Seller, those assets set forth on Exhibit A and Seller's rights under the Assigned Contracts (collectively, the "Purchased Assets") and the inventory assets of Seller described in Section 2.06 (the "Inventory") and as set forth on Exhibit A, in exchange for the

payment of the consideration specified in Section 2.05 and Section 2.06. Buyer shall be permitted to update Exhibit A with respect to any assets relating to the Business (including adding any assets to the list of Excluded Assets identified below) until two (2) Business Days prior to the Closing Date.

Section 2.02    Excluded Assets.    Notwithstanding anything to the contrary set forth herein, the Purchased Assets shall not include, and Buyer shall not acquire any right, title or interest in, to or under, (a) cash and cash equivalents of Seller, (b) necessary inventory to complete existing purchase orders received by Seller prior to the Closing, (c) any contract that is not an Assigned Contract, including, but not limited to, the CBA, the Schoolhouse Facility Lease, and the Corporate HQ Lease, (d) any and all rights of Seller in and to any real property owned by Seller, (e) any of the rights that accrue or will accrue to Seller under this Agreement, (f) the 2025 Media Receivables, and (g) Seller's bank accounts (collectively, the "Excluded Assets").

Section 2.03    Assumed Liabilities.

(a)    On the terms and subject to the conditions set forth in this Agreement, and subject in all respects to the valid approval of the Bankruptcy Court, at the Closing Buyer shall assume and agree to pay, perform and discharge the following Liabilities of Seller (the "Assumed Liabilities")

(i)    all Liabilities arising under any of the Assigned Contracts solely to the extent arising from and after the Closing Date; and

(ii)    all Cure Costs.

Section 2.04    Excluded Liabilities.    Notwithstanding the provisions of Section 2.03 or any other provision of this Agreement to the contrary, Buyer shall not assume, be bound by and shall not be responsible to pay, perform or discharge any Liabilities of Seller or any of its Affiliates of any kind or nature, fixed or contingent, known or unknown (or which may be asserted against or imposed upon Buyer as a successor or transferee of Seller or as an acquiror of the Purchased Assets), other than the Assumed Liabilities (the "Excluded Liabilities"). Without limiting the generality of the foregoing, the Excluded Liabilities shall include, and Buyer shall not assume or be responsible or liable in any manner for, any of the following: (a) any Liabilities of Seller arising or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby, including fees and expenses of counsel, accountants, consultants, advisers, investment bankers, brokers, asset managers and any others; (b) any Liability for (i) Taxes of Seller (except as provided for in Section 6.07) (or any respective stockholder, member, or Affiliate of Seller); (ii) Taxes relating to the Business, the Purchased Assets or the Assumed Liabilities for any Pre-Closing Tax Period; or (iii) all Taxes attributable to any Pre-Closing Tax Period of any Person imposed on Buyer as a transferee or successor, by contract or pursuant to any Law (including, but not limited to, Treasury Regulations Section 1.1502-6 or comparable federal, state, local or foreign Law) with respect to Liabilities or relationships existing on or prior to the Closing Date or by agreements entered into or transactions entered into on or prior to the Closing Date (except as provided for in Section 2.03(a)(ii)); (c) any indebtedness of Seller or any of its Affiliates for borrowed money or for which Seller has provided any guaranty (including without limitation any

12

interest accruing on such indebtedness); (d) any Liabilities (including Taxes) relating to or arising out of the Excluded Assets or Excluded Liabilities; (e) any Liabilities of Seller in respect of (i) any pending or threatened Action or (ii) any future Action to the extent such future Action relates to acts or omissions by Seller or any of its Affiliates prior to the Closing, including, but not limited to, the matters described in <u>Section 4.11</u> of the Disclosure Schedules; (f) any Liabilities of Seller or any other Person for or with respect to any present or former employees, officers, directors, managers, retirees, independent contractors or consultants of Seller or its Affiliates (or for any other Persons performing services for the Business), including any Liabilities associated with salary, payroll or any claims for wages or other benefits, bonuses, workers' compensation, damages, penalties, fines, severance, retention, termination or other payments, and Liabilities under, or relating to, Benefit Plans, which have accrued on or prior to the Closing Date, but not thereafter; (g) any Liabilities of Seller or the Business relating or arising from Seller's operation of the Purchased Assets and the Business prior to the Closing, including any unfulfilled commitments, quotations, purchase orders, customer orders or work orders that do not constitute part of the Purchased Assets or Assigned Contracts, or any accounts payable with respect to the Business for periods prior to the Closing; (h) any Liabilities of Seller or any of their Affiliates to indemnify, reimburse or advance amounts to any present or former officer, director, manager, employee or agent of Seller or their Affiliates (including with respect to any breach of fiduciary obligations by same); (i) any Liabilities arising out of, in respect of or in connection with the failure by Seller or any of their respective Affiliates to comply with any Law or Governmental Order; (j) any Liabilities of Seller arising out of or relating to Seller's acts or omissions occurring after the Closing; (k) any Liabilities of Seller with respect to uncashed checks to vendors, customers or employees and non-refunded overpayments or credits owed by Seller to any third party; (1) any Liabilities of Seller arising out of, in respect of or in connection with any Contract that is not an Assigned Contract, including, but not limited to, the Corporate HQ Lease, the CBA, and the Schoolhouse Facility Lease; (m) any Liabilities of Seller with respect to, arising out of, or in any way related to the dispute between Seller and Form Portfolios LLC and its affiliates, including, but not limited to, Form Portfolios LLC v. Food52, Inc., No. 1:24-cv-7690 (E.D.N.Y.), (n) any Liabilities arising and attributable to periods on or prior to the Closing Date, other than the Assumed Liabilities, and (o) any Liabilities arising out of the matters set forth on <u>Exhibit B</u>. Buyer shall be permitted to update <u>Exhibit B</u> with respect to any Liabilities relating to the Business or Seller (including adding any Liabilities to the list of Excluded Liabilities) until two (2) Business Days prior to the Closing Date.

### Section 2.05    Purchase Price; Closing Payments.

(a)    On the terms and subject to the conditions set forth in this Agreement, the aggregate purchase price to be paid by Buyer for the Purchased Assets shall be Six Million Five Hundred Thousand Dollars ($6,500,000.00) (the "Closing Consideration" and together with the Credit Bid, the "<u>Purchase Price</u>").

(b)    At the Closing and unless otherwise set forth in the Sale Order or other order of the Bankruptcy Court, Buyer shall pay the Closing Consideration (i) by termination of Seller's obligations under the DIP and (ii) by wire transfer of immediately available funds in accordance with the wire transfer instructions delivered by Seller to Buyer in writing at least two (2) Business

Days prior to the Closing Date (the "Closing Payment") in an amount equal to the Closing Consideration minus the Credit Bid Amount.

### Section 2.06    Inventory.

(a)    Buyer shall acquire from Seller as part of the Purchased Assets all Inventory, consisting of all finished goods and all components and materials being used for current SKU production, as exists as of the Closing, subject to the provisions of Sections 2.06(b) and (c) being timely satisfied by Seller and upon terms to be mutually agreed to in writing between Seller and Buyer at least ten (10) Business Days prior to the Closing Date.  For the avoidance of doubt, Seller shall be responsible for all landed duty, all freight and storage charges, and all other charges and obligations for all Inventory prior to Buyer's acceptance of the Inventory and Buyer shall be responsible for freight and storage charges for any Inventory purchased by Buyer after Buyer's acceptance of the Inventory.

(b)    At least fifteen (15) Business Days prior to the Closing Date, Seller shall deliver to Buyer a schedule setting forth Seller's then-current Inventory (excluding any inventory necessary for the fulfillment of existing purchase orders) and, at Buyer's election, permit Buyer access to view Seller's Inventory.  Seller shall facilitate the transfer to Buyer of such Inventory immediately following the Closing, including Inventory located in any third-party warehouses.  Buyer shall not purchase any Inventory unless Buyer is satisfied, in its sole discretion, that such components and materials are being used for current SKU production as of the Closing, as supported by purchase orders and any other documentation and information reasonably requested by Buyer.  Buyer's determination to not purchase and assume any Inventory pursuant to this Section 2.06 shall not reduce the Purchase Price.

(c)    The warehouse reports for on hand inventory (including a warehouse list of any damaged or unsaleable goods for exclusion from the Inventory purchase) shall be provided by Seller at least ten (10) Business Days prior to Closing.  Seller shall promptly respond and provide such additional information and documentation, to the extent such information and documentation is available, respecting the Inventory as Buyer may reasonably request prior to Closing.

(d)    Seller shall provide Buyer access to the warehouses where the Inventory is stored at least fifteen (15) days prior to Closing to allow Buyer to inspect the Inventory at Buyer's expense, and Seller shall arrange to transfer warehouse receipts and such other documents as Buyer may request or as may be required in order to evidence Buyer's ownership of the Inventory and to obtain possession of same, which is located in the warehouses and elsewhere as applicable, to Buyer within seventy-two (72) hours after the Closing.

(e)    Buyer shall have the right, upon reasonable advance notice to Seller, to assign its rights to inspect, transfer, and acquire the Inventory to one or more third party designees, which such designee(s) shall have the rights afforded to Buyer set forth in this Section 2.06.

### Section 2.07    Allocation of Purchase Price.

The Parties have agreed that the Purchase Price shall be allocated in accordance with a schedule to be prepared by Buyer and delivered to Seller within sixty (60) days following the Closing Date (the "Allocation Schedule") in accordance with Code Section 1060 and the Treasury Regulations promulgated thereunder (and any similar

provision of state, local or foreign Law, as appropriate) among an undivided interest in the Purchased Assets for all Tax purposes. Buyer and Seller also shall allocate and report any adjustments to the Purchase Price in accordance with Treasury Regulations Section 1.1060-1(e), and any allocations made as a result of such adjustments shall become part of the Allocation Schedule. Buyer and Seller shall file all Tax Returns (including amended returns and claims for refund) and Tax information reports in a manner consistent with the Allocation Schedule except as otherwise provided by applicable Law. Neither Buyer nor Seller shall take any position for Tax purposes that is inconsistent with the Allocation Schedule (with respect to Tax Returns or otherwise) unless required to do so by applicable Law.

**Section 2.08    Third Party Consents.**    To the extent that Seller's rights under any Contract or Permit may not be assigned to Buyer in the Bankruptcy Case without the consent of another Person which has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be a violation of applicable Law. After the Closing and upon request of Buyer, for up to thirty (30) days following Closing, Seller and its Affiliates shall use commercially reasonable efforts and assist Buyer with obtaining any such required consent(s) as promptly as reasonably practicable under the circumstances and, immediately after obtaining such required consent(s), such Contract(s), Permit(s) or other Purchased Asset(s) shall be deemed assigned to Buyer pursuant to the terms of this Agreement. To the extent that (i) the Parties fail to obtain such consent for transfer of any Contract, Permit or other Purchased Asset and (ii) the failure to obtain such consent does not have a Material Adverse Effect on the Buyer's operation of the Purchased Assets, the Parties hereby agree that such an occurrence shall not result in any adjustment to the Purchase Price. To the extent that the failure to obtain such consent for transfer of any Contract or Permit would have a Material Adverse Effect on the Buyer's operation of the Purchased Assets, Buyer shall not be obligated to close until such consents are obtained.

**Section 2.09    Transferred Contracts; Cure Cost Assigned Contracts.**    Buyer shall have the right, exercisable in Buyer's sole discretion at any time after the Effective Date and prior to Closing to designate any Contract that is not identified as a Cure Cost Assigned Contract on Exhibit A as an Assigned Contract (such Contracts, "Transferred Contracts"); provided, however, that (i) if Buyer exercises Buyer's right to designate any Contracts as Transferred Contracts, Buyer shall pay any Cure Costs associated with such Transferred Contracts; (ii) any Cure Costs associated with such Transferred Contracts shall not count towards the Cure Costs Cap; and (iii) Exhibit A shall be updated to add any Transferred Contracts as Assigned Contracts. Prior to exercising any right of termination as a result of the Cure Costs exceeding the Cure Cost Cap pursuant to a violation of the closing condition set forth in Section 7.01(g), the Buyer will negotiate in good faith with counterparties to Assigned Contracts to reduce the Cure Costs or enter into new contracts, on commercially reasonable terms, in an attempt to reduce the Cure Costs to an amount below the Cure Cost Cap. In the event the Buyer is unable to do so, the Buyer shall provide the Seller with the option to pay the Cure Costs in excess of the Cure Costs Cap and, if Seller does so, Buyer shall be unable to assert a violation of the Cure Costs Cap closing condition set forth in Section 7.01(g). For the avoidance of doubt, to the extent that any Cure Cost Assigned Contract is terminated or rejected, the Cure Costs associated with such Cure Cost Assigned Contract shall not count towards the Cure Costs Cap.

## ARTICLE III
## CLOSING

**Section 3.01    Closing.**  On the terms and subject to the conditions of this Agreement, the consummation of the transactions contemplated by this Agreement shall take place at a closing (the "<u>Closing</u>") as promptly as practicable but not less than three (3) Business Days following the satisfaction or, to the extent permitted by applicable Law, waiver of all conditions to the obligations of the Parties set forth in Article VII (other than such conditions as may, by their terms, only be satisfied at the Closing or on the Closing Date, but subject to the satisfaction or waiver of such conditions), or at such other place or at such other time or on such other date as the Seller and the Buyer mutually may agree in writing.  The day on which the Closing takes place is referred to as the "<u>Closing Date</u>."  The Closing shall take place remotely by the electronic exchange of documents and signature pages in accordance with the terms of this Agreement without the requirement of any Party to be physically present at the Closing.  Each Party will participate in the Closing by delivery of its required funds or documents electronically under appropriate closing instructions, oral or written, or through its respective counsel or other agents, in each case in accordance with the Sale Order and the approval of the Bankruptcy Court.

**Section 3.02    Closing Deliverables.**

(a)    At the Closing, Seller shall deliver or cause to be delivered to Buyer the following:

(i)    a bill of sale for the Purchased Assets in form and substance reasonably satisfactory to the Buyer, duly executed by the Seller (the "<u>Bill of Sale</u>");

(ii)    an Intellectual Property Assignment and Assumption Agreement in a form reasonably satisfactory to the Buyer (the "<u>IP Assignment and Assumption Agreement</u>"), executed accordingly by Seller;

(iii)    a counterpart of the assignment and assumption agreement in a form agreed upon by Buyer and Seller (the "<u>Assignment and Assumption Agreement</u>"), duly executed by Seller;

(iv)    all other documents, instruments or certificates required to be delivered by Seller pursuant to this Agreement or reasonably requested by Buyer, including without limitation (x) any releases or valid termination instruments of any security interests with respect to the Purchased Assets to the extent requested by Buyer [and (y) all deliverables required by <u>Section 2.06</u> with respect to Inventory].

(b)    At the Closing, Buyer shall deliver or cause to be delivered to Seller (or to the other applicable Person set forth below) the following:

(i)    payment in cash of the Closing Payment to Seller, in accordance with <u>Section 2.05</u>;

        (ii)     a counterpart of the Assignment and Assumption Agreement, duly executed by Buyer; and

        (iii)    all other documents, instruments or certificates required to be delivered by Buyer pursuant to this Agreement.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF SELLER**

Except as set forth in the correspondingly numbered Sections of the Disclosure Schedules, Seller represents and warrants to Buyer that the statements contained in this <u>Article IV</u> are true and correct as of the Effective Date and as of the Closing Date.

**Section 4.01    Organization and Qualification of Seller.**

(a)     Seller is duly organized, validly existing and in good standing under the Laws of its state of incorporation.  Subject to any limitations imposed as a result of filing the Bankruptcy Case, Seller has full corporate power and authority to own, operate and lease the assets now owned, operated or leased by it and to carry on the Business as currently conducted, to own or use the Purchased Assets, and to perform all their obligations under the Assigned Contracts.  Seller is not, nor is it required to be, licensed or qualified to do business in any other jurisdiction as a result of the ownership of the Purchased Assets or the operation of the Business as currently conducted, except where the failure to be so licensed or qualified would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.

(b)     Except as set forth on <u>Section 4.01(b)</u> of the Disclosure Schedules, Seller does not have any subsidiaries or otherwise own any interest (debt, equity, or otherwise) in any other Person.

**Section 4.02    Authority of Seller.**  Subject to entry of the Sale Order, Seller has full legal power and authority to (a) enter into this Agreement and the other Transaction Documents to which it is a party, (b) carry out its obligations hereunder and thereunder and (c) consummate the transactions contemplated hereby and thereby.  Subject to entry of the Sale Order, the execution and delivery by Seller of this Agreement and any other Transaction Document to which it is a party, the performance of its obligations hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite action on the part of Seller.  Subject to entry of the Sale Order, this Agreement has been duly executed and delivered by Seller, and (assuming due authorization, execution and delivery by Buyer) constitutes a legal, valid and binding obligation, enforceable against Seller in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization or other Laws affecting creditors' rights generally and by general equitable principles.  Subject to entry of the Sale Order, when each other Transaction Document to which Seller is or will be a party has been duly executed and delivered by Seller (assuming due authorization, execution and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of Seller enforceable against it in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization or other Laws affecting creditors' rights generally and by general equitable principles.

17

**Section 4.03   No Conflicts; Consents.**   Subject to entry of the Sale Order, the execution, delivery and performance by Seller of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not:   (a) conflict with or result in a violation or breach of, or default under, any provision of the certificate of incorporation, bylaws or other organizational documents of Seller; (b) conflict with or result in a material violation or material breach of any provision of any Law or Governmental Order applicable to Seller or the Purchased Assets;  (c)  require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any Assigned Contract or Permit that is material to the operation of the Business with respect to the Purchased Assets and to which Seller is a party or by which Seller is bound or to which any of the Purchased Assets are subject (including any Assigned Contract); provided that the Contracts set forth in <u>Section 4.03</u> of the Disclosure Schedules may contain anti-assignment provisions which, absent entry of the Sale Order might prohibit assignment, provided further that the inclusion of a Contract or agreement on <u>Section 4.03</u> shall not be construed as an admission by any party that any such anti-assignment provisions are enforceable under applicable bankruptcy or non-bankruptcy law; or (d) result in the creation or imposition of any Encumbrance other than Permitted Encumbrances on the Purchased Assets.   Except as required in connection with the Bankruptcy Case and as set forth on <u>Section 4.03</u> of the Disclosure Schedules, no consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Seller in connection with the execution and delivery of this Agreement or any of the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby.

**Section 4.04   Financial Statements.**   Complete copies of the Seller's (a) financial statements consisting of its balance sheets as of December 31, 2024 and December 31, 2023 and the related profit and loss statements for the years then ended (the "<u>Annual Financial Statements</u>"), and (b) financial statements consisting of the balance sheet of the Seller as of November 30, 2025 and the related profit and loss statements for the eleven (11)-month period then ended (the "<u>Interim Financial Statements</u>," and together with the Annual Financial Statements, the "<u>Financial Statements</u>") have been delivered to Buyer.  The Financial Statements have been prepared in accordance with GAAP, applied on a consistent basis throughout the periods involved.  The Financial Statements are based on the Seller's books and records, and fairly present the financial condition of Seller and the Business as of the applicable dates and the results of the operations of Seller and the Business for the periods indicated.  The balance sheet of Seller as of December 31, 2024 is referred to herein as the "<u>Balance Sheet</u>" and the date thereof as the "<u>Balance Sheet Date</u>" and the balance sheet of Seller as of November 30, 2025 is referred to herein as the "<u>Interim Balance Sheet</u>" and the date thereof as the "<u>Interim Balance Sheet Date</u>."

**Section 4.05   Absence of Certain Changes, Events and Conditions.**   Since the Interim Balance Sheet Date, and other than in the ordinary course of business consistent with past practice, there has not been any:   (a) Material Adverse Effect; (b) material change in any method of accounting or accounting practice of Seller; (c) except with respect to Schoolhouse and Dansk Inventory, transfer, assignment, sale or other disposition of any of the Purchased Assets (including all Intellectual Property or other intangible assets related to Schoolhouse and Dansk);

(d) cancellation of any debts or claims or amendment, termination or waiver of any rights constituting Purchased Assets; (e) imposition of any Encumbrance, except for Permitted Encumbrances, upon any of the Purchased Assets; or (f) except with respect to Schoolhouse and Dansk Inventory, any Contract to do any of the foregoing, or any action or omission by Seller that would result in any of the foregoing.

**Section 4.06    Material Contracts.**

(a)    Section 4.06(a) of the Disclosure Schedules lists, each of the following Contracts, including the names of the parties to the Contracts, a brief description of the goods or services provided thereunder, and contact information for the counterparties to the Contracts (the "Material Contracts"), copies of each of which have been delivered to Buyer prior to the date hereof:

(i)    any Contracts involving aggregate annual consideration in excess of Fifty Thousand Dollars ($50,000) and which, in each case, cannot be cancelled without penalty or without more than 90 days' notice;

(ii)    any Contracts that limit or purport to limit the ability of Seller to compete in any line of business or with any Person or in any geographic area or during any period of time;

(iii)    any Contracts for the sale of any of the Purchased Assets or for the grant to any Person of any option, right of first refusal or preferential or similar right to purchase any of the Purchased Assets;

(iv)    any Contracts that require Seller to exclusively purchase, or purchase all of its requirements for, any product or service from any Person or Persons, or grant exclusivity to any Person or Persons;

(v)    any Contracts providing for any joint venture or material partnership or other similar material agreement involving co-investment between the Business and any other Person;

(vi)    any Contracts with any Governmental Authority to which Seller is a party and relating to the Business or the Purchased Assets;

(vii)    any Contracts with Material Customers and Material Vendors, including without limitation, Contracts with vendors who manufacture inventory and Contracts relating to the distribution channels through which Seller sells their products;

(viii)    Contracts with warehouseman for each location at which Inventory is stored; and

(ix)    any other Contracts, plans or arrangements that are material to the Business as currently conducted or the Purchased Assets.

(b)    Each Material Contract is valid and binding on Seller in accordance with its terms and is in full force and effect.  Except as set forth on Section 4.06(b) of the Disclosure Schedules, neither Seller nor, to the Knowledge of Seller, any other party thereto is in breach of or default

under (or is alleged to be in breach of or default under), or has provided or received any notice of any intention to terminate or materially modify, any Material Contract.  No event or circumstance has occurred that, with notice or lapse of time or both, would constitute an event of default under any Material Contract or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit thereunder.  Complete and correct copies of each Material Contract (including all modifications, amendments and supplements thereto and waivers thereunder) have been made available to Buyer at least five (5) Business Days prior to the Effective Date.

(c)    Section 4.06(c) of the Disclosure Schedules set forth a complete and accurate list, as of January 9, 2026, of all 2025 Media Receivables.

**Section 4.07    Title to Assets.**  Subject to any defaults that may arise due to the filing of the Bankruptcy Case and except for the Inventory that will be sold in connection with the liquidation of Schoolhouse and Dansk, Seller has good and valid title to, or a valid leasehold interest in, all of the Purchased Assets (including all Intellectual Property or other intangible assets related thereto).  Except as set forth on Section 4.07 of the Disclosure Schedules, all such Purchased Assets (including leasehold interests) are held by Seller free and clear of Encumbrances except for Permitted Encumbrances, it being acknowledged that the Purchased Assets will be transferred to Buyer free and clear of all Encumbrances pursuant to the terms of the Sale Order.

**Section 4.08    Condition and Sufficiency of Assets.**  Except for the Excluded Assets, the Purchased Assets constitute all of the assets used by Seller to conduct the Business as currently conducted.

**Section 4.09    Real Property.**

(a)    Seller does not own any real property.

(b)    Seller does not lease any real property other than the real property leased pursuant to the Corporate HQ Lease and the Schoolhouse Facility Lease.

**Section 4.10    Customers and Vendors.**

(a)    Section 4.10 of the Disclosure Schedules sets forth (a) an accurate and complete list of the names, addresses and contract information of all of Seller's customers who were invoiced or are expected to be invoiced at least Fifty Thousand Dollars ($50,000) during calendar year 2025 (each, a "Material Customer"), and (b) the amount of consideration paid by each Material Customer during such period.  Seller has not received any written notice, and has no reason to believe, that any of the Material Customers has ceased or intends to cease after the Closing, to use the goods or services of the Business or to otherwise terminate or materially reduce its relationship with the Business.

(b)    Section 4.10 of the Disclosure Schedules sets forth (a) an accurate and complete list of the names, addresses and contact information of all of Seller's vendors to which Seller paid or expects to pay at least Fifty Thousand Dollars ($50,000) during calendar year 2025 (each, a "Material Vendor"), and (b) the amount of consideration paid to each Material Vendor during such

period.  Seller has not received any written notice, and has no reason to believe, that any of the Material Vendors has ceased or intends to cease after the Closing, to provide goods or services to the Business or to otherwise terminate or materially reduce its relationship with the Business.

### Section 4.11    Legal Proceedings; Governmental Orders.

(a)    Section 4.11 of the Disclosure Schedules includes a list of all currently pending or, to the Knowledge of Seller, threatened Actions against or by Seller that:  (i) relate to or affect the Purchased Assets, the Intellectual Property or the Business; or (ii) challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.  To the Knowledge of Seller, no additional event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

(b)    Except as set forth on Section 4.11 of the Disclosure Schedules, there are no outstanding Governmental Orders and no unsatisfied judgments, penalties or awards against, relating to or affecting the Purchased Assets, the Intellectual Property or the Business.

### Section 4.12    Compliance with Laws; Permits.

(a)    For the three (3) year period immediately preceding the Closing Date, Seller has complied, and is now complying, in all material respects, with all Laws applicable to the ownership and use of the Purchased Assets, except where failure to so comply would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.

(b)    All Permits required for Seller for the ownership and use of the Purchased Assets have been obtained by Seller and are valid and in full force and effect.  All fees and charges due with respect to such Permits as of the Closing have been paid in full prior to the Closing Date.  To the Knowledge of Seller, no event has occurred that, with or without notice or lapse of time or both, would reasonably be expected to result in the revocation, suspension, lapse or limitation of any such Permit.

### Section 4.13    Taxes.

(a)    All Tax Returns required to be filed by Seller have been timely filed.  All Tax Returns filed or required to be filed by Seller are true, complete and correct in all material respects and were prepared in substantial compliance with all applicable Laws and regulations.  Seller is not currently the beneficiary of any extension of time within which to file any Tax Return.  Except as set forth on Section 4.13(a) of the Disclosure Schedules, all Taxes due and owing or claimed due by a Governmental Authority by Seller have been timely paid.

(b)    Except as set forth on Section 4.13(b) of the Disclosure Schedules, there are currently no proposed or pending adjustments by any Governmental Authority in connection with any Tax Returns.

(c)    There are no Encumbrances for Taxes upon any of the Purchased Assets nor is any taxing authority in the process of imposing any Encumbrances for Taxes on any of the Purchased Assets (other than for current Taxes not yet due and payable).  All of the Purchased Assets have

been properly listed and described on the property Tax rolls for all periods prior to and including the Closing Date, and no portion of the Purchased Assets constitutes omitted property for property Tax purposes.

(d)    Neither Seller nor any Affiliate thereof is a "foreign person" as that term is used in Treasury Regulations Section 1.1445.2.

(e)    To the Knowledge of Seller, no claim has ever been made by a Governmental Authority in a jurisdiction where Seller does not file Tax Returns that the Purchased Assets are or may be subject to taxation by that jurisdiction.

**Section 4.14    Relationships with Related Persons.**  Except as set forth on Section 4.14 of the Disclosure Schedules, no Related Person of Seller or of Seller's Affiliates has, or since January 1, 2022 had, any interest in any of the Purchased Assets or the Intellectual Property, or is party to a Contract with, or has any claim or right against, Seller with respect to the Purchased Assets or the Intellectual Property.

**Section 4.15    Brokers.**  Except as set forth in Section 4.14 of the Disclosure Schedules, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Seller.

**Section 4.16    Data Privacy.**  Seller is and has been in compliance in all material respects with (a) all applicable privacy Laws in all relevant jurisdictions, (b) its privacy policies and (c) the requirements of any Contract or code of ethics or code of conduct to which Seller is a party, in each case in connection with Seller's collection, storage, transfer (including any transfer across national borders) or use of any personally identifiable information from any individuals, including any customers, prospective customers, employees, individuals participating in legal proceedings or other activities for which Seller is providing services, or other third parties (collectively, the "Personal Information").  Seller has all rights or licenses necessary to transfer Personal Information and all documents maintained by Seller on behalf of its customers to Buyer.  Seller has commercially reasonable physical, technical and administrative security measures and policies in place to protect all Personal Information collected by it or on its behalf from and against unauthorized access, use or disclosure.  To the Knowledge of Seller, Seller is and has been in compliance in all material respects with all Laws relating to data loss, theft and breach.

**Section 4.17    Intellectual Property.**

(a)    Section 4.17(a) of the Disclosure Schedules sets forth all known Intellectual Property used or held for use in, or necessary for, the conduct of the Business as currently conducted by Seller or otherwise relating to the Purchased Assets, including all Intellectual Property registered with or pending before any Governmental Authority (the "Seller Intellectual Property").  Except as set forth on Section 4.17(a) of the Disclosure Schedules, Seller owns all right, title and interest in and to, or otherwise holds an exclusive license to use, the Seller Intellectual Property, free and clear of Encumbrances (other than Permitted Encumbrances).  The Seller Intellectual Property is valid and subsisting and Seller has taken all reasonable steps required to maintain the validity of and enforce the Seller Intellectual Property, including continuous use

of trademarks that constitute Seller Intellectual Property, and, except as set forth on <u>Section 4.17(a)</u> of the Disclosure Schedules, to the Knowledge of Seller, no Person is impairing, making unauthorized use of, misappropriating, infringing upon, violating or otherwise taking any action materially conflicting with any Seller Intellectual Property.  Except as would not reasonably be expected to be material to the Business, Seller has not received within the two (2) years prior to the date hereof any written claim, and is not currently a party to any pending Action, alleging that Seller's operation of the Business or use of the Purchased Assets infringes, misappropriates or otherwise violates the Intellectual Property of any third party.  The Seller Intellectual Property comprises all of the Intellectual Property necessary to operate the business of the Company in substantially the same manner as operated immediately prior to the Closing.  The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein, and the compliance with the provisions of this Agreement do not and will not conflict with, alter or impair any of the rights of Seller in any Seller Intellectual Property or the validity, enforceability, use, right to use, ownership, priority, duration, scope or effectiveness of any Seller Intellectual Property. All Seller Intellectual Property will be owned by or licensed for use by Purchaser immediately after the Closing on substantially the same terms and conditions as by Seller immediately prior to the Closing.  Seller represents and warrants that Seller owns legal title and any applicable copyrights and other intellectual property rights in all text, images, designs and other content appearing on the Online Platforms.

(b)    To the Knowledge of Seller, Seller has entered into binding, valid and enforceable written Contracts with each current and former employee and independent contractor whereby such employee or independent contractor (i) acknowledges Seller's exclusive ownership of all Seller Intellectual Property invented, created or developed by such employee or independent contractor within the scope of his or her employment or engagement with Seller; (ii) grants to Seller a present, irrevocable assignment of any ownership interest such employee or independent contractor may have in or to such Intellectual Property; and (iii) irrevocably waives any right or interest, including any moral rights, regarding such Intellectual Property, to the extent permitted by applicable Law. Seller has provided Buyer with true and complete copies of all such Contracts.

**Section 4.18    Environmental Matters.**  Seller is, and for the past two years has been, in compliance in all material respects with all Environmental Laws applicable to the Purchased Assets and the Business.  Seller has not received any written notice of, and to the Knowledge of Seller, is not the subject of, any pending or threatened Action relating to any actual or alleged violation of Environmental Laws or the release of any hazardous materials relating to the Business or the Purchased Assets.  Seller has obtained and is in compliance in all material respects with all environmental Permits required for the operation of the Business, all of which are in full force and effect.

**Section 4.19    Employee Matters.**

(a)    Except as set forth on <u>Section 4.19</u> of the Disclosure Schedules, there are no employment, consulting, severance or indemnification contracts between Seller and any of its employees.

(b)      Neither Seller nor any ERISA Affiliate has incurred any liability with respect to any Benefit Plan, which may create, or result in any liability to Buyer.

**Section 4.20    No Prior Sale of Assets.**  Except for (i) the sale of inventory in the ordinary course of business, (ii) the Inventory sold in connection with the liquidation of Schoolhouse and Dansk, and (iii) the physical assets sold in connection with the shutdown of the Portland, Oregon, office, prior to the date hereof Seller has not transferred, assigned, licensed, sold, or otherwise disposed of any rights or any assets owned by Seller that would enable any third parties to compete with the business to be conducted by Buyer following the Closing, including, but not limited to, the Intellectual Property within the Purchased Assets.

**Section 4.21    No Other Representations.**  Except as set forth in this Article IV and in the Bankruptcy Case filings, Seller has not made any representation or warranty as to any aspect of Seller or the Purchased Assets, or its Liabilities, businesses or results of operations, and Buyer disclaims its reliance upon any statement or information other than the representations and warranties of Seller set forth in this Article IV and in the Bankruptcy Case filings.  No representation or warranty by Seller in this Article IV or any Bankruptcy Case filing, and no statement contained in this Article IV or contained in any Bankruptcy Case filing contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that the statements contained in this Article V are true and correct as of the date of this Agreement and as of the Closing Date.

**Section 5.01    Organization of Buyer.**  Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of Delaware.

**Section 5.02    Authority of Buyer.**  Buyer has full company power and authority to enter into this Agreement and the other Transaction Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery by Buyer of this Agreement and any other Transaction Document to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite company action on the part of Buyer.  This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Seller) this Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization or other Laws affecting creditors' rights generally and by general equitable principles.  When each other Transaction Document to which Buyer is or will be a party has been duly executed and delivered by Buyer (assuming due authorization, execution and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of Buyer enforceable against it in accordance with its terms, except as may be

24

limited by bankruptcy, insolvency, reorganization or other Laws affecting creditors' rights generally and by general equitable principles.

**Section 5.03    No Conflicts; Consents.**  The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the certificate of formation, operating agreement or other organizational documents of Buyer; (b) conflict with or result in a material violation or breach of any provision of any Law or Governmental Order applicable to Buyer; or (c) require the consent, notice or other action by any Person, conflict with, result in a violation or breach of, constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any Contract to which Buyer is a party or by which Buyer is bound.  No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby.

**Section 5.04    Sufficiency of Funds.**  Buyer has sufficient cash on hand or other financial resources available to it to satisfy its monetary obligations under this Agreement, including the payment of the Purchase Price at the Closing in accordance with Article II.

**Section 5.05    Brokers.**  Buyer has not engaged any agent, broker or other Person acting pursuant to the express or implied authority of Buyer which is or may be entitled to a commission or broker or finder's fee in connection with the transactions contemplated by this Agreement or otherwise with respect to the sale of the Purchased Assets.

**Section 5.06    No Other Representations.**  Except as set forth in this Article V, neither Buyer nor any of its Representatives have made any representation or warranty as to any aspect of Buyer or its assets, Liabilities, businesses or results of operations, and Seller disclaims its reliance upon any statement or information other than the representations and warranties of Buyer set forth in this Article V.

**Section 5.07    Certain Acknowledgments**.  BUYER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ARTICLE IV ABOVE, THE TRANSACTION DOCUMENTS OR ANY CERTIFICATE DELIVERED IN CONNECTION HEREWITH, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS INCLUDING EXPENSES TO BE INCURRED IN CONNECTION WITH THE PURCHASED ASSETS, THE PHYSICAL CONDITION OF ANY PERSONAL PROPERTY COMPRISING A PART OF THE PURCHASED ASSETS OR THAT IS THE SUBJECT OF ANY OTHER ASSUMED LEASE OR ASSIGNED CONTRACT TO BE ASSUMED BY BUYER AT THE CLOSING,  THE VALUE OF THE PURCHASED ASSETS (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF PROPERTY, THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE MERCHANTABILITY OR FITNESS OF THE PERSONAL PROPERTY OR ANY OTHER PORTION OF THE

PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE.  WITHOUT IN ANY WAY LIMITING THE FOREGOING, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ARTICLE IV ABOVE, THE TRANSACTION DOCUMENTS OR ANY CERTIFICATE DELIVERED IN CONNECTION HEREWITH, SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS. BUYER FURTHER ACKNOWLEDGES THAT, BUYER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE PURCHASED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE PURCHASED ASSETS AS BUYER DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH BUYER'S ACQUISITION OF THE PURCHASED ASSETS, BUYER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS AND ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE IV, ANY TRANSACTION DOCUMENT OR ANY CERTIFICATE DELIVERED IN CONNECTION HEREWITH. ACCORDINGLY, SUBJECT TO THE FOREGOING, BUYER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS" BASIS, AS QUALIFIED BY THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE IV.  BUYER HEREBY EXPRESSLY ACKNOWLEDGES THAT THE ASSIGNMENT AND ASSUMPTION OF THE ASSUMED LEASES AND ASSIGNED CONTRACTS FORMING PART OF THE PURCHASED ASSETS WILL BE CONSUMMATED IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT NOTWITHSTANDING ANY AND ALL OUTSTANDING DEFAULTS AND OTHER CLAIMS FOR FAILURES TO COMPLY WITH THE PROVISIONS OF SUCH ASSUMED LEASES AND ASSIGNED CONTRACTS, CERTAIN OF WHICH DEFAULTS OR CLAIMS MAY NOT BE SUBJECT TO CURE OR WAIVER.

## ARTICLE VI
## COVENANTS

**Section 6.01    Conduct of Business.**  Except (a) as otherwise expressly contemplated by this Agreement, (b) upon the prior written consent of Buyer or (c) at the direction of the Bankruptcy Court, from the Effective Date until the Closing Date (or the earlier valid termination of this Agreement), Seller shall use commercially reasonable efforts to conduct the Business in the ordinary course, preserve intact the Purchased Assets and use commercially reasonable efforts to maintain and preserve the current organization and operations of the Business, including Seller's material business and regulatory relationships (including with Material Customers and Material Vendors).  Such commercially reasonable efforts shall include, but not be limited to, posting content to Seller's Accounts no less frequently than once every twenty-four (24) hours and refreshing the content on Seller's home page at least five (5) times in any given seven (7) day period.  Without limiting the foregoing (but subject to the express limitation set forth in the first sentence of this Section 6.01), Seller shall not, and shall cause its Affiliates not to, take any of the following actions in respect of the Purchased Assets without the prior written consent of Buyer: (i) sell, transfer, license or otherwise dispose of, or encumber in any manner, any Purchased Asset, (ii) terminate, amend or modify any Material Contract, or (iii) cause Seller to merge or consolidate with any other Person.

**Section 6.02    Access to Information.**  During the period commencing on the Effective Date and ending on the Closing Date (or the earlier valid termination of this Agreement), Seller shall, and shall cause its Affiliates to, cooperate with Buyer and give Buyer and its representatives (including Buyer's accountants, consultants, counsel and employees), upon reasonable notice and during normal business hours, full access to the properties, contracts, leases, equipment, employees, affairs, books, documents, records and other information of Seller to the extent relating to the Business, the Purchased Assets, Assumed Liabilities, and any other aspect of this Agreement, and shall cause their respective officers, employees, agents and representatives to furnish to Buyer all available documents, records and other information (and copies thereof), to the extent relating to the Business, the Purchased Assets, Assumed Liabilities, and any other aspect of this Agreement, in each case, as Buyer may reasonably request.

**Section 6.03    Employees and Employee Benefits.**  Seller shall be solely responsible at all times after the Closing, and Buyer shall have no Liability for, (i) Liabilities relating to Benefit Plans (including, but not limited to, accrued and unused sick leave, vacation or other paid time off) and (ii) any compensation or other amounts payable to any current or former employee, officer, director, manager, independent contractor or consultant of Seller, including hourly pay, commission, bonus, salary or accrued, unused paid time off as may be required by applicable Law, with respect to any services provided to Seller.  Seller shall pay all such amounts to all entitled Persons as soon as reasonably practicable and in accordance with Seller's regular pay practices; *provided, however*, that Seller must make all such payments in accordance with applicable Law. For avoidance of doubt, each of the foregoing shall constitute Excluded Liabilities.

**Section 6.04    Confidentiality.** From and after the Closing, Seller shall, and shall cause its Affiliates to, hold, and shall use their commercially reasonable efforts to cause their respective Representatives to hold, in confidence any and all Confidential Information, except to the extent that such party can show that such information (a) is generally available to and known by the public through no fault of Seller or its Affiliates or their respective Representatives; or (b) is lawfully acquired by such party or any of its Affiliates or Representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation.  If Seller or any of its Affiliates or their respective Representatives are compelled to disclose any Confidential Information by judicial or administrative process or by other requirements of Law at any time after the Closing, such party shall promptly notify Buyer in writing to the extent it is permitted to do so and shall disclose only that portion of such information which such party is advised by its counsel in writing is legally required to be disclosed.  Notwithstanding the foregoing, (a) Seller may disclose Confidential Information regarding Seller (and only Seller) to any Third Party pursuant to any discussions or negotiations that would be reasonably likely to lead to an Alternative Transaction, in accordance with the applicable motions of the Bankruptcy Case and as approved by the Bankruptcy Court provided that such information does not disclose or include any confidential or proprietary information of Buyer and (b) an executed copy of this Agreement may be filed publicly with the Bankruptcy Court and may also be disclosed to any Third Party pursuant to any discussions or

negotiations that would be reasonably likely to lead to an Alternative Transaction, provided such Third Party executes a non-disclosure agreement acceptable by Buyer and Seller.

**Section 6.05    Public Announcements.**  Subject to the provisions of the Bankruptcy Code and Seller's and Buyer's right to make such filings and disclosures as it deems necessary in good faith in connection with the Bankruptcy Case, or as otherwise required by applicable Law (based upon the reasonable advice of counsel), no Party shall make any public announcement in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media without the prior written consent of the other Parties (which consent shall not be unreasonably withheld or delayed), and the Parties shall cooperate as to the timing and contents of any such announcement.  For the avoidance of doubt, the Parties consent that this Agreement will be publicly filed on the docket of the Seller's Chapter 11 Case and the Seller may publicly disclose that it entered into this Agreement for a going-concern sale of the Purchased Assets for the consideration set forth herein, and that it intends to seek Bankruptcy Court approval of this Agreement, subject to any higher or better bids that may be submitted in the section 363 sale process, in accordance with the milestones set forth herein.

**Section 6.06    Receivables and Expenses.**

(a)      Seller shall fulfill, and shall remain solely responsible for, any purchase orders received in connection with the Business and accepted by Seller prior to the Closing.  If, following the Closing, Seller or any of its Affiliates receive or collect any funds relating to the Purchased Assets, Seller or its Affiliate shall remit such funds to Buyer within ten (10) Business Days after receipt thereof.  From and after the Closing, if Buyer receives or collects any funds relating to any Excluded Asset or receives or collects any funds relating to the Purchased Assets for purchase orders received prior to the Closing, Buyer shall remit any such funds to Seller within ten (10) Business Days after receipt thereof.

(b)      Other than Cure Costs, if, following Closing, Buyer receives a bill for expenses related to any (i) Purchased Asset for the period prior to or on the Closing or (ii) Excluded Asset, Buyer shall promptly provide a copy of such bill to Seller and Seller shall as promptly as reasonably practicable pay such bill in accordance with its terms.  If Seller receives a bill related to any Purchased Asset for a period after the Closing, Seller shall promptly provide a copy of such bill to Buyer and Buyer shall as promptly as reasonably practicable pay such bill in accordance with its terms.  In the event that Buyer and/or Seller receives or prior to the date hereof has already paid a bill for expenses related to a Purchased Asset where such bill for expenses includes both the period before and after the Closing, such Party shall promptly provide a copy of such bill to the other party and both Parties shall as promptly as reasonably practicable pay the portion of the bill relating to their respective period of responsibility.

(c)      Buyer shall purchase, and Seller shall sell to Buyer, all media receivables other than the 2025 Media Receivables (the "Sold Receivables"), and Seller shall pay over to Buyer any amounts collected on the Sold Receivables within two (2) Business Days of receipt.  Any collections on the Sold Receivables collected by Seller prior to the Closing Date shall be segregated and paid over to Buyer on the Closing Date.

**Section 6.07    Tax Matters.**

(a)    Any and all property transfer, documentary, stamp, registration, recording, filing, goods and services, value added or other similar Taxes payable as a result of or with respect to the sale or transfer of the Purchased Assets and the Business and the assumption of the Assumed Liabilities pursuant to this Agreement ("Transfer Taxes") shall be borne by the Buyer and Buyer shall timely file all Tax Returns related to any Transfer Taxes.

(b)    Seller and Buyer hereby agree that all *ad valorem* Taxes relating to the Purchased Assets shall be prorated to take into account the period of time such Purchased Assets were owned by Seller and Buyer.  Such proration shall, initially, be based on the most recent Tax statements, received by Seller as of the Closing Date.  Seller shall be responsible for all such Taxes allocable to all times on or prior to the Closing Date, and Buyer shall be responsible for all such Taxes allocable to all times after the Closing Date.

(c)    The Seller and Buyer hereby agree that the acquisition of the Purchased Assets shall be treated as a sale of undivided interests in the Purchased Assets by and between the Seller and Buyer for federal income Tax purposes to the extent attributable to the Purchase Price and any allocable liabilities.  Each Party agrees not to assert, in connection with any Tax Return, Tax audit or similar proceeding, any position inconsistent with the Tax treatment and determinations described in this Agreement.

**Section 6.08    Use of Name.**  Seller agrees that Seller and its Affiliates shall, as promptly as practicable (but in no event later than two (2) days) after the Closing, cease doing business under any identical or substantially similar name to the legal name of Seller, including, but not limited to, any name which includes the "Food52", "Five Two", "Schoolhouse" or "Dansk" name; *provided* that Seller and its Affiliates shall be permitted to use the names "Food52" and "Schoolhouse" solely to the extent necessary in the winding up of the business and affairs of Seller. Seller shall use commercially reasonable efforts to, no later than five (5) days after the Closing, legally change Seller's corporate and business names (to the extent such names include any identical or substantially similar name to the legal name of Seller) to names that are not confusingly similar to such names, and file notices of such name changes with the Bankruptcy Court.  Within fifteen (15) days of Closing, Seller shall file a motion with the Bankruptcy Court requesting entry of an Order authorizing change of case caption to remove references to "Food52".  As of the Closing, Seller and its Affiliates hereby expressly consent to Buyer's perpetual and royalty-free use and exploitation of the "Food52", "Five Two", "SchoolHouse" and "Dansk" names and all variations thereof world-wide in connection with Buyer's use in commerce of the Intellectual Property.  Following the Closing, neither Seller nor any of its Affiliates shall grant any license or other right to use the name "Food52", "Five Two", "SchoolHouse" or "Dansk" to any other Person.

**Section 6.09    Cooperation.**  From the Effective Date until the Closing Date, each of Seller and Buyer agree to cooperate with each other in determining whether filings are required to be made or consents required to be obtained in any jurisdiction in connection with the consummation of the transactions contemplated by this Agreement and in making or causing to be made any such filings promptly and in seeking to obtain timely any such consents.  Without limiting the specific obligations of any Party hereto under any covenant or agreement hereunder, each Party shall use

its good faith efforts to take all action and do all things necessary to consummate the transactions contemplated in this Agreement as soon as reasonably practicable.

**Section 6.10** **Actions Regarding Intellectual Property; Domains.**    Prior to, at, or immediately following the Closing:  (i) Seller shall deliver to Buyer the administrative and technical access credentials (user names, passwords, access keys, etc.) required for Buyer to assume ownership and control of the domains, website(s), social media platforms, Amazon Web Store, Shopify and other online accounts and services specified on Exhibit A (Purchased Assets) under the heading "V – Other Assets and Related Access Rights" (collectively, the "Online Platforms"); and (ii) in cooperation with Buyer, Seller shall arrange for the transfer of ownership and administrative control of the Online Platforms to Buyer, in accordance with the requirements and procedures of the applicable registrars and platform service providers, and provide any additional information set forth on Exhibit A (Purchased Assets) under the heading "V – Other Assets and Related Access Rights".  Any fees that may be required by the Online Platforms to effect such change of ownership and control shall be paid by Buyer, provided that past due amounts related to the pre-Closing period shall be the responsibility of Seller.  Seller and Buyer shall cooperate with each other in good faith to effect such transfers of ownership and control of the Online Platforms.  Seller's failure to timely comply with its foregoing covenants shall be deemed a material default under this Agreement.

**Section 6.11 Further Assurances.**

(a)    Following the Closing, each of the Parties shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the other Transaction Documents.

(b)    For a period not to exceed two (2) weeks post-Closing, in the event that there is a Contract with a customer or vendor of Seller that is not included in the Assigned Contracts at Closing but that is discovered by Seller or Buyer after the Closing, Seller or Buyer shall notify the other party of such Contract and Buyer shall have the option to take assignment thereof without the payment of any additional consideration; provided, however, that any such Contract shall be added to the Assigned Contracts list on Exhibit A and Buyer shall pay the Cure Costs to assume such Contract.

**Section 6.12    Access to Books and Records.**  From and after the Closing, upon request by Seller, Buyer will permit Seller and Seller's Representatives to have reasonable access during normal business hours, at the sole expense of Seller and in a manner so as not to interfere unreasonably with the normal business operations of Buyer, to all premises, properties, personnel, books and records, and Contracts for the purposes of (a) preparing Tax Returns and (b) to facilitate the wind down of Seller

30

**Section 6.13    2025 Media Receivables.** On or before January 9, 2026, Seller shall deliver to Buyer a fully populated <u>Schedule 4.06(c)</u> setting forth the amount of the 2025 Media Receivables.

# ARTICLE VII
## CONDITIONS TO CLOSING

**Section 7.01    Conditions to Buyer's Obligation to Close.** The obligation of Buyer under this Agreement to effect the Closing shall be subject to the fulfillment at or prior to the Closing of each of the following conditions, any of which may be waived in writing by Buyer:

(a)    (i) the Fundamental Representations shall be true and correct in all respects on and as of the Effective Date and at and as of the Closing Date (unless such representation or warranty is given as of a particular date in which case such representation or warranty shall be true and correct on and as of such date), and (ii) each of the other representations and warranties of Seller set forth in <u>Article IV</u> shall be materially true and correct on and as of the Effective Date and at and as of the Closing Date (unless such representation or warranty is given as of a particular date in which case such representation or warranty shall be true and correct on and as of such date), except with respect to this clause (ii) for any failure to be so true and correct that, individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect;

(b)    Seller shall have complied with and performed in all material respects all of the agreements and covenants required by this Agreement and each other Transaction Document to be performed or complied with by Seller on or prior to the Closing;

(c)    Seller shall have delivered to Buyer a certificate, dated as of the Closing Date and executed by a duly authorized officer of Seller, certifying that the conditions set forth in <u>Section 7.01(a)</u> and <u>7.01(b)</u> have been satisfied;

(d)    Seller shall have delivered or caused to be delivered to Buyer each of the documents, agreements and other deliverables set forth in <u>Section 3.02(a)</u>, including each Transaction Document duly executed by Seller (and any other applicable parties thereto);

(e)    No Material Adverse Effect shall have occurred; and

(f)    (i) The Bankruptcy Court shall have entered the Sale Order and (ii) no order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date; and

(g)    The Cure Costs associated with the Cure Cost Assigned Contracts shall exceed the Cure Costs Cap and Seller is unable to satisfy the amount of the Cure Costs over and above the Cure Costs Cap.

**Section 7.02    Conditions to Seller's Obligation to Close.** The obligation of Seller under this Agreement to effect the Closing shall be subject to the fulfillment at or prior to the Closing of each of the following conditions, any of which may be waived in writing by Seller:

(a)      Each of the representations and warranties of Buyer set forth in <u>Article V</u> shall be true and correct on and as of the Effective Date and at and as of the Closing Date (unless such representation or warranty is given as of a particular date in which case such representation or warranty shall be true and correct on and as of such date), except for any failure to be so true and correct that, individually or in the aggregate, has not had and would not reasonably be expected to have a material adverse effect on the ability of Buyer to timely consummate the transactions contemplated hereby;

(b)      Buyer shall have complied with and performed in all material respects all of the agreements and covenants required by this Agreement and each other Transaction Document to be performed or complied with by it on or prior to the Closing;

(c)      Buyer shall have delivered to Seller a certificate, dated as of the Closing Date and executed by a duly authorized officer of Buyer, certifying that the conditions set forth in <u>Section 7.02(a)</u> and <u>7.02(b)</u> have been satisfied;

(d)      Buyer shall have delivered or caused to be delivered to Seller each of the documents, agreements and other deliverables set forth in <u>Section 3.02(b)</u>, including each Transaction Document duly executed by Buyer (and any other applicable parties thereto);

(e)      The Sale Order shall have been entered by the Bankruptcy Court, and such Sale Order shall be in effect and not reversed or stayed, or modified in any material respect; and

(f)      All Cure Costs shall have been paid by Buyer.

## ARTICLE VIII
## TERMINATION

**Section 8.01    Termination.**

(a)      This Agreement may be terminated at any time prior to the Closing, by written notice from the terminating Party to the other Party (other than a termination pursuant to <u>Section 8.01(a)(i)</u>) only as follows:

(i)      by the mutual written agreement of Seller and Buyer;

(ii)      by either Seller or Buyer if the Bankruptcy Court enters a final order approving the sale of all or any of the Purchased Assets to a Third Party, unless such final order results from the failure of the Party seeking to terminate this Agreement to perform in any material respect any of its obligations under this Agreement required to be performed by it at or prior to the Closing;

(iii)      by either Seller or Buyer at or prior to the Bankruptcy Court hearing regarding approval of this Agreement, if an Alternative Transaction for an aggregate purchase price exceeding the Purchase Price is accepted and approved by the Bankruptcy Court;

(iv)      by either Seller or Buyer, if the Closing has not occurred on or before February 28, 2026 (the "<u>Outside Date</u>"); <u>provided</u>, that the right to terminate this Agreement under

this Section 8.01(a)(iv) shall not be available to a Party if the Closing has not occurred prior to the Outside Date due to such Party's or its Affiliate's failure to perform any covenant or obligation under this Agreement;

(v)    by Buyer if Seller has breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, and such breach or failure to perform would give rise to the failure of a condition set forth in Section 7.01(a) or Section 7.01(b) and such breach or failure has not been cured within thirty (30) days from the date Buyer notifies Seller in writing of such breach or failure; or

(vi)    by Seller if Buyer has breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, and such breach or failure to perform would give rise to the failure of a condition set forth in Section 7.02(a) or Section 7.02(b) and such breach or failure has not been cured by thirty (30) days from the date Seller notifies Buyer in writing of such breach or failure.

**Section 8.02    Effect of Termination.**  If this Agreement is terminated pursuant to Section 8.01, this Agreement shall become null and void and of no further force and effect, without any Liability (except as set forth in Section 9.06) or obligation on the part of any Party or its Affiliates; provided that Section 6.04, this Section 8.02, Article IX and Article X shall remain in full force and effect.  Notwithstanding the foregoing or anything to the contrary set forth in this Agreement, termination of this Agreement shall not relieve any Party or any of its Affiliates from Liability for fraud or willful and material breach of any covenant or agreement set forth in this Agreement prior to its termination; provided that in no event will Buyer's aggregate Liability hereunder (whether in respect of fraud, willful and material breach or otherwise and whether in equity or at law, in Contract, in tort or otherwise) exceed $400,000.

## ARTICLE IX
## BANKRUPTCY MATTERS

**Section 9.01    Bankruptcy Court Approval.**  Each of Seller and Buyer acknowledges that this Agreement and the sale of the Purchased Assets to Buyer (and any Designated Buyer) and the assumption of the Assumed Liabilities by Buyer (and any Designated Buyer) are subject to Bankruptcy Court approval.  Buyer acknowledges that:  (i) to obtain such approval, the Seller must demonstrate that it has taken reasonable steps to obtain the highest and otherwise best offer possible for the Purchased Assets, and that such demonstration will include giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court; and (ii) Buyer must provide adequate assurance of future performance as required under the Bankruptcy Code with respect to each Assigned Contract.

**Section 9.02    Sale Order**

(a)    Buyer agrees that it will promptly take such actions as are reasonably requested by the Seller to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Buyer (and any Designated Buyer, where applicable) of the Assigned Contracts, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of

performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.  In the event the entry of the Sale Order is appealed or otherwise challenged, the Parties shall use commercially reasonable efforts to defend such appeal(s) or other challenges.

(b)     From the date hereof until the earlier of:  (i) the termination of this Agreement and (ii) the final Closing Date, the Seller shall use its reasonable best efforts to obtain entry of the Sale Order and any other orders reasonably necessary to consummate the transactions contemplated under this Agreement.

(c)     Seller shall file such motions or pleadings as may be appropriate or necessary to: (i) assume and assign the Assigned Contracts, and (ii) determine the amount of the "Cure Costs" associated with any such Assigned Contracts; provided that nothing herein shall preclude Seller, subject to Buyer's prior written consent, from filing such motions to reject any Contracts that are not designated as Assigned Contracts by the Buyer in accordance with this Agreement or that have been designated for rejection by the Buyer.

**Section 9.03    Modification of Sale Order**.  The Seller may not modify the Sale Order without the prior written consent of the Buyer.

**Section 9.04    Seller and Buyer Duties**

(a)     The Seller and Buyer shall each:  (i) appear in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the transactions contemplated under this Agreement; and (ii) keep the other Party reasonably apprised of the status of material matters related to this Agreement, including, upon reasonable request, promptly furnishing the other with copies of notices or other communications received from the Bankruptcy Court or any Third Party or any Governmental Authority with respect to the transactions contemplated by this Agreement.

(b)     Seller shall use commercially reasonable efforts to give Buyer reasonable advance notice of any hearings regarding the motions required to obtain the entry of the Sale Order.

(c)     Seller shall give Buyer reasonable advance notice and proposed drafts of all pleadings, motions, Orders, notices, other papers, hearings, and other proceedings related to this Agreement and the transactions contemplated hereby, and will provide Buyer and its counsel with a reasonable opportunity to review such papers prior to filing with the Bankruptcy Court and, with respect to all provisions that impact the Buyer or relate to the transactions contemplated by this Agreement, such pleadings, Orders, and other papers shall be in form and substance acceptable to the Buyer and consistent with this Agreement.

**Section 9.05    Bankruptcy Court Milestones.**

(a)     Seller shall comply with the following timeline (each a "Bankruptcy Court Milestone"), subject to further extension with prior written consent from Buyer:

(i)      On December 28, 2025, Seller shall file a motion in the Bankruptcy Court in the Bankruptcy Case seeking the approval of the transactions contemplated in this Agreement including, without limitation, the Break Up Fee and the Expense Reimbursement.

(ii)      On or before January 9, 2026, the Bankruptcy Court shall enter an order (the "Bidding Procedures Order") approving the Seller's entry into this Agreement and establishing bidding procedures mutually satisfactory to the Buyer and Seller which provide for an auction and sale process (with agreed upon bid increments and bidder qualifications), and specifically approving the terms of the Break Up Fee and the Expense Reimbursement.

(iii)      On or before February 2, 2026, an order approving the Bankruptcy Sale to the Buyer or other winner of the auction, as applicable, shall have been entered by a Bankruptcy Court; and

(iv)      On or before February 6, 2026, or such later date as Buyer shall agree in writing, the Bankruptcy Sale shall have been consummated.

**Section 9.06      Break Up Fee; Expense Reimbursement**

(a)      In the event of a termination of this Agreement by the Buyer pursuant to Section 8.01(a)(ii), (iii), (iv), or (v), Seller shall be obligated to pay to Buyer $200,000 (the "Break Up Fee") as liquidated damages, and not as a penalty, for the failure of Seller to consummate the Transactions in accordance with the terms of this Agreement.  In addition, if the Seller consummates an Alternative Transaction, this liquidated damages provision shall apply, and must be paid to the Buyer as a "Break Up Fee" in accordance with the terms of the Bidding Procedures Order.  Notwithstanding anything herein to the contrary, the sole right of Buyer for Seller's breach of this Agreement or failure to consummate the transactions contemplated by this Agreement will be (if any) a resort to the Break Up Fee in accordance with this Section 9.06.  In no event shall the Seller be required to pay any amounts in excess of the Break Up Fee and the Buyer agrees that the Seller shall not be responsible for any special or consequential damages related to any breach of this Agreement by Seller.

(b)      An expense reimbursement of the reasonable fees and expenses of counsel and other related expenses in connection with the diligence, documentation and funding of the transactions contemplated hereby, up to a maximum of Two Hundred Twenty-Five Thousand Dollars ($200,000) (the "Expense Reimbursement"), shall be paid to Buyer in the event of termination of this Agreement in accordance with subsection (a).

(c)      Payment by the Seller of the Break Up Fee and Expense Reimbursement to the Buyer shall constitute an administrative expense of Seller entitled to a first priority pursuant to Sections 503(b) and 507(b)(1) of the Bankruptcy Code superior to that of any other expense of the estate of any Seller, payable from the sale proceeds of any transaction based on an Alternative Transaction or from other sources.  The Break Up Fee and Expense Reimbursement shall be secured by all of the assets of the Seller on a *pari passu* basis with the obligations to Buyer in its capacity as DIP Lender in the Bankruptcy Case.

# ARTICLE X
# MISCELLANEOUS

**Section 10.01  Expenses.**  Except as otherwise expressly provided herein, all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

**Section 10.02  Notices.**  All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent and received by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the day of receipt (or refusal of receipt) when mailed, by certified or registered mail, return receipt requested, postage prepaid.  Such communications must be sent to the respective parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 10.02):

|  |  |
|---|---|
| if to Buyer, then to: | Marquee Brands, LLC<br>330 West 34th Street<br>15th Floor,<br>New York, New York 10001<br>Email: ncassidy@marqueebrands.com |

if to Buyer, then to:

Marquee Brands, LLC
330 West 34th Street
15th Floor,
New York, New York 10001
Email: ncassidy@marqueebrands.com

with a copy (which shall not constitute notice) to:

Moore & Van Allen PLLC
100 N. Tryon Street, Suite 4700
Charlotte, North Carolina 28202
Attention:James R. Langdon
Email:jimlangdon@mvalaw.com

if to Seller, then to:

Food52 Inc.
1 Dock 72 Way, 13th Floor
Brooklyn, New York 11205
Attention: Erika Ayers Badan
Email: erika@food52.com;
heidi.robinson@food52.com

|                                          |                                          |
|------------------------------------------|------------------------------------------|
| with a copy (which shall not constitute notice) to: | Young Conaway Stargatt & Taylor, LLP |
|                                          | Rodney Square                            |
|                                          | 1000 North King Street                   |
|                                          | Wilmington, Delaware 19801               |
|                                          | Attention:Michael R. Nestor, Kara Hammond Coyle and Elizabeth S. Justison |
|                                          | Email: mnestor@ycst.com; kcoyle@ycst.com; ejustison@ycst.com |

**Section 10.03  Interpretation.**  For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole.  Unless the context otherwise requires, references herein:  (i) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Disclosure Schedules and Exhibits attached to, this Agreement; (ii) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof; and (iii) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder.  This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.  The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

**Section 10.04  Headings.**  The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 10.05  Severability.**  If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties hereto as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 10.06  Entire Agreement.**  This Agreement and the other Transaction Documents constitute the sole and entire agreement of the Parties with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

**Section 10.07  Successors and Assigns.**  This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns.  No Party may assign its rights or obligations hereunder without the prior written consent of the other Party; *provided, however*, Buyer may assign its rights or obligations under this Agreement without

consent to any Affiliate of Buyer.  No assignment shall relieve the assigning Party of any of its obligations hereunder.

**Section 10.08   No Third-Party Beneficiaries.**  This Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature under or by reason of this Agreement.

**Section 10.09   Amendment and Modification; Waiver.**  This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each Party.  No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving.  No waiver by any Party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 10.10   Governing Law.**  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware (without application of principles of conflicts of law).  In connection with any controversy arising out of or related to this Agreement, Seller and Buyer hereby irrevocably consent to the exclusive jurisdiction of the Bankruptcy Court, or if, and only if, the Bankruptcy Case has been closed, the courts of the State of Delaware.  Seller and Buyer each irrevocably consents to service of process out of the aforementioned courts and waives any objection which it may now or hereafter have to the laying of venue of any action or proceeding arising out of or in connection with this Agreement brought in the aforementioned courts.

**Section 10.11   Specific Performance.**  The Parties agree that irreparable damage would occur and that the Parties would not have any adequate remedy at law in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that the Parties shall be entitled to an injunction or injunctions to prevent breaches or threatened breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in the Bankruptcy Court without proof of actual damages or otherwise (and, to the fullest extent permitted by Law, each Party hereby waives any requirement for the securing or posting of any bond in connection with such remedy), this being in addition to any other remedy to which they are entitled at law or in equity.

**Section 10.12   Counterparts.**  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**Section 10.13   Non-Survival of Representations, Warranties and Covenants**.  The respective representations, warranties and covenants of Seller and Buyer contained in this Agreement and any certificate delivered pursuant hereto shall terminate at, and not survive, the

Closing; provided that this Section 10.13 shall not limit any covenant or agreement of the Parties to the extent that its terms require performance after the Closing, which shall survive in accordance with their terms.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**BUYER:**

**F52, LLC**

By: _____

Name:    Daniel Suratt

Title:    Chief Executive Officer

**SELLER:**

**FOOD52, INC.**

By: _____

Name: _____

Title: _____

*[Signature Page to Asset Purchase Agreement]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**BUYER**:

**F52, LLC**

By: _____

Name:

Title:

**SELLER**:

**FOOD52, INC.**

By:   *Erika Badan*

Name:   Erika Badan

Title:   Chief Executive Officer

*[Signature Page to Asset Purchase Agreement]*

**EXHIBIT A**

**PURCHASED ASSETS**

I.    Common Law Marks

| MARKS | DATES OF FIRST USE IN U.S. COMMERCE | GOODS |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

II.    IMG Registered Marks

US

| MARKS and USPTO Reg. Nos. | GOODS |
|---|---|
| | |
| | |
| | |

International

| Owner | Mark/Name | Registration No. | Country |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| Owner | Mark/Name | Registration No. | Country |
|-------|-----------|------------------|---------|
|       |           |                  |         |
|       |           |                  |         |
|       |           |                  |         |
|       |           |                  |         |
|       |           |                  |         |
|       |           |                  |         |
|       |           |                  |         |
|       |           |                  |         |
|       |           |                  |         |
|       |           |                  |         |
|       |           |                  |         |
|       |           |                  |         |
|       |           |                  |         |
|       |           |                  |         |
|       |           |                  |         |
|       |           |                  |         |
|       |           |                  |         |
|       |           |                  |         |
|       |           |                  |         |

III.    Domains

    1.

IV.    <u>Molds</u>

| Item | Mold 1 | Remark |
|------|--------|--------|
|      |        |        |
|      |        |        |
|      |        |        |
|      |        |        |
|      |        |        |
|      |        |        |

V.    <u>Other Assets and Related Access Rights</u>

Prior to, at, or immediately following the Closing, Seller shall take the following actions:

**I.    Domain Names & DNS Management**

- Provide complete list of and Admin access to all URLs and registered domains and provide Transfer Authorization Codes (EPP codes) with each domain.

- Provide complete list of and Admin access to all domain registrars and login credentials.

- Provide complete list of and Admin access to DNS control (e.g. Cloudflare) services that manage traffic routing and SSL certificates.

**II.    Site Hosting and Infrastructure**

- Provide complete list of and Admin access to all content delivery networks (e.g. Akamai, Cloudflare), site hosting and serving providers (e.g. Amazon Web Services), authentication and single-sign on tools, user database hosting, front end frameworks, on-site search accounts, DevOps CI/CD, DevOps site monitoring tools (e.g. Datadog), third-party APIs, video player platforms (e.g. JW Player), project management tools (e.g. Asana) and community management tools.

**III.    Content and Editorial Tooling**

- Provide complete list of and Admin access to all content management systems (e.g. WordPress), digital asset management systems, image licensing (e.g. Getty, Shutterstock), design software (e.g. Adobe Creative Suite).

**IV.    Social Media**

- Provide complete list of and Admin access to all social media accounts for Food 52, Home 52 and any other brands, inclusive of but not limited to:

    - https://www.facebook.com/food52/

    - https://www.instagram.com/Food52/

    - https://www.pinterest.com/food52/

    - https://www.tiktok.com/@food52

    - https://www.youtube.com/food52

    - https://x.com/Food52

    - https://www.instagram.com/home52/

    - https://www.tiktok.com/@home52

- Remove any personal recovery emails or phone numbers associated with the accounts.

- Provide complete list of and Admin access to all social media management tools (e.g. True Anthem, Sprout).

**V.    Marketing**

- Provide complete list of and Admin access to all email service providers (e.g. Salesforce, Braze), email measurement and personalization tools (e.g. Litmus, Movable Ink), email validation and database hygiene tools (e.g. Validify), and SEO tool (e.g. SEMRush, BrightEdge) accounts.

**VI.    E-commerce**

- Provide complete list of Admin access to all commerce platforms (e.g. Shopify), microservices (e.g. Heroku) to support commerce, tax calculations (e.g. Avalara), and return/RMA tools (e.g. Loop Returns).

**VII.    Analytics**

- Provide complete list of and Admin access to all web (e.g. Google, Adobe, MixPanel) and content (e.g. Parsely, Chartbeat) analytics, any A/B testing tools, data visualization, social intelligence and benchmarking, tag management solutions, ad intelligence tools (e.g. Comscore, MediaRadar), and affiliate commerce (e.g. Trackonomics) platforms.

**VIII.    Ad Operations, Ad Serving and Ad Monetization**

- Provide complete list of and Admin access to all ad serving platforms (e.g. Google Ads Manager, Meta Ads Manager), ad networks, ad exchanges, supply side platforms, header bidding solutions, and creative management platforms, sales CRM (e.g. Salesforce), campaign management and ops workflow (e.g. adops.com), and revenue reporting tools.

**IX.    Data Management and Ad Targeting**

- Provide complete list of and Admin access to all data management platforms (DMP), customer data platforms (CDP), consent management platforms (CMP), identity resolution solutions, ad verification, viewability and brand safety tools, contextual ad targeting tools, and clean rooms.

**X.    Customer Support**

- Provide complete list of and Admin access to all FAQ platforms (e.g. Zendesk) and digital tools (e.g. Gladly) to service customer requests.

**EXHIBIT A (cont.)**

**ASSIGNED CONTRACTS**

Assigned Contracts:

Cure Cost Assigned Contracts:

1Password

Adswerve

Amazon Web Services

Boostr

Cloudflare

Comscore

Fivetran

Google Ads

Google, LLC

JW Player

Looker

Meta

Netsuite

Verizon

WECA

ZenDesk

VistaVu Solutions Ltd

Shopify

Collins Building Services Inc

Dash Hudson Inc

Paylocity Corporation

Bill.com

Vercel

RAMP

Sailthru Inc.

**EXHIBIT B**

**EXCLUDED LIABILITIES**