**<u>Exhibit A</u>**

**Asset Purchase Agreement**

**Execution Version**

**ASSET PURCHASE AGREEMENT**

by and among

**TROY-CSL LIGHTING, INC.,**

as Buyer;

and

**FOOD52, INC.**

as Seller

**Dated as of February 6, 2026**

# TABLE OF CONTENTS

Page

Article I        DEFINITIONS.................................................................................................... 2

Article II       PURCHASE AND SALE ................................................................................. 12

Article III      CLOSING ........................................................................................................ 19

Article IV       REPRESENTATIONS AND WARRANTIES OF SELLER............................. 20

Article V        REPRESENTATIONS AND WARRANTIES OF BUYER .............................. 28

Article VI       COVENANTS ................................................................................................. 30

Article VII      CONDITIONS TO CLOSING ........................................................................ 35

Article VIII     TERMINATION.............................................................................................. 37

Article IX       BANKRUPTCY MATTERS............................................................................ 38

Article X        MISCELLANEOUS ........................................................................................ 41

Exhibits

Exhibit A            Purchased Assets
Exhibit B            Excluded Liabilities

Schedules

Disclosure Schedules

33979426.5

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is dated as of February 6, 2026 (the "Effective Date"), and is entered into by and among TROY-CSL LIGHTING, INC., a New York corporation ("Buyer"), and FOOD52, INC., a Delaware corporation ("Seller").  Each of Buyer and Seller are at times referred to herein individually as a "Party" and together as the "Parties".

## RECITALS

WHEREAS, Seller owns that certain home goods brand commonly referred to as "Schoolhouse Electric" engaged in the sale of heirloom-quality home goods, including the ecommerce business related thereto, acquired and operated by Seller since 2021 (the "Business");

WHEREAS, on December 29, 2025, Seller commenced bankruptcy case number 25-12277 (LSS) (the "Bankruptcy Case") under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, in connection with the Bankruptcy Case, Seller desires to sell, transfer, convey, assign and deliver to Buyer, all of the Purchased Assets, and Buyer desires to: (i) purchase, acquire and assume all of the Purchased Assets (including any associated goodwill) and all of the Assumed Liabilities (and no other Liabilities) (each as defined herein); and (ii) consummate such other transactions as are contemplated by this Agreement and the other Transaction Documents (as defined herein), in each case upon the terms and conditions set forth in this Agreement (with all such transactions referred to as the "Transaction");

WHEREAS, the Parties intend to effectuate the Transaction through a sale of the Purchased Assets pursuant to Sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code, Rules 2002, 6004, 6006 and 9007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1 and 6004-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware, all on the terms and subject to the conditions set forth in this Agreement and in the Sale Order (as defined herein); and

WHEREAS, Seller's and Buyer's willingness to consummate the Transaction set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

The following terms have the meanings specified or referred to in this Article I:

33979426.5

"2025 Media Receivables" means all of Seller's media and programmatic sales and accounts receivables generated through December 31, 2025.

"Accounts" means all social media accounts, usernames and handles used in the Business.

"Action" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Allocation Schedule" has the meaning set forth in Section 2.07.

"Alternative Transaction" means a sale, transfer, or other disposition, whether direct or indirect, whether by means of an asset sale, merger, sale of stock, amalgamation, reorganization, or otherwise of (a) beneficial ownership of a majority of the equity interests or voting power of Seller or (b) any material portion of the Purchased Assets, in a transaction or a series of transactions with a Third Party.

"Annual Financial Statements" has the meaning set forth in Section 4.04.

"Assigned Contracts" means the contracts set forth on Exhibit A to be assigned to Buyer at the Closing in accordance with this Agreement and the Sale Order.

"Assignment and Assumption Agreement" has the meaning set forth in Section 3.02(a)(iii).

"Assumed Liabilities" has the meaning set forth in Section 2.03.

"Avoidance Actions" means any and all claims and causes of action arising under the Bankruptcy Code, including Sections 544 through 553 thereof, or any similar Laws of the United States or any state, territory or possession thereof, or the District of Columbia (including any preference or fraudulent conveyance action under such laws) or any other applicable jurisdiction.

"Auction" has the meaning set forth in Section 9.05(a)(ii).

"Backup Bidder" has the meaning set forth in Section 9.07(b).

"Balance Sheet" has the meaning set forth in Section 4.04.

"Balance Sheet Date" has the meaning set forth in Section 4.04.

33979426.5

"<u>Bankruptcy Case</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Code</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Court</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Rules</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Sale</u>" means the sale of the Purchased Assets by Seller to Buyer in the Bankruptcy Case pursuant to this Agreement and the Sale Order.

"<u>Benefit Plan</u>" means all employee benefit plans (within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA) and all employment agreements, cash or equity-based bonus or incentive arrangements, severance or retention arrangements, vacation policies, pension or retirement plans, change in control, post-employment, disability or health and welfare plans, sponsored, maintained or contributed to by Seller or any of its Affiliates for the benefit of any employee of Seller, other than any plan, program or arrangement sponsored by a Governmental Authority, mandated by and maintained solely pursuant to any collective bargaining agreement or any "multiemployer plan" within the meaning of Section 3(37) of ERISA.

"<u>Bid</u>" means a proposal, solicitation, or offer.

"<u>Bidding Procedures</u>" has the meaning set forth in <u>Section 9.05(a)(i)</u>.

"<u>Bidding Procedures Order</u>" has the meaning set forth in <u>Section 9.05(a)(i)</u>.

"<u>Bill of Sale</u>" has the meaning set forth in <u>Section 3.02(a)(i)</u>.

"<u>Break Up Fee</u>" has the meaning set forth in <u>Section 9.06(a).</u>

"<u>Business</u>" has the meaning set forth in the recitals.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or a day on which commercial banks located in New York, New York are authorized or required by Law to be closed for business.

"<u>Buyer</u>" has the meaning set forth in the preamble.

"<u>CBA</u>" means the Contract, dated January 1, 2024, by and between Seller and the International Brotherhood of Electrical Workers Local Union 48.

"<u>Claim</u>" means any claim within the meaning of section 101(5) of the Bankruptcy Code.

"<u>Closing</u>" has the meaning set forth in <u>Section 3.01</u>.

"<u>Closing Payment</u>" has the meaning set forth in <u>Section 2.05(b)</u>.

"<u>Closing Date</u>" has the meaning set forth in <u>Section 3.01</u>.

4

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidential Information" means (a) all of Seller's information that is a trade secret under applicable trade secret or other Law and (b) all other non-public information of Seller. Confidential Information includes, but is not limited to, all proprietary software code, productive and other processes, designs, sketches, photographs, graphs, drawings, financial statements, projections, samples, technical know-how, inventions and ideas, past, current and planned research and development, list of customers, price lists, market studies, and business plans; provided, that following the Closing, "Confidential Information" shall not apply to or be deemed to be, any Purchased Assets or Assumed Liabilities.

"Contracts" means all contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures and all other agreements, commitments and legally binding arrangements, whether written or oral.

"Consumer Data" means Personal Information pertaining to current or former consumers, or prospective consumers, used in, or collected in connection with, the Business, including email addresses and other contact information, loyalty and rewards program information and customer lists.

"Copyrights" means all copyrights, whether in published or unpublished works, which include: (a) literary works and any other original works of authorship fixed in any tangible medium of expression; (b) databases, data collections (including all Consumer Data) and rights therein, software (including all source code, object code), specifications (including tech packs for all product designs), firmware, 2D and 3D models, algorithms, methodologies and implementations thereof and web site content and Digital Properties; (c) rights to compilations, collective works and derivative works of any of the foregoing; and (d) registrations and applications for registration for any of the foregoing and any renewals or extensions thereof.

"Corporate HQ Lease" means the Agreement of Lease by and between Seller and BNY Tower Associates LLC, dated as of October 19, 2021.

"Cure Cost Assigned Contracts" means those Assigned Contracts set forth under the heading "Cure Cost Assigned Contracts" on Exhibit A.

"Cure Costs" means all monetary Liabilities that must be paid or otherwise satisfied in order to cure any monetary defaults required to be cured under section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption of the Assigned Contracts.

"Cure Costs Cap" means $5,000.00.

"Dansk" means that certain home goods brand known as "Dansk Designs", acquired and operated by Seller since 2021.

5

"<u>Deposit</u>" means $220,000.00, paid by wire transfer of immediately available funds and held in a segregated account identified and established by Seller pursuant to the terms of the Bankruptcy Rules as applied by the Bankruptcy Court.

"<u>Designated Buyer</u>" means the Buyer's designee.

"<u>Digital Properties</u>" means websites, mobile apps, Accounts, Domain Names, and related content.

"<u>DIP</u>" means that certain debtor in possession financing facility reflected by the DIP Term Sheet, Interim Financing Order and Final Financing Order and which facility was approved by the Bankruptcy Court pursuant to the Interim Financing Order and Final Financing Order, together with any documents and agreements required or otherwise contemplated by the DIP Term Sheet, Interim Financing Order and Final Financing Order.

"<u>DIP Term Sheet</u>" means that certain debtor in possession credit facility term sheet approved by the Bankruptcy Court pursuant to the Interim Financing Order and Final Financing Order.

"<u>Disclosure Schedules</u>" means the Disclosure Schedules delivered by Seller and attached to this Agreement.

"<u>Dollars</u>" or "<u>$</u>" means the lawful currency of the United States.

"<u>Domain Names</u>" means Internet electronic addresses, uniform resource locators and alphanumeric designations associated therewith registered with or assigned by any domain name registrar, domain name registry or other domain name registration authority as part of an electronic address on the Internet and all applications for any of the foregoing.

"<u>Effective Date</u>" has the meaning set forth in the preamble.

"<u>Encumbrance</u>" means any charge, claim, community property interest, pledge, condition, equitable interest, lien (statutory or other), security interest, purchase option, right of first refusal or offer, mortgage, easement, encroachment, right of way or other similar encumbrance.

"<u>Environmental Law</u>" means any applicable Law, and any Governmental Order or binding agreement with any Governmental Authority:  (a) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata); or (b) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any hazardous materials.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"<u>Excluded Assets</u>" has the meaning set forth in <u>Section 2.02</u>.

"Excluded Liabilities" has the meaning set forth in Section 2.04.

"Final Financing Order" means that certain final order, dated on or about December 31, 2025, as may be subsequently amended by the Bankruptcy Court, approving the DIP on a final basis.

"Financials" means information demonstrating (in Seller's reasonable business judgment) that a Potential Bidder has the financial capability to consummate the applicable Sale and to provide adequate assurance of future performance under the Assigned Contracts, including, but not limited to, the most current audited and latest unaudited financial statements of the Potential Bidder.

"Financial Statements" has the meaning set forth in Section 4.04.

"Fundamental Representations" means the representations and warranties in Section 4.01 (Organization and Qualification of Seller), Section 4.02 (Authority of Seller), Section 4.06 (Material Contracts), Section 4.07 (Title to Assets), Section 4.08 (Condition and Sufficiency of Assets), Section 4.13 (Taxes), Section 4.14 (Relationships with Related Persons), Section 4.15 (Brokers), and Section 4.17 (Intellectual Property).

"GAAP" means United States generally accepted accounting principles in effect from time to time.

"Governmental Authority" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"Intellectual Property" means all intellectual property rights in any jurisdiction, whether registered or unregistered, including such rights in and to the following (a) Copyrights, (b) Domain Names, (c) Patents, (d) Trademarks, (e) Trade Secrets, (f) advertising and marketing materials, (g) product archives and designs, including but not limited to all (i) 3D renderings and (ii) historical, current, and future (up to and including the Closing Date) product development files, CAD drawings, sketches, mood boards, (h) all images and videos not otherwise included within clauses (a)-(f), or (i) embodiments of any of the foregoing (a)-(h), and (j) all rights and claims for damages, restitution and injunctive and other legal and equitable relief, including the rights to and claims to sue for past, present and future infringement, misappropriation, dilution, misuse, breach or default, passing off, unfair competition and/or deceptive trade practices related to the foregoing or other violation thereof and all other related claims and causes of action, with the right but no obligation to sue for such legal and equitable relief and to collect, or otherwise recover, any such damages.

33979426.5

"Interim Balance Sheet" has the meaning set forth in Section 4.04.

"Interim Balance Sheet Date" has the meaning set forth in Section 4.04.

"Interim Financial Statements" has the meaning set forth in Section 4.04.

"Interim Financing Order" means that certain interim order, dated on or about December 31, 2025, by the Bankruptcy Court approving the DIP on an interim basis.

"Knowledge of Seller" or any other similar knowledge qualification, means, the actual knowledge of Erika Badan, Heidi Robinson, Clifford Endo, and Emily Mejer after reasonable investigation and inquiry.

"Law" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"Liability" means, with respect to any Person, any liability or obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise, and whether or not the same is required to be accrued on the financial statements of such Person.

"Material Adverse Effect" means any event, occurrence, fact, condition or change that is, or could reasonably be expected to become, individually or in the aggregate, (a) materially adverse to, or that has had, or could reasonably be expected to have, a materially adverse effect on, the condition (financial or otherwise) of Schoolhouse, the Purchased Assets or the Assumed Liabilities, taken as a whole, or (b) that would reasonably be expected to prevent, materially impede or materially delay, or prevents, materially impedes or materially delays, the consummation by the Seller of the transactions contemplated by this Agreement; provided, that solely with respect to clause (a), "Material Adverse Effect" shall not include any event, occurrence, fact, condition or change arising out of or attributable to (i) economic or political conditions generally, (ii) conditions generally affecting the industry in which Schoolhouse operates, (iii) changes in financial, banking or securities markets generally; (iv) national or international political or social conditions, including the engagement by any country in hostilities, whether commenced before or after the date hereof and whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack; (v) the occurrence of any act of God or other calamity or force majeure events (whether or not declared as such), including any strike, labor dispute, civil disturbance, embargo, natural disaster, fire, flood, hurricane, tornado, or other weather event; (vi) changes in Law or GAAP; (vii) the taking of any action expressly required by this Agreement or taken (or omitted to be taken) with the prior written consent of Buyer; or (vii) any effects or changes as a result of the announcement, pendency, or completion of the purchase and sale of the Purchased Assets or the assumption of the Assumed Liabilities, in each case as contemplated by this Agreement, including losses or threatened losses of employees, customers, suppliers, distributors, or others having relationships with Seller, except in each case to the extent such event, occurrence, fact, condition or change disproportionately

8

affects Schoolhouse or the Purchased Assets relative to the business and operations of other Persons engaged in the same industry in which Schoolhouse operates.

"Material Contracts" has the meaning set forth in Section 4.06(a).

"Material Customer" has the meaning set forth in Section 4.10(a).

"Material Vendor" has the meaning set forth in Section 4.10(b).

"Modification" has the meaning set forth in Section 6.13.

"Online Platforms" has the meaning set forth in Section 6.10.

"Outside Date" has the meaning set forth in Section 8.01(a)(iv).

"Patents" means all patents, industrial and utility models, industrial designs, petty patents, patents of importation, patents of addition, certificates of invention and any other indicia of invention ownership issued or granted by any Governmental Authority, including all provisional applications, priority and other applications, divisionals, continuations (in whole or in part), extensions, reissues, re-examinations or equivalents or counterparts of any of the foregoing.

"Permits" means all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained, or required to be obtained, from Governmental Authorities.

"Permitted Encumbrances" means:  (a) liens for Taxes not yet due and payable as of the Closing Date; and (b)  mechanics', carriers', workmen's, repairmen's, or other like liens arising or incurred in the ordinary course of business consistent with past practice or in connection with amounts that are not delinquent and which are not, individually or in the aggregate, material to the Purchased Assets.

"Person" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"Personal Information" has the meaning set forth in Section 4.16.

"Potential Bidder" means any Person (other than F52, LLC, a Delaware limited liability company) interested in consummating a Sale.

"Pre-Closing Tax Period" means any taxable period ending on or before the Closing Date and, with respect to any taxable period beginning on or before and ending after the Closing Date, the portion of such taxable period ending on and including the Closing Date.

"Purchase Price" has the meaning set forth in Section 2.05(a).

"Purchased Assets" has the meaning set forth in Section 2.01.

9

"Qualified Bid" means a Bid by a Qualified Bidder that is submitted in writing and satisfies each of the requirements set forth in the Bidding Procedures as determined by Seller.

"Qualified Bidder" means a Potential Bidder whose Financials, or the Financials of its equity holder(s), as applicable, demonstrate the financial capability to consummate the applicable Sale of any of Seller's assets relating to the Business and to provide adequate assurance of future performance under the Assigned Contracts as contemplated by such Qualified Bidder's Bid and whose Bid is a Qualified Bid, that Seller determines should be considered a Qualified Bidder.

"Radial" has the meaning set forth in Section 2.06(b).

"Related Person" means, with respect to any entity, (i) any Person that directly or indirectly controls, is directly or indirectly controlled by or is directly or indirectly under common control with such specified Person; (ii) any Person that holds a Material Interest in such specified Person; (iii) each Person that serves as a director, officer, partner, executor or trustee of such specified Person (or in a similar capacity); (iv) any Person in which such specified Person holds a Material Interest; (v) any Person with respect to which such specified Person serves as a general partner or a trustee (or in a similar capacity); and (vi) any Related Person of such Person described in clauses (i) through (v). For purposes of this definition, "control" (including "controlling," "controlled by," and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise; and "Material Interest" means direct or indirect beneficial ownership (as defined in Rule 13d-3 under the Exchange Act) of voting securities or other voting interests representing at least ten percent (10%) of the outstanding voting power of a Person or equity securities representing at least ten percent (10%) of the outstanding equity securities in a Person.

"Representative" means, with respect to any Person, any and all directors, managers, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"Sale" means the sale of Seller's assets relating to the Business.

"Sale Motion" means the motion filed with the Bankruptcy Court by Seller seeking (a) approval of the terms and conditions of this Agreement and the Transaction Documents, and (b) authorization for the sale of the Purchased Assets pursuant to Section 363 of the Bankruptcy Code, free and clear of all Encumbrances.

"Sale Order" means the order of the Bankruptcy Court granting the relief requested in the Sale Motion and authorizing the sale of the Purchased Assets pursuant to Section 363 of the Bankruptcy Code, free and clear of all Encumbrances, claims and interests in form and substance reasonably acceptable to Buyer; which, in all events, must, (i) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by Seller of this Agreement and the terms of this Agreement in all respects, (B) the sale of the Purchased Assets to Buyer on the terms set forth herein and free and clear of all Encumbrances, and (C) the performance by Seller of their respective obligations under this Agreement; (ii) authorize and

10

empower Seller to assume and assign to Buyer the Assigned Contracts; (iii) enjoin and forever bar any creditors or any other person from bringing any claims or asserting any liens against Buyer or the Purchased Assets other than for Assumed Liabilities; and (iv) find that (A) the consideration provided by Buyer pursuant to this Agreement represents the highest or otherwise best offer for the Purchased Assets and constitutes reasonably equivalent value and fair consideration for the Purchased Assets, (B) as of the Closing, the transactions contemplated by this Agreement effect a legal, valid, enforceable and effective sale and transfer of the Purchased Assets, (C) Seller gave due and proper notice of the transactions contemplated by this Agreement to each party entitled to such notice, (D) this Agreement was negotiated and entered into at arms' length and Buyer is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code and grants Buyer the protections of Section 363(m) of the Bankruptcy Code, (E) the provisions of Section 363(n) of the Bankruptcy Code have not been violated and (F) Buyer is not a successor to the Seller.

"Schoolhouse" means that certain home goods brand engaged in the sale of heirloom-quality home goods commonly referred to as "Schoolhouse Electric", including but not limited to home décor, textiles, hardware, lighting, and further including the ecommerce business related thereto, acquired and operated by Seller since 2021, and is also referred to as the "Business".

"Schoolhouse Facility Lease" means the Office Lease by and between Seller and Schoolhouse Factory LLC, dated January 1, 2020.

"Schoolhouse Intellectual Property" means all of Seller's Intellectual Property relating to Schoolhouse.

"Schoolhouse Inventory" has the meaning set forth in Section 2.01.

"Seller Intellectual Property" has the meaning set forth in Section 4.17(a).

"Seller" has the meaning set forth in the preamble.

"Successful Bid" has the meaning set forth in Section 9.07(b).

"Successful Bidder" has the meaning set forth in Section 9.07(b).

"Tax Return" means any return, declaration, report, claim for refund, property rendition, information return or statement or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Taxes" means (a) all federal, state, local, or foreign income, gross receipts, sales, use, production, ad valorem, transfer, documentary, franchise, registration, profits, license, lease, service, service use, escheat, withholding, social security (or similar), payroll, employment, unemployment, disability, estimated, excise, severance, environmental, stamp, transfer, value added, alternative or add-on minimum, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments, charges, or other tax of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties, and (b) any Liabilities for the payment

11

of any taxes, interest, penalty, addition to tax or like additional amount resulting from the application of Treasury Regulations Section 1.1502-6 or comparable federal, state or local Law.

"Third Party" means any Person other than the Seller, Buyer or any of their respective Affiliates.

"Trademarks" means (a) trademarks, service marks, fictional business names, trade names, trade dress, commercial names, certification marks, collective marks and other proprietary rights to any words, names, slogans, symbols, logos, devices or combinations thereof used to identify, distinguish and indicate the source or origin of goods or services used in the Business; (b) registrations, renewals, applications for registration, equivalents and counterparts of the foregoing; and (c) the goodwill associated with each of the foregoing.

"Trade Secrets" means anything that would constitute a "trade secret" under applicable Law, know-how, customer and supplier lists, and other confidential or proprietary information, including inventions, discoveries, processes, procedures, systems, business methods, business plans, confidential business information and other proprietary information and rights.

"Transaction" has the meaning set forth in the recitals.

"Transaction Documents" means this Agreement, the Assignment and Assumption Agreement, the IP Assignment and Assumption Agreement, the Bill of Sale and the other agreements, instruments and documents required to be delivered at the Closing.

"Treasury Regulations" means the regulations promulgated by the United States Treasury Department under the Code.

"USPTO" means the United States Patent and Trademark Office.

## ARTICLE II
## PURCHASE AND SALE

**Section 2.01    Purchased Assets.**  On the terms and subject to the conditions set forth in this Agreement, and subject in all respects to the valid approval of the Bankruptcy Court, at the Closing Seller shall sell, transfer, deliver, and assign to Buyer, and Buyer shall purchase and acquire from Seller, free and clear of any Encumbrances, all of Seller's right, title and interest in, to and under the following (collectively, the "Purchased Assets"):

(a)    all of the tangible and intangible assets, properties, and, to the extent transferable, rights owned by Seller (other than the Excluded Assets) related to Schoolhouse, including, without limitation, any and all Schoolhouse Intellectual Property (and any associated goodwill attached thereto); provided, however, that both (i) Seller's emails (except to the extent expressly part of the books and records constituting the Purchased Assets) and (ii) email addresses of Seller's employees who shall continue to be with Seller post-Closing shall be expressly excluded from the Purchased Assets; provided, further, that Seller shall provide Buyer with historical information and operations relating to suppliers and vendors organized by brand;

12

(b)    the specific Schoolhouse assets, including but not limited to the Schoolhouse books and records, set forth on Exhibit A;

(c)    Seller's rights under the Assigned Contracts;

(d)    the Schoolhouse Inventory described in Section 2.06; and

(e)    any rights, Claims or causes of action of Seller against a third party relating to the Purchased Assets listed on Sections 2.01(a)-(d) above or the Assumed Liabilities as of the Closing Date and all rights of indemnity, warranty rights, rights of contribution, rights to refunds (other than Tax refunds relating to any pre-Closing Tax Period), rights of reimbursement and other rights of recovery, including insurance proceeds, possessed by Seller as of the Closing Date (regardless of whether such rights are currently exercisable) to the extent related to any Purchased Asset or Assumed Liability.

Buyer shall be permitted to update Exhibit A with respect to any assets relating to the Business (including adding any assets to the list of Purchased Assets thereon or Excluded Assets identified below) until two (2) Business Days prior to the Closing Date.

Section 2.02    Excluded Assets.    Notwithstanding anything to the contrary set forth herein, the Purchased Assets shall not include, and Buyer shall not acquire any right, title or interest in, to or under, the following assets, properties, rights and interests of Seller, all of which shall be retained by Seller (collectively, the "Excluded Assets"):

(a)    cash and cash equivalents of Seller;

(b)    necessary inventory of the Business to complete existing purchase orders received by Seller prior to the Closing (which such existing purchase orders are Excluded Liabilities hereunder);

(c)    any Contract that is not an Assigned Contract, including, but not limited to, the CBA, the Schoolhouse Facility Lease, and the Corporate HQ Lease;

(d)    all Intellectual Property of Seller other than the Schoolhouse Intellectual Property;

(e)    any Schoolhouse tangible personal property that is not the Schoolhouse Inventory (i.e., furniture, fixtures, equipment, machinery, tools, vehicles, office equipment, supplies, computers, telephones and other tangible personal property);

(f)    any and all rights of Seller in and to any real property owned by Seller;

(g)    all Benefit Plans and assets attributable thereto;

(h)    all of the tangible and intangible assets, properties, books and records of Seller not relating to Schoolhouse and finished goods, components and materials that are not Schoolhouse Inventory;

13

(i)      any of the rights that accrue or will accrue to Seller under this Agreement;

(j)      the 2025 Media Receivables;

(k)      Seller's bank accounts;

(l)      Seller's emails, except to the extent expressly part of the books and records constituting the Purchased Assets;

(m)      email addresses of Seller's employees who shall continue to be with Seller post-Closing;

(n)      the landlord's security deposit in connection with the Corporate HQ Lease;

(o)      all Avoidance Actions (whether known or unknown, contingent or otherwise) accruing or arising prior to the Closing Date;

(p)      any rights, Claims or causes of action, of any kind or any nature whatsoever, of Seller against any of its Affiliates or any of Seller's or its Affiliates' former or current officers, directors, managers, members, unitholders, Insiders (as defined under the Bankruptcy Code), auditors, insurers, accountants or other retained professionals of Seller, including claims for indemnification or contribution;

(q)      any and all rights, Claims, and causes of action of Seller against a third party (other than any such Claims expressly included in the Purchased Assets), including, but not limited to, all rights, Claims and causes of action against Seller's pre-petition lenders;

(r)      all insurance policies and binders of Seller, all Claims, refunds and credits of Seller from insurance policies or binders due or to become due with respect to such policies or binders and all rights of Seller to proceeds thereof, other than insurance proceeds to the extent related to any rights, Claims or causes of action of the Seller against a third party relating to the Purchased Assets or the Assumed Liabilities as of the Closing Date;

(s)      any Liability to the extent relating to any Excluded Asset or that is not an Assumed Liability;

(t)      all rights, Claims and causes of action to the extent relating to any Excluded Asset or any Excluded Liability;

(u)      any Tax refunds or credits of Seller attributable to Taxes that are Excluded Liabilities;

(v)      any adequate assurance deposit under Section 366 of the Bankruptcy Code; and

(w)      any Liabilities in respect of any Contracts that are not Assigned Contracts, including any Liabilities arising out of the rejection of any such Contracts pursuant to Section 365 of the Bankruptcy Code.

14

33979426.5

**Section 2.03    Assumed Liabilities.**  On the terms and subject to the conditions set forth in this Agreement, and subject in all respects to the valid approval of the Bankruptcy Court, at the Closing Buyer shall assume and agree to pay, perform and discharge the following Liabilities of Seller (the "Assumed Liabilities"):

(a)    all Liabilities arising under any of the Assigned Contracts solely to the extent arising from and after the Closing Date; and

(b)    all Cure Costs solely with respect to the Assigned Contracts.

**Section 2.04    Excluded Liabilities.**  Notwithstanding the provisions of Section 2.03 or any other provision of this Agreement to the contrary, Buyer shall not assume, be bound by and shall not be responsible to pay, perform or discharge any Liabilities of Seller or any of its Affiliates of any kind or nature, fixed or contingent, known or unknown (or which may be asserted against or imposed upon Buyer as a successor or transferee of Seller or as an acquiror of the Purchased Assets), other than the Assumed Liabilities (the "Excluded Liabilities").  Without limiting the generality of the foregoing, the Excluded Liabilities shall include, and Buyer shall not assume or be responsible or liable in any manner for, any of the following:  (a) any Liabilities of Seller arising or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby, including fees and expenses of counsel, accountants, consultants, advisers, investment bankers, brokers, asset managers and any others; (b) any Liability for (i) Taxes of Seller (except as provided for in Section 6.07) (or any respective stockholder, member, or Affiliate of Seller); (ii) Taxes relating to the Business, the Purchased Assets or the Assumed Liabilities for any Pre-Closing Tax Period; or (iii) all Taxes attributable to any Pre-Closing Tax Period of any Person imposed on Buyer as a transferee or successor, by contract or pursuant to any Law (including, but not limited to, Treasury Regulations Section 1.1502-6 or comparable federal, state, local or foreign Law) with respect to Liabilities or relationships existing on or prior to the Closing Date or by agreements entered into or transactions entered into on or prior to the Closing Date (except as provided for in Section 2.03(b)); (c) any indebtedness of Seller or any of its Affiliates for borrowed money or for which Seller has provided any guaranty (including without limitation any interest accruing on such indebtedness); (d) any Liabilities (including Taxes) relating to or arising out of the Excluded Assets or Excluded Liabilities; (e) any Liabilities of Seller in respect of (i) any pending or threatened Action or (ii) any future Action to the extent such future Action relates to acts or omissions by Seller or any of its Affiliates prior to the Closing, including, but not limited to, the matters described in Section 4.11 of the Disclosure Schedules; (f) any Liabilities of Seller or any other Person for or with respect to any present or former employees, officers, directors, managers, retirees, independent contractors or consultants of Seller or its Affiliates (or for any other Persons performing services for the Business), including any Liabilities associated with salary, payroll or any claims for wages or other benefits, bonuses, workers' compensation, damages, penalties, fines, severance, retention, termination or other payments, and Liabilities under, or relating to, Benefit Plans; (g) any Liabilities of Seller or the Business relating to or arising from Seller's operation of the Purchased Assets and the Business prior to the Closing, including any unfulfilled commitments, quotations, purchase orders, customer orders or work orders that do not constitute part of the Purchased Assets or Assigned Contracts, or any accounts payable with respect to the Business for periods prior to the Closing; (h) any Liabilities of Seller or any of their

15

Affiliates to indemnify, reimburse or advance amounts to any present or former officer, director, manager, employee or agent of Seller or their Affiliates (including with respect to any breach of fiduciary obligations by same); (i) any Liabilities arising out of, in respect of or in connection with the failure by Seller or any of their respective Affiliates to comply with any Law or Governmental Order; (j) any Liabilities of Seller arising out of or relating to Seller's acts or omissions occurring after the Closing; (k) any Liabilities of Seller with respect to uncashed checks to vendors, customers or employees and non-refunded overpayments or credits owed by Seller to any Third Party; (1) any Liabilities of Seller arising out of, in respect of or in connection with any Contract that is not an Assigned Contract, including, but not limited to, the Corporate HQ Lease, the CBA, and the Schoolhouse Facility Lease, and any Cure Costs with respect to Contracts that are not Assigned Contracts; (m) any Liabilities of Seller with respect to, arising out of, or in any way related to the dispute between Seller and Form Portfolios LLC and its affiliates, including, but not limited to, Form Portfolios LLC v. Food52, Inc., No. 1:24-cv-7690 (E.D.N.Y.), (n) any Liabilities arising and attributable to periods on or prior to the Closing Date, other than the Assumed Liabilities, and (o) any Liabilities arising out of the matters set forth on Exhibit B. Buyer shall be permitted to update Exhibit B with respect to any Liabilities relating to the Business or Seller (including adding any Liabilities to the list of Excluded Liabilities) until two (2) Business Days prior to the Closing Date.

**Section 2.05    Purchase Price; Closing Payments.**

(a)    On the terms and subject to the conditions set forth in this Agreement, the aggregate purchase price to be paid by Buyer for the Purchased Assets shall be Two Million Two Hundred Thousand Dollars ($2,200,000.00) comprised of a payment made at Closing (the "Closing Consideration") of One Million Nine Hundred Eighty Thousand Dollars ($1,980,000.00) and application of the Deposit for the benefit of Seller (collectively, the "Purchase Price").

(b)    At the Closing and unless otherwise set forth in the Sale Order or other order of the Bankruptcy Court, Buyer shall pay the Closing Consideration by wire transfer of immediately available funds in accordance with the wire transfer instructions delivered by Seller to Buyer in writing at least two (2) Business Days prior to the Closing Date (the "Closing Payment").

**Section 2.06    Schoolhouse Inventory.**

(a)    Buyer shall acquire from Seller as part of the Purchased Assets all inventory consisting of all finished goods being used for current SKU production related to Schoolhouse, as exists as of the Closing, subject to the provisions of this Sections 2.06 and upon terms to be mutually agreed to in writing between Seller and Buyer in accordance with this Section 2.06 at least three (3) Business Days prior to the Closing Date (the "Schoolhouse Inventory"). For the avoidance of doubt, Seller shall be responsible for all landed duty, all freight and storage charges, and all other charges and obligations for all Schoolhouse Inventory of the Business prior to Buyer's acceptance of the Schoolhouse Inventory at Closing and Buyer shall be responsible for freight and storage charges for any Schoolhouse Inventory purchased by Buyer after Buyer's acceptance of the Schoolhouse Inventory following the Closing.

(b)      At least five (5) Business Days prior to the Closing Date, Seller shall deliver to Buyer a schedule setting forth Seller's then-current inventory related to the Business (excluding any inventory necessary for the fulfillment of existing purchase orders (which such inventory for existing purchase orders Seller and Buyer shall discuss and is an Excluded Asset)) and, at Buyer's election, facilitate Buyer's introduction to the Radial 3PL Representatives who control access to the facilities and would grant Buyer access to view Seller's inventory related to the Business. Seller shall facilitate the transfer to Buyer of the Schoolhouse Inventory immediately following the Closing. For the avoidance of doubt, Buyer shall be responsible for physically removing any Schoolhouse Inventory and Seller shall have no obligation to physically transfer such Schoolhouse Inventory. Buyer shall have the right to purchase any and all finished goods related to Schoolhouse set forth or required to be set forth on the schedule delivered by Seller pursuant to the first sentence of this Section 2.06(b), but Buyer may determine it shall not purchase any such finished goods related to Schoolhouse unless Buyer is satisfied, in its sole discretion, that such finished goods are being used for current SKU production that are marketed or sold by Schoolhouse as of the Closing and are not finished goods for the fulfillment of existing purchase orders, as supported by purchase orders and any other documentation and information reasonably requested by Buyer. Buyer's determination to purchase and assume or not purchase and assume any inventory of the Business pursuant to this Section 2.06 shall not, increase or reduce, as applicable, the Purchase Price.  For the avoidance of doubt, Buyer shall purchase or assume all, none or any amount of the inventory of the Business; provided, however, that if Buyer elects not to purchase or assume any portion of the inventory of the Business: (i) Buyer may, in its sole discretion, request that Radial, Inc., a Pennsylvania corporation ("Radial"), dispose of any such inventory of the Business and (ii) under no circumstances will Seller be responsible for the removal or disposal of such inventory of the Business.

(c)      The warehouse reports for on hand inventory of the Business (including a warehouse list of any damaged or unsaleable goods for exclusion with respect to the same) shall be provided by Seller at least five (5) Business Days prior to Closing.  Seller shall promptly respond and provide such additional information and documentation, to the extent such information and documentation is available, respecting the inventory of the Business as Buyer may reasonably request prior to Closing.

(d)      Seller shall facilitate Buyer's introduction to the Radial 3PL Representatives who control access to the facilities and would grant Buyer access to the warehouses where the inventory relating to the Business is stored at least five (5) Business Days prior to Closing to allow Buyer to inspect the inventory relating to the Business at Buyer's expense, and Seller shall arrange to transfer warehouse receipts and such other documents as Buyer may request or as may be required in order to evidence Buyer's ownership of the Schoolhouse Inventory and for Buyer to obtain possession of same, which is located in the warehouses and elsewhere as applicable, to Buyer within seventy-two (72) hours after the Closing.

(e)      Buyer shall have the right, upon reasonable advance notice to Seller, to assign its rights to inspect, transfer, and acquire the inventory relating to the Business and the Schoolhouse Inventory (as applicable) to one or more third party designees, which such designee(s) shall have the rights afforded to Buyer set forth in this Section 2.06.

17

**Section 2.07    Allocation of Purchase Price.**  The Parties have agreed that the Purchase Price shall be allocated in accordance with a schedule to be prepared by Buyer and delivered to Seller within sixty (60) days following the Closing Date (the "Allocation Schedule") in accordance with Code Section 1060 and the Treasury Regulations promulgated thereunder (and any similar provision of state, local or foreign Law, as appropriate) among an undivided interest in the Purchased Assets for all Tax purposes.  Buyer and Seller also shall allocate and report any adjustments to the Purchase Price in accordance with Treasury Regulations Section 1.1060-1(e), and any allocations made as a result of such adjustments shall become part of the Allocation Schedule.  Buyer and Seller shall file all Tax Returns (including amended returns and claims for refund) and Tax information reports in a manner consistent with the Allocation Schedule except as otherwise provided by applicable Law.  Neither Buyer nor Seller shall take any position for Tax purposes that is inconsistent with the Allocation Schedule (with respect to Tax Returns or otherwise) unless required to do so by applicable Law.  For the avoidance of doubt, the allocations made in connection with the Allocation Schedule shall be made solely for Tax purposes and shall not be binding on Seller for any other purpose in connection with the Bankruptcy Case.

**Section 2.08    Third Party Consents.**  To the extent that Seller's rights under any Contract or Permit may not be assigned to Buyer in the Bankruptcy Case without the consent of another Person which has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be a violation of applicable Law.  After the Closing and upon request of Buyer, for up to thirty (30) days following Closing, Seller and its Affiliates shall use commercially reasonable efforts and assist Buyer with obtaining any such required consent(s) as promptly as reasonably practicable under the circumstances and, immediately after obtaining such required consent(s), such Contract(s), Permit(s) or other Purchased Asset(s) shall be deemed assigned to Buyer pursuant to the terms of this Agreement. To the extent that (i) the Parties fail to obtain such consent for transfer of any Contract, Permit or other Purchased Asset and (ii) the failure to obtain such consent does not have a Material Adverse Effect on the Buyer's operation of the Purchased Assets, the Parties hereby agree that such an occurrence shall not result in any adjustment to the Purchase Price.  To the extent that the failure to obtain such consent for transfer of any Contract or Permit would have a Material Adverse Effect on the Buyer's operation of the Purchased Assets, Buyer shall not be obligated to close until such consents are obtained.

**Section 2.09    Transferred Contracts; Cure Cost Assigned Contracts.**  Buyer shall have the right, exercisable in Buyer's sole discretion at any time after the Effective Date and prior to Closing to designate any Contract that is not identified as a Cure Cost Assigned Contract on Exhibit A as an Assigned Contract (such Contracts, "Transferred Contracts"); provided, however, that (i) if Buyer exercises Buyer's right to designate any Contracts as Transferred Contracts, Buyer shall pay any Cure Costs associated with such Transferred Contracts; (ii) any Cure Costs associated with such Transferred Contracts shall not count towards the Cure Costs Cap; and (iii) Exhibit A shall be updated to add any Transferred Contracts as Assigned Contracts.  Prior to exercising any right of termination as a result of the Cure Costs exceeding the Cure Cost Cap pursuant to a violation of the closing condition set forth in Section 7.01(g), the Buyer will negotiate in good faith with counterparties to Assigned Contracts to reduce the Cure Costs or enter into new Contracts, on commercially reasonable terms, in an attempt to reduce the Cure Costs to an amount

18

below the Cure Cost Cap.  In the event the Buyer is unable to do so, the Buyer shall provide the Seller with the option to pay the Cure Costs in excess of the Cure Costs Cap at Closing and, if Seller does so, Buyer shall be unable to assert a violation of the Cure Costs Cap closing condition set forth in Section 7.01(g).  For the avoidance of doubt, to the extent that any Cure Cost Assigned Contract is terminated or rejected, the Cure Costs associated with such Cure Cost Assigned Contract shall not count towards the Cure Costs Cap.

## ARTICLE III
## CLOSING

**Section 3.01    Closing.**  On the terms and subject to the conditions of this Agreement, the consummation of the transactions contemplated by this Agreement shall take place at a closing (the "Closing") as promptly as practicable but not less than three (3) Business Days following the satisfaction or, to the extent permitted by applicable Law, waiver of all conditions to the obligations of the Parties set forth in Article VII (other than such conditions as may, by their terms, only be satisfied at the Closing or on the Closing Date, but subject to the satisfaction or waiver of such conditions), or at such other place or at such other time or on such other date as the Seller and the Buyer mutually may agree in writing.  The day on which the Closing takes place is referred to as the "Closing Date."  The Closing shall take place remotely by the electronic exchange of documents and signature pages in accordance with the terms of this Agreement without the requirement of any Party to be physically present at the Closing.  Each Party will participate in the Closing by delivery of its required funds or documents electronically under appropriate closing instructions, oral or written, or through its respective counsel or other agents, in each case in accordance with the Sale Order and the approval of the Bankruptcy Court.

**Section 3.02    Closing Deliverables.**

(a)    At the Closing, Seller shall deliver or cause to be delivered to Buyer the following:

(i)    a bill of sale for the Purchased Assets in form and substance reasonably satisfactory to the Buyer, duly executed by the Seller (the "Bill of Sale");

(ii)    an Intellectual Property Assignment and Assumption Agreement in a form reasonably satisfactory to the Buyer (the "IP Assignment and Assumption Agreement"), executed accordingly by Seller;

(iii)    a counterpart of the assignment and assumption agreement in a form agreed upon by Buyer and Seller (the "Assignment and Assumption Agreement"), duly executed by Seller; and

(iv)    all other documents, instruments or certificates required to be delivered by Seller pursuant to this Agreement or reasonably requested by Buyer, including without limitation (x) any releases or valid termination instruments of any security interests with respect to the Purchased Assets to the extent requested by Buyer and (y) all deliverables required by Section 2.06

19

with respect to introductions to the Radial 3PL Representatives who control access to the facilities where the inventory of the Business is stored.

(b)    At the Closing, Buyer shall deliver or cause to be delivered to Seller (or to the other applicable Person set forth below) the following:

(i)    payment in cash of the Closing Payment to Seller, in accordance with Section 2.05;

(ii)    a counterpart of the Assignment and Assumption Agreement, duly executed by Buyer; and

(iii)    all other documents, instruments or certificates required to be delivered by Buyer pursuant to this Agreement.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the correspondingly numbered Sections of the Disclosure Schedules, Seller represents and warrants to Buyer that the statements contained in this Article IV are true and correct as of the Effective Date and as of the Closing Date.

**Section 4.01    Organization and Qualification of Seller.**

(a)    Seller is duly organized, validly existing and in good standing under the Laws of its state of incorporation.  Subject to any limitations imposed as a result of filing the Bankruptcy Case, Seller has full corporate power and authority to own, operate and lease the assets now owned, operated or leased by it and to carry on the Business as currently conducted, to own or use the Purchased Assets, and to perform all their obligations under the Assigned Contracts.  Seller is not, nor is it required to be, licensed or qualified to do business in any other jurisdiction as a result of the ownership of the Purchased Assets or the operation of the Business as currently conducted, except where the failure to be so licensed or qualified would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.

(b)    Except as set forth on Section 4.01(b) of the Disclosure Schedules, Seller does not have any subsidiaries or otherwise own any interest (debt, equity, or otherwise) in any other Person.

**Section 4.02    Authority of Seller.**  Subject to entry of the Sale Order, Seller has full legal power and authority to (a) enter into this Agreement and the other Transaction Documents to which it is a party, (b) carry out its obligations hereunder and thereunder and (c) consummate the transactions contemplated hereby and thereby.  Subject to entry of the Sale Order, the execution and delivery by Seller of this Agreement and any other Transaction Document to which it is a party, the performance of its obligations hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite action on the part of Seller.  Subject to entry of the Sale Order, this Agreement has been duly executed and delivered by Seller, and (assuming due authorization, execution and delivery by Buyer) constitutes

20

a legal, valid and binding obligation, enforceable against Seller in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization or other Laws affecting creditors' rights generally and by general equitable principles.  Subject to entry of the Sale Order, when each other Transaction Document to which Seller is or will be a party has been duly executed and delivered by Seller (assuming due authorization, execution and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of Seller enforceable against it in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization or other Laws affecting creditors' rights generally and by general equitable principles.

Section 4.03    No Conflicts; Consents.   Subject to entry of the Sale Order, the execution, delivery and performance by Seller of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not:  (a) conflict with or result in a violation or breach of, or default under, any provision of the certificate of incorporation, bylaws or other organizational documents of Seller; (b) conflict with or result in a material violation or material breach of any provision of any Law or Governmental Order applicable to Seller or the Purchased Assets; (c) require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any Assigned Contract or Permit that is material to the operation of the Business with respect to the Purchased Assets and to which Seller is a party or by which Seller is bound or to which any of the Purchased Assets are subject (including any Assigned Contract); provided, that the Contracts set forth in Section 4.03 of the Disclosure Schedules may contain anti-assignment provisions which, absent entry of the Sale Order might prohibit assignment, provided, further, that the inclusion of a Contract or agreement on Section 4.03 shall not be construed as an admission by any party that any such anti-assignment provisions are enforceable under applicable bankruptcy or non-bankruptcy law; or (d) result in the creation or imposition of any Encumbrance other than Permitted Encumbrances on the Purchased Assets.  Except as required in connection with the Bankruptcy Case and as set forth on Section 4.03 of the Disclosure Schedules, no consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Seller in connection with the execution and delivery of this Agreement or any of the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby.

Section 4.04    Financial Statements.   Complete copies of the Seller's (a) financial statements consisting of its balance sheets as of December 31, 2024 and December 31, 2023 and the related profit and loss statements for the years then ended (the "Annual Financial Statements"), and (b) financial statements consisting of the balance sheet of the Seller as of November 30, 2025 and the related profit and loss statements for the eleven (11)-month period then ended (the "Interim Financial Statements," and together with the Annual Financial Statements, the "Financial Statements") have been delivered to Buyer.  The Financial Statements have been prepared in accordance with GAAP, applied on a consistent basis throughout the periods involved.  The Financial Statements are based on the Seller's books and records, and fairly present the financial condition of Seller and the Business as of the applicable dates and the results of the operations of

21

Seller and the Business for the periods indicated.  The balance sheet of Seller as of December 31, 2024 is referred to herein as the "Balance Sheet" and the date thereof as the "Balance Sheet Date" and the balance sheet of Seller as of November 30, 2025 is referred to herein as the "Interim Balance Sheet" and the date thereof as the "Interim Balance Sheet Date."

**Section 4.05    Absence of Certain Changes, Events and Conditions.**  Since the Interim Balance Sheet Date, and other than in the ordinary course of business consistent with past practice, there has not been any:  (a) Material Adverse Effect; (b) material change in any method of accounting or accounting practice of Seller; (c) except with respect to Schoolhouse Inventory as described on Section 4.05 of the Disclosure Schedules, transfer, assignment, sale or other disposition of any of the Purchased Assets (including all Intellectual Property or other intangible assets related to Schoolhouse); (d) cancellation of any debts or claims or amendment, termination or waiver of any rights constituting Purchased Assets; (e) imposition of any Encumbrance, except for Permitted Encumbrances, upon any of the Purchased Assets; or (f) except with respect to Schoolhouse Inventory as described on Section 4.05 of the Disclosure Schedules, any Contract to do any of the foregoing, or any action or omission by Seller that would result in any of the foregoing.

**Section 4.06    Material Contracts.**

(a)    Section 4.06(a) of the Disclosure Schedules lists each of the following Contracts, as such Contracts relate to the Business, including the names of the parties to the Contracts, a brief description of the goods or services provided thereunder, and contact information for the counterparties to the Contracts (the "Material Contracts"), copies of each of which have been delivered to Buyer prior to the date hereof:

(i)    any Contracts involving aggregate annual consideration in excess of Fifty Thousand Dollars ($50,000) and which, in each case, cannot be cancelled without penalty or without more than 90 days notice;

(ii)    any Contracts that limit or purport to limit the ability of Seller to compete in any line of business or with any Person or in any geographic area or during any period of time;

(iii)    any Contracts for the sale of any of the Purchased Assets or for the grant to any Person of any option, right of first refusal or preferential or similar right to purchase any of the Purchased Assets;

(iv)    any Contracts that require Seller to exclusively purchase, or purchase all of its requirements for, any product or service relating to Schoolhouse, from any Person or Persons, or grant exclusivity to any Person or Persons;

(v)    any Contracts providing for any joint venture or material partnership or other similar material agreement involving co-investment between Schoolhouse and any other Person;

22

(vi)     any Contracts with any Governmental Authority to which Seller is a party and relating to the Business or the Purchased Assets;

(vii)     any Contracts with Material Customers and Material Vendors, including without limitation, Contracts with vendors who manufacture inventory and Contracts relating to the distribution channels through which Seller sells their products;

(viii)     Contracts with warehouseman for each location at which inventory related to the Business is stored; and

(ix)     any other Contracts, plans or arrangements that are material to the Business as currently conducted, or the Purchased Assets.

(b)     Each Material Contract is valid and binding on Seller in accordance with its terms and is in full force and effect.  Except as set forth on Section 4.06(b) of the Disclosure Schedules, neither Seller nor, to the Knowledge of Seller, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under), or has provided or received any notice of any intention to terminate or materially modify, any Material Contract.  No event or circumstance has occurred that, with notice or lapse of time or both, would constitute an event of default under any Material Contract or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit thereunder.  Complete and correct copies of each Material Contract (including all modifications, amendments and supplements thereto and waivers thereunder) have been made available to Buyer at least five (5) Business Days prior to the Effective Date.

(c)     Section 4.06(c) of the Disclosure Schedules sets forth a complete and accurate list, as of January 9, 2026, of all 2025 Media Receivables.

**Section 4.07    Title to Assets.**  Subject to any defaults that may arise due to the filing of the Bankruptcy Case, Seller has good and valid title to, or a valid leasehold interest in, all of the Purchased Assets along with any associated goodwill (including all Schoolhouse Intellectual Property or other intangible assets related thereto and all inventory relating to Schoolhouse used by Seller to conduct the Business as currently conducted).  Except as set forth on Section 4.07 of the Disclosure Schedules, all such Purchased Assets (including leasehold interests) are held by Seller free and clear of Encumbrances except for Permitted Encumbrances, it being acknowledged that the Purchased Assets will be transferred to Buyer free and clear of all Encumbrances pursuant to the terms of the Sale Order.

**Section 4.08    Condition and Sufficiency of Assets.**  Except for the Excluded Assets, the Purchased Assets constitute all of the assets used by Seller to conduct the Business as currently conducted.

**Section 4.09    Real Property.**

(a)     Seller does not own any real property.

23

(b)    Seller does not lease any real property other than the real property leased pursuant to the Corporate HQ Lease and the Schoolhouse Facility Lease.

**Section 4.10    Customers and Vendors.**

(a)    Section 4.10 of the Disclosure Schedules sets forth (a) an accurate and complete list of the names, addresses and contract information of all of Seller's customers who were invoiced or are expected to be invoiced at least Fifty Thousand Dollars ($50,000) during calendar year 2025 with respect to Schoolhouse (each, a "Material Customer"), and (b) the amount of consideration paid by each Material Customer during such period.  Seller has not received any written notice, and has no reason to believe, that any of the Material Customers has ceased or intends to cease after the Closing, to use the goods or services of the Business or to otherwise terminate or materially reduce its relationship with the Business.

(b)    Section 4.10 of the Disclosure Schedules sets forth (a) an accurate and complete list of the names, addresses and contact information of all of Seller's vendors to which Seller paid or expects to pay at least Fifty Thousand Dollars ($50,000) during calendar year 2025 with respect to Schoolhouse (each, a "Material Vendor"), and (b) the amount of consideration paid to each Material Vendor during such period.  Seller has not received any written notice, and has no reason to believe, that any of the Material Vendors has ceased or intends to cease after the Closing, to provide goods or services to the Business or to otherwise terminate or materially reduce its relationship with the Business.

**Section 4.11    Legal Proceedings; Governmental Orders.**

(a)    Section 4.11 of the Disclosure Schedules includes a list of all currently pending or, to the Knowledge of Seller, threatened Actions against or by Seller that:  (i) relate to or affect the Purchased Assets, the Assumed Liabilities, the Schoolhouse Intellectual Property or the Business; or (ii) challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.  To the Knowledge of Seller, no additional event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

(b)    Except as set forth on Section 4.11 of the Disclosure Schedules, there are no outstanding Governmental Orders and no unsatisfied judgments, penalties or awards against, relating to or affecting the Purchased Assets, the Assumed Liabilities, the Schoolhouse Intellectual Property or the Business.

**Section 4.12    Compliance with Laws; Permits.**

(a)    For the three (3) year period immediately preceding the Closing Date, Seller has complied, and is now complying, in all material respects, with all Laws applicable to the ownership and use of the Purchased Assets, except where failure to so comply would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.

(b)    All Permits required for Seller for the ownership and use of the Purchased Assets have been obtained by Seller and are valid and in full force and effect.  All fees and charges due

24

with respect to such Permits as of the Closing have been paid in full prior to the Closing Date. To the Knowledge of Seller, no event has occurred that, with or without notice or lapse of time or both, would reasonably be expected to result in the revocation, suspension, lapse or limitation of any such Permit.

**Section 4.13    Taxes.**

(a)    All Tax Returns required to be filed by Seller have been timely filed. All Tax Returns filed or required to be filed by Seller are true, complete and correct in all material respects and were prepared in substantial compliance with all applicable Laws and regulations. Seller is not currently the beneficiary of any extension of time within which to file any Tax Return. Except as set forth on <u>Section 4.13(a)</u> of the Disclosure Schedules, all Taxes due and owing or claimed due by a Governmental Authority by Seller, whether or not shown or required to be shown on any Tax Return, have been timely paid, and no Taxes are delinquent.

(b)    Except as set forth on <u>Section 4.13(b)</u> of the Disclosure Schedules, there are currently no proposed or pending adjustments by any Governmental Authority in connection with any Tax Returns.

(c)    There are no Encumbrances for Taxes upon any of the Purchased Assets nor is any taxing authority in the process of imposing any Encumbrances for Taxes on any of the Purchased Assets (other than for current Taxes not yet due and payable). All of the Purchased Assets have been properly listed and described on the property Tax rolls for all periods prior to and including the Closing Date, and no portion of the Purchased Assets constitutes omitted property for property Tax purposes.

(d)    Neither Seller nor any Affiliate thereof is a "foreign person" as that term is used in Treasury Regulations Section 1.1445.2.

(e)    To the Knowledge of Seller, no claim has ever been made by a Governmental Authority in a jurisdiction where Seller does not file Tax Returns that the Purchased Assets are or may be subject to taxation by that jurisdiction.

(f)    To the Knowledge of Seller, Seller has collected or withheld and paid all Taxes required to have been collected or withheld by applicable Law, and any amounts so collected or withheld have been timely paid to the applicable Taxing authority.

**Section 4.14    Relationships with Related Persons.**  Except as set forth on <u>Section 4.14</u> of the Disclosure Schedules, no Related Person of Seller or of Seller's Affiliates has, or since January 1, 2022 had, any interest in any of the Purchased Assets or the Schoolhouse Intellectual Property, or is party to a Contract with, or has any claim or right against, Seller with respect to the Purchased Assets or the Schoolhouse Intellectual Property.

**Section 4.15    Brokers.**  Except as set forth in <u>Section 4.15</u> of the Disclosure Schedules, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or

commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Seller.

**Section 4.16    Data Privacy.**  Seller is and has been in compliance in all material respects with (a) all applicable privacy Laws in all relevant jurisdictions, (b) its privacy policies and (c) the requirements of any Contract or code of ethics or code of conduct to which Seller is a party, in each case in connection with Seller's collection, storage, transfer (including any transfer across national borders) or use of any personally identifiable information from any individuals, including any customers, prospective customers, employees, individuals participating in legal proceedings or other activities for which Seller is providing services, or other third parties (collectively, the "Personal Information").   Seller has all rights or licenses necessary to transfer Personal Information and all documents maintained by Seller on behalf of its customers to Buyer.  Seller has commercially reasonable physical, technical and administrative security measures and policies in place to protect all Personal Information collected by it or on its behalf from and against unauthorized access, use or disclosure.  To the Knowledge of Seller, Seller is and has been in compliance in all material respects with all Laws relating to data loss, theft and breach.

**Section 4.17    Intellectual Property.**

(a)    Section 4.17(a) of the Disclosure Schedules sets forth all known Schoolhouse Intellectual Property used or held for use in, or necessary for, the conduct of the Business as currently conducted by Seller or otherwise relating to the Purchased Assets, including all Schoolhouse Intellectual Property registered with or pending before any Governmental Authority (the "Seller Intellectual Property").  Except as set forth on Section 4.17(a) of the Disclosure Schedules, Seller owns all right, title and interest in and to, or otherwise holds a transferable, exclusive license to use, the Seller Intellectual Property, free and clear of Encumbrances (other than Permitted Encumbrances).  The Seller Intellectual Property is valid and subsisting and Seller has taken all reasonable steps required to maintain the validity of and enforce the Seller Intellectual Property, including continuous use of trademarks that constitute Seller Intellectual Property, and, except as set forth on Section 4.17(a) of the Disclosure Schedules, to the Knowledge of Seller, no Person is impairing, making unauthorized use of, misappropriating, infringing upon, violating or otherwise taking any action materially conflicting with any Seller Intellectual Property.  Except as would not reasonably be expected to be material to the Business, Seller has not received within the two (2) years prior to the date hereof any written claim, and is not currently a party to any pending Action, alleging that Seller's operation of the Business or use of the Purchased Assets infringes, misappropriates or otherwise violates the Intellectual Property of any third party.  The Seller Intellectual Property comprises all of the Intellectual Property (along with any associated goodwill) necessary to operate the Business in substantially the same manner as operated immediately prior to the Closing.  The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein, and the compliance with the provisions of this Agreement do not and will not conflict with, alter or impair any of the rights of Seller in any Seller Intellectual Property or the validity, enforceability, use, right to use, ownership, priority, duration, scope or effectiveness of any Seller Intellectual Property. All Seller Intellectual Property (along with any associated goodwill) will be owned by or licensed for use by Buyer immediately after the Closing on substantially the same terms and conditions as by Seller immediately prior to the Closing.  Seller represents and warrants that Seller owns legal title and any applicable

26

Copyrights and other intellectual property rights in all text, images, designs and other content appearing on the Online Platforms and the Accounts.

(b)    To the Knowledge of Seller, Seller has entered into binding, valid and enforceable written Contracts with each current and former employee and independent contractor whereby such employee or independent contractor (i) acknowledges Seller's exclusive ownership of all Seller Intellectual Property invented, created or developed by such employee or independent contractor within the scope of his or her employment or engagement with Seller; (ii) grants to Seller a present, irrevocable assignment of any ownership interest such employee or independent contractor may have in or to such Intellectual Property; and (iii) irrevocably waives any right or interest, including any moral rights, regarding such Intellectual Property, to the extent permitted by applicable Law. Seller has provided Buyer with true and complete copies of all such Contracts. To the Knowledge of Seller, no independent contractor that contributed to or worked on Seller Intellectual Property material to Schoolhouse has failed to enter into a binding, valid and enforceable written Contract contemplated by the foregoing sentence.

Section 4.18    **Environmental Matters.**  Seller is, and for the past two years has been, in compliance in all material respects with all Environmental Laws applicable to the Purchased Assets and the Business.  Seller has not received any written notice of, and to the Knowledge of Seller, is not the subject of, any pending or threatened Action relating to any actual or alleged violation of Environmental Laws or the release of any hazardous materials relating to the Business or the Purchased Assets.  Seller has obtained and is in compliance in all material respects with all environmental Permits required for the operation of the Business, all of which are in full force and effect.

Section 4.19    **Employee Matters.**

(a)    Except as set forth on Section 4.19 of the Disclosure Schedules, there are no employment, consulting, severance or indemnification contracts between Seller and any of its employees. No such employment, consulting, severance or indemnification contracts (whether or not disclosed on Section 4.19 of the Disclosure Schedules) will create or result in any Liability to Buyer.

(b)    Neither Seller nor any ERISA Affiliate has incurred any Liability with respect to any Benefit Plan, which may create, or result in any Liability to Buyer.

Section 4.20    **No Prior Sale of Assets.**  Except for (i) the sale of inventory in the ordinary course of business, (ii) the inventory sold in connection with the liquidation of Schoolhouse, and (iii) the physical assets sold in connection with the shutdown of the Portland, Oregon, office, prior to the date hereof Seller has not transferred, assigned, licensed, sold, or otherwise disposed of any rights or any assets owned by Seller that would enable any third parties to compete with the business to be conducted by Buyer following the Closing, including, but not limited to, the Schoolhouse Intellectual Property within the Purchased Assets.

Section 4.21    **No Other Representations.**  Except as set forth in this Article IV and in the Bankruptcy Case filings, Seller has not made any representation or warranty as to any aspect

27

of Seller or the Purchased Assets, or its Liabilities, businesses or results of operations, and Buyer disclaims its reliance upon any statement or information other than the representations and warranties of Seller set forth in this Article IV and in the Bankruptcy Case filings. No representation or warranty by Seller in this Article IV or any Bankruptcy Case filing, and no statement contained in this Article IV or contained in any Bankruptcy Case filing contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that the statements contained in this Article V are true and correct as of the date of this Agreement and as of the Closing Date.

**Section 5.01    Organization of Buyer.**  Buyer is a corporation duly organized, validly existing and in good standing under the Laws of New York.

**Section 5.02    Authority of Buyer.**  Buyer has full company power and authority to enter into this Agreement and the other Transaction Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery by Buyer of this Agreement and any other Transaction Document to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite company action on the part of Buyer.  This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Seller) this Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization or other Laws affecting creditors' rights generally and by general equitable principles.  When each other Transaction Document to which Buyer is or will be a party has been duly executed and delivered by Buyer (assuming due authorization, execution and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of Buyer enforceable against it in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization or other Laws affecting creditors' rights generally and by general equitable principles.

**Section 5.03    No Conflicts; Consents.**  The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the certificate of incorporation, bylaws or other organizational documents of Buyer; (b) conflict with or result in a material violation or breach of any provision of any Law or Governmental Order applicable to Buyer; or (c) require the consent, notice or other action by any Person, conflict with, result in a violation or breach of, constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any Contract to which Buyer is a party or by which Buyer is bound.  No consent, approval, Permit, Governmental Order, declaration

28

or filing with, or notice to, any Governmental Authority is required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby.

**Section 5.04    Sufficiency of Funds.**  Buyer has sufficient cash on hand or other financial resources available to it to satisfy its monetary obligations under this Agreement, including the payment of the Closing Consideration at the Closing in accordance with Article II.

**Section 5.05    Brokers.**  Buyer has not engaged any agent, broker or other Person acting pursuant to the express or implied authority of Buyer which is or may be entitled to a commission or broker or finder's fee in connection with the transactions contemplated by this Agreement or otherwise with respect to the sale of the Purchased Assets.

**Section 5.06    No Other Representations.**  Except as set forth in this Article V, neither Buyer nor any of its Representatives have made any representation or warranty as to any aspect of Buyer or its assets, Liabilities, businesses or results of operations, and Seller disclaims its reliance upon any statement or information other than the representations and warranties of Buyer set forth in this Article V.

**Section 5.07    Certain Acknowledgments**.  BUYER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ARTICLE IV ABOVE, THE TRANSACTION DOCUMENTS, OR ANY CERTIFICATE DELIVERED IN CONNECTION HEREWITH, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS INCLUDING EXPENSES TO BE INCURRED IN CONNECTION WITH THE PURCHASED ASSETS, THE PHYSICAL CONDITION OF ANY PERSONAL PROPERTY COMPRISING A PART OF THE PURCHASED ASSETS OR THAT IS THE SUBJECT OF ANY OTHER ASSUMED LEASE OR ASSIGNED CONTRACT TO BE ASSUMED BY BUYER AT THE CLOSING,  THE VALUE OF THE PURCHASED ASSETS (OR ANY PORTION THEREOF), THE MERCHANTABILITY OR FITNESS OF THE PERSONAL PROPERTY OR ANY OTHER PORTION OF THE PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE. WITHOUT IN ANY WAY LIMITING THE FOREGOING, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ARTICLE IV ABOVE, THE TRANSACTION DOCUMENTS, OR ANY CERTIFICATE DELIVERED IN CONNECTION HEREWITH, SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS. BUYER FURTHER ACKNOWLEDGES THAT, BUYER HAS CONDUCTED AN INDEPENDENT INVESTIGATION OF THE PHYSICAL CONDITION OF THE PURCHASED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE PURCHASED ASSETS AS BUYER DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH BUYER'S ACQUISITION OF THE PURCHASED ASSETS, BUYER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INVESTIGATIONS AND ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE IV, ANY TRANSACTION DOCUMENT, OR ANY CERTIFICATE DELIVERED IN CONNECTION HEREWITH. ACCORDINGLY, SUBJECT

29

TO THE FOREGOING, BUYER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS" BASIS, AS QUALIFIED OR PROVIDED BY THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN <u>ARTICLE IV</u>.   BUYER HEREBY EXPRESSLY ACKNOWLEDGES THAT THE ASSIGNMENT AND ASSUMPTION OF ASSIGNED CONTRACTS FORMING PART OF THE PURCHASED ASSETS WILL BE CONSUMMATED IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT NOTWITHSTANDING ANY AND ALL OUTSTANDING DEFAULTS AND OTHER CLAIMS FOR FAILURES TO COMPLY WITH THE PROVISIONS OF SUCH ASSIGNED CONTRACTS, CERTAIN OF WHICH DEFAULTS OR CLAIMS MAY NOT BE SUBJECT TO CURE OR WAIVER.

**ARTICLE VI**
**COVENANTS**

**Section 6.01    Conduct of Business.**  Except (a) as otherwise expressly contemplated by this Agreement, (b) upon the prior written consent of Buyer or (c) at the direction of the Bankruptcy Court, from the Effective Date until the Closing Date (or the earlier valid termination of this Agreement), Seller shall observe and comply with the Bidding Procedures and all applicable Orders of the Bankruptcy Court, use commercially reasonable efforts to conduct the Business in the ordinary course, preserve intact the Purchased Assets and use commercially reasonable efforts to maintain and preserve the current organization and operations of the Business, including Seller's material business and regulatory relationships (including with Material Customers and Material Vendors).  Such commercially reasonable efforts shall include, but not be limited to, posting content to Seller's Accounts no less frequently than once every twenty-four (24) hours and refreshing the content on Seller's home page at least five (5) times in any given seven (7) day period.  Without limiting the foregoing (but subject to the express limitation set forth in the first sentence of this <u>Section 6.01</u>), Seller shall not, and shall cause its Affiliates not to, take any of the following actions in respect of the Purchased Assets without the prior written consent of Buyer: (i) sell, transfer, license or otherwise dispose of, or encumber in any manner, any Purchased Asset, (ii) terminate, amend or modify any Material Contract, or (iii) cause Seller to merge or consolidate with any other Person.

**Section 6.02    Access to Information.**  During the period commencing on the Effective Date and ending on the Closing Date (or the earlier valid termination of this Agreement), Seller shall, and shall cause its Affiliates to, cooperate with Buyer and give Buyer and its Representatives (including Buyer's accountants, consultants, counsel and employees), upon reasonable notice and during normal business hours, full access to the properties, contracts, leases, equipment, employees, affairs, books, documents, records and other information of Seller to the extent relating to the Business, the Purchased Assets, Assumed Liabilities, and any other aspect of this Agreement, and shall cause their respective Representatives to furnish to Buyer all available documents, records and other information (and copies thereof), to the extent relating to the Business, the Purchased Assets, Assumed Liabilities, and any other aspect of this Agreement, in each case, as Buyer may reasonably request.

30

**Section 6.03    Employees and Employee Benefits.**  Seller shall be solely responsible at all times after the Closing, and Buyer shall have no Liability for, (i) Liabilities relating to Benefit Plans (including, but not limited to, accrued and unused sick leave, vacation or other paid time off) and (ii) any compensation or other amounts payable to any current or former employee, officer, director, manager, independent contractor or consultant of Seller, including hourly pay, commission, bonus, salary or accrued, unused paid time off as may be required by applicable Law, with respect to any services provided to Seller.  Seller shall pay all such amounts to all entitled Persons as soon as reasonably practicable and in accordance with Seller's regular pay practices; provided, however, that Seller must make all such payments in accordance with applicable Law. For avoidance of doubt, each of the foregoing shall constitute Excluded Liabilities.

**Section 6.04    Confidentiality.** From and after the Closing, Seller shall, and shall cause its Affiliates to, hold, and shall use their commercially reasonable efforts to cause their respective Representatives to hold, in confidence any and all Confidential Information, except to the extent that such party can show that such information (a) is generally available to and known by the public through no fault of Seller or its Affiliates or their respective Representatives; or (b) is lawfully acquired by such party or any of its Affiliates or Representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation.   If Seller or any of its Affiliates or their respective Representatives are compelled to disclose any Confidential Information by judicial or administrative process or by other requirements of Law, such party shall promptly notify Buyer in writing to the extent it is permitted to do so and shall disclose only that portion of such information which such party is advised by its counsel in writing is legally required to be disclosed. Notwithstanding the foregoing, (a) Seller may disclose Confidential Information regarding Seller (and only Seller) to any Third Party pursuant to any discussions or negotiations that would be reasonably likely to lead to an Alternative Transaction, in accordance with the applicable motions of the Bankruptcy Case and as approved by the Bankruptcy Court provided that such information does not disclose or include any confidential or proprietary information of Buyer and (b) an executed copy of this Agreement may be filed publicly with the Bankruptcy Court and may also be disclosed to any Third Party pursuant to any discussions or negotiations that would be reasonably likely to lead to an Alternative Transaction, provided such Third Party executes a non-disclosure agreement acceptable by Buyer and Seller.

**Section 6.05    Public Announcements.**  Subject to the provisions of the Bankruptcy Code and Seller's and Buyer's right to make such filings and disclosures as it deems necessary in good faith in connection with the Bankruptcy Case, or as otherwise required by applicable Law (based upon the reasonable advice of counsel), no Party shall make any public announcement in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media without the prior written consent of the other Parties (which consent shall not be unreasonably withheld or delayed), and the Parties shall cooperate as to the timing and contents of any such announcement; provided, that it shall not be considered reasonable for Seller to withhold consent with respect to any such announcement or communication by Buyer that does not contain disparaging information about Seller or the Business.  For the avoidance of doubt, the Parties consent that this Agreement will be publicly filed on the docket of the Seller's Bankruptcy Case and the Seller may publicly disclose that it entered into this Agreement for a going-concern sale

31

of the Purchased Assets for the consideration set forth herein, and that it intends to seek Bankruptcy Court approval of this Agreement, subject to any higher or better bids that may be submitted in the section 363 sale process, in accordance with the milestones set forth herein.

### Section 6.06    Receivables and Expenses.

(a)    Seller shall fulfill, and shall remain solely responsible for, any purchase orders received in connection with the Business and accepted by Seller prior to the Closing. If, following the Closing, Seller or any of its Affiliates receive or collect any funds relating to the Purchased Assets, Seller or its Affiliate shall remit such funds to Buyer within ten (10) Business Days after receipt thereof. From and after the Closing, if Buyer receives or collects any funds relating to any Excluded Asset or receives or collects any funds relating to the Purchased Assets for purchase orders received prior to the Closing, Buyer shall remit any such funds to Seller within ten (10) Business Days after receipt thereof.

(b)    Other than Cure Costs, if, following Closing, Buyer receives a bill for expenses related to any (i) Purchased Asset for the period prior to or on the Closing or (ii) Excluded Asset, Buyer shall promptly provide a copy of such bill to Seller and Seller shall as promptly as reasonably practicable pay such bill in accordance with its terms. If Seller receives a bill related to any Purchased Asset for a period after the Closing, Seller shall promptly provide a copy of such bill to Buyer and Buyer shall as promptly as reasonably practicable pay such bill in accordance with its terms. In the event that Buyer and/or Seller receives or prior to the date hereof has already paid a bill for expenses related to a Purchased Asset where such bill for expenses includes both the period before and after the Closing, such Party shall promptly provide a copy of such bill to the other party and both Parties shall as promptly as reasonably practicable pay the portion of the bill relating to their respective period of responsibility.

### Section 6.07    Tax Matters.

(a)    Subject to Section 2.04(b), any and all property transfer, documentary, stamp, registration, recording, filing, goods and services, value added or other similar Taxes payable as a result of or with respect to the sale or transfer of the Purchased Assets and the Business and the assumption of the Assumed Liabilities pursuant to this Agreement ("Transfer Taxes") shall be borne by the Buyer and Buyer shall timely file all Tax Returns related to any Transfer Taxes. For the avoidance of doubt, Buyer shall have no Liability for unremitted Sales Tax related to or arising from a Pre-Closing Tax Period.

(b)    Seller and Buyer hereby agree that all *ad valorem* Taxes relating to the Purchased Assets shall be prorated to take into account the period of time such Purchased Assets were owned by Seller and Buyer. Such proration shall, initially, be based on the most recent Tax statements, received by Seller as of the Closing Date. Seller shall be responsible for all such Taxes allocable to all times on or prior to the Closing Date, and Buyer shall be responsible for all such Taxes allocable to all times after the Closing Date.

(c)    The Seller and Buyer hereby agree that the acquisition of the Purchased Assets shall be treated as a sale of undivided interests in the Purchased Assets by and between the Seller and

33979426.5

Buyer for federal income Tax purposes to the extent attributable to the Purchase Price and any allocable liabilities.  Each Party agrees not to assert, in connection with any Tax Return, Tax audit or similar proceeding, any position inconsistent with the Tax treatment and determinations described in this Agreement.

**Section 6.08 Use of Name.**  Seller agrees that Seller and its Affiliates shall, as promptly as practicable (but in no event later than two (2) days) after the Closing, cease doing business under any identical or substantially similar name to the legal or trade name(s) of Seller, including, but not limited to, any name which includes the "Schoolhouse" name; <u>provided</u>, that Seller and its Affiliates shall be permitted to use the name "Schoolhouse" solely to the extent necessary in the winding up of the business and affairs of Seller.  Seller shall use commercially reasonable efforts to, no later than five (5) days after the Closing, legally change Seller's corporate and business names (to the extent such names include any identical or substantially similar name to the legal name of Seller) to names that are not confusingly similar to such names, and file notices of such name changes with the Bankruptcy Court.  Within fifteen (15) days of Closing, Seller shall file a motion with the Bankruptcy Court requesting entry of an Order authorizing change of case caption to remove references to "Food52", and which shall not include the name "Schoolhouse" or anything reasonably similar thereto.  As of the Closing, Seller and its Affiliates hereby expressly consent to Buyer's perpetual and royalty-free exclusive use and exploitation of the "Schoolhouse" name and all variations thereof world-wide in connection with Buyer's use in commerce of the Schoolhouse Intellectual Property.  Following the Closing, neither Seller nor any of its Affiliates shall grant any license or other right to use the name "Schoolhouse" to any other Person.

**Section 6.09 Cooperation.**  From the Effective Date until the Closing Date, each of Seller and Buyer agree to cooperate with each other in determining whether filings are required to be made or consents required to be obtained in any jurisdiction in connection with the consummation of the transactions contemplated by this Agreement and in making or causing to be made any such filings promptly and in seeking to obtain timely any such consents.  Without limiting the specific obligations of any Party hereto under any covenant or agreement hereunder, each Party shall use its good faith efforts to take all actions and do all things necessary to consummate the transactions contemplated in this Agreement as soon as reasonably practicable.

**Section 6.10 Actions Regarding Intellectual Property; Domains.**  Prior to, at, or immediately following the Closing:  (i) Seller shall deliver to Buyer the administrative and technical access credentials (user names, passwords, access keys, etc.) required for Buyer to assume ownership and control of the domains, website(s), social media platforms, Amazon Web Store, Shopify and other online accounts and services that constitute the Purchased Assets or otherwise relate to the Business and take the other actions with respect thereto as specified on <u>Exhibit A</u> (Purchased Assets) under the heading Other Assets and Related Access Rights (collectively, the "<u>Online Platforms</u>"); and (ii) in cooperation with Buyer, Seller shall arrange for the transfer of ownership and administrative control of the Online Platforms to Buyer, in accordance with the requirements and procedures of the applicable registrars and platform service providers, and provide any additional information set forth on <u>Exhibit A</u> (Purchased Assets) under the heading "Other Assets and Related Access Rights".  Any fees that may be required by the Online Platforms to effect such change of ownership and control shall be paid by Buyer, <u>provided</u>, that past due amounts related to the pre-Closing period shall be the responsibility of Seller.  Seller

and Buyer shall cooperate with each other in good faith to effect such transfers of ownership and control of the Online Platforms.  Seller's failure to timely comply with its foregoing covenants shall be deemed a material default under this Agreement.

**Section 6.11 Further Assurances.**

(a)     Following the Closing, each of the Parties shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the other Transaction Documents.

(b)     For a period not to exceed two (2) weeks post-Closing, in the event that there is a Contract with a customer or vendor of Seller that is related to Schoolhouse and not included in the Assigned Contracts at Closing but that is discovered by Seller or Buyer after the Closing, Seller or Buyer shall notify the other party of such Contract and Buyer shall have the option to take assignment thereof without the payment of any additional consideration; provided, however, that any such Contract shall be added to the Assigned Contracts list on Exhibit A and Buyer shall pay the Cure Costs to assume such Contract.

**Section 6.12    Access to Books and Records.**  From and after the Closing, upon request by Seller, Buyer will permit Seller and Seller's Representatives to have reasonable access during normal business hours, at the sole expense of Seller and in a manner so as not to interfere unreasonably with the normal business operations of Buyer, to all premises, properties, personnel, books and records, and Contracts of Buyer that are Purchased Assets or Assumed Liabilities for the purposes of (a) preparing Tax Returns and (b) to facilitate the wind down of Seller.

**Section 6.13    Notice of Certain Events.**  From the Effective Date through the Closing, Seller shall promptly notify Buyer in writing of any notice or other communication from any Governmental Authority in connection with the Bankruptcy Case that effects the consummation of the transactions contemplated by this Agreement.

## ARTICLE VII
## CONDITIONS TO CLOSING

**Section 7.01    Conditions to Buyer's Obligation to Close.**  The obligation of Buyer under this Agreement to effect the Closing shall be subject to the fulfillment at or prior to the Closing of each of the following conditions, any of which may be waived in writing by Buyer:

(a)     (i) the Fundamental Representations shall be true and correct in all respects on and as of the Effective Date and at and as of the Closing Date (unless such representation or warranty is given as of a particular date in which case such representation or warranty shall be true and correct on and as of such date), and (ii) each of the other representations and warranties of Seller set forth in Article IV shall be materially true and correct on and as of the Effective Date and at and as of the Closing Date (unless such representation or warranty is given as of a particular date

34

in which case such representation or warranty shall be true and correct on and as of such date), except with respect to this clause (ii) for any failure to be so true and correct that, individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect;

(b)     Seller shall have complied with and performed in all material respects all of the agreements and covenants required by this Agreement and each other Transaction Document to be performed or complied with by Seller on or prior to the Closing;

(c)     Seller shall have delivered to Buyer a certificate, dated as of the Closing Date and executed by a duly authorized officer of Seller, certifying that the conditions set forth in Section 7.01(a) and 7.01(b) have been satisfied;

(d)     Seller shall have delivered or caused to be delivered to Buyer each of the documents, agreements and other deliverables set forth in Section 3.02(a), including each Transaction Document to be duly executed by Seller (and any other applicable parties thereto);

(e)     No Material Adverse Effect shall have occurred;

(f)     (i) The Bankruptcy Court shall have entered the Sale Order and (ii) no order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date; and

(g)     The Cure Costs associated with the Cure Cost Assigned Contracts shall not exceed the Cure Costs Cap unless Seller is unable to satisfy the amount of the Cure Costs over and above the Cure Costs Cap.

**Section 7.02     Conditions to Seller's Obligation to Close.**  The obligation of Seller under this Agreement to effect the Closing shall be subject to the fulfillment at or prior to the Closing of each of the following conditions, any of which may be waived in writing by Seller:

(a)     Each of the representations and warranties of Buyer set forth in Article V shall be true and correct on and as of the Effective Date and at and as of the Closing Date (unless such representation or warranty is given as of a particular date in which case such representation or warranty shall be true and correct on and as of such date), except for any failure to be so true and correct that, individually or in the aggregate, has not had and would not reasonably be expected to have a material adverse effect on the ability of Buyer to timely consummate the transactions contemplated hereby;

(b)     Buyer shall have complied with and performed in all material respects all of the agreements and covenants required by this Agreement and each other Transaction Document to be performed or complied with by it on or prior to the Closing;

(c)     Buyer shall have delivered to Seller a certificate, dated as of the Closing Date and executed by a duly authorized officer of Buyer, certifying that the conditions set forth in Section 7.02(a) and 7.02(b) have been satisfied;

35

(d)    Buyer shall have delivered or caused to be delivered to Seller each of the documents, agreements and other deliverables set forth in Section 3.02(b), including each Transaction Document to be duly executed by Buyer (and any other applicable parties thereto);

(e)    The Sale Order shall have been entered by the Bankruptcy Court, and such Sale Order shall be in effect and not reversed or stayed, or modified in any material respect; and

(f)    All Cure Costs subject to the Cure Costs Cap shall have been paid by Buyer.

## ARTICLE VIII
## TERMINATION

**Section 8.01    Termination.**

(a)    This Agreement may be terminated at any time prior to the Closing, by written notice from the terminating Party to the other Party (other than a termination pursuant to Section 8.01(a)(i)) only as follows:

(i)    by the mutual written agreement of Seller and Buyer;

(ii)    by either Seller or Buyer if the Bankruptcy Court enters a final order approving the sale of all or any of the Purchased Assets to a Third Party, unless such final order results from the failure of the Party seeking to terminate this Agreement to perform in any material respect any of its obligations under this Agreement required to be performed by it at or prior to the Closing;

(iii)    by either Seller or Buyer at or prior to the Bankruptcy Court hearing regarding approval of this Agreement, if an Alternative Transaction is accepted and approved by the Bankruptcy Court;

(iv)    by either Seller or Buyer, if the Closing has not occurred on or before February 28, 2026 (the "Outside Date"); provided, that the right to terminate this Agreement under this Section 8.01(a)(iv) shall not be available to a Party if the Closing has not occurred prior to the Outside Date due to such Party's or its Affiliate's failure to perform any covenant or obligation under this Agreement;

(v)    by Buyer if Seller has breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, and such breach or failure to perform would give rise to the failure of a condition set forth in Section 7.01(a) or Section 7.01(b) and such breach or failure has not been cured within thirty (30) days from the date Buyer notifies Seller in writing of such breach or failure; or

(vi)    by Seller if Buyer has breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, and such breach or failure to perform would give rise to the failure of a condition set forth in Section 7.02(a) or Section 7.02(b) and such breach or failure has not been cured by thirty (30) days from the date Seller notifies Buyer in writing of such breach or failure.

36

**Section 8.02    Effect of Termination.**  If this Agreement is terminated pursuant to <u>Section 8.01</u>, this Agreement shall become null and void and of no further force and effect, without any Liability or obligation on the part of any Party or its Affiliates; <u>provided</u> that <u>Section 6.04</u>, this <u>Section 8.02</u>, <u>Article IX</u> and <u>Article X</u> shall remain in full force and effect.  Notwithstanding the foregoing or anything to the contrary set forth in this Agreement, termination of this Agreement shall not relieve any Party or any of its Affiliates from Liability for fraud or willful and material breach of any covenant or agreement set forth in this Agreement prior to its termination; <u>provided</u>, that in no event will Buyer's aggregate Liability hereunder (whether in respect of fraud, willful and material breach or otherwise and whether in equity or at law, in Contract, in tort or otherwise) exceed $220,000.00.

**ARTICLE IX**
**BANKRUPTCY MATTERS**

**Section 9.01    Bankruptcy Court Approval.**  Each of Seller and Buyer acknowledges that this Agreement and the sale of the Purchased Assets to Buyer (and any Designated Buyer) and the assumption of the Assumed Liabilities by Buyer (and any Designated Buyer) are subject to Bankruptcy Court approval.  Buyer acknowledges that:  (i) to obtain such approval, the Seller must demonstrate that it has taken reasonable steps to obtain the highest and otherwise best offer possible for the Purchased Assets, and that such demonstration will include giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court; and (ii) Buyer must provide adequate assurance of future performance as required under the Bankruptcy Code with respect to each Assigned Contract.

**Section 9.02    Sale Order**

(a)    Buyer agrees that it will promptly take such actions as are reasonably requested by the Seller to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Buyer (and any Designated Buyer, where applicable) of the Assigned Contracts, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.  In the event the entry of the Sale Order is appealed or otherwise challenged, the Parties shall use commercially reasonable efforts to defend such appeal(s) or other challenges.

(b)    From the date hereof until the earlier of:  (i) the termination of this Agreement and (ii) the final Closing Date, the Seller shall use its reasonable best efforts to obtain entry of the Sale Order and any other orders reasonably necessary to consummate the transactions contemplated under this Agreement.

(c)    Seller shall file such motions or pleadings as may be appropriate or necessary to: (i) assume and assign the Assigned Contracts, and (ii) determine the amount of the "Cure Costs" associated with any such Assigned Contracts; <u>provided</u>, that nothing herein shall preclude Seller, subject to Buyer's prior written consent, from filing such motions to reject any Contracts that are

37

not designated as Assigned Contracts by the Buyer in accordance with this Agreement or that have been designated for rejection by the Buyer.

Section 9.03    **Modification of Sale Order**.  The Seller may not modify the Sale Order without the prior written consent of the Buyer.

Section 9.04    **Seller and Buyer Duties**

(a)    The Seller and Buyer shall each:  (i) appear in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the transactions contemplated under this Agreement; and (ii) keep the other Party reasonably apprised of the status of material matters related to this Agreement, including, upon reasonable request, promptly furnishing the other with copies of notices or other communications received from the Bankruptcy Court or any Third Party or any Governmental Authority with respect to the transactions contemplated by this Agreement.

(b)    Seller shall use commercially reasonable efforts to give Buyer reasonable advance notice of any hearings regarding the motions required to obtain the entry of the Sale Order.

(c)    Seller shall give Buyer reasonable advance notice and proposed drafts of all pleadings, motions, Orders, notices, other papers, hearings, and other proceedings related to this Agreement and the transactions contemplated hereby, and will provide Buyer and its counsel a reasonable opportunity to review such papers prior to filing with the Bankruptcy Court and, with respect to all provisions that impact the Buyer or relate to the transactions contemplated by this Agreement, such pleadings, Orders, and other papers shall be in form and substance acceptable to the Buyer and consistent with this Agreement.

Section 9.05    **Bankruptcy Court Milestones.**

(a)    Seller has complied, or shall comply, in each case as applicable, with the following timeline, subject to further extension with prior written consent from Buyer:

(i)    On January 12, 2026, the Bankruptcy Court entered into an order (the "Bidding Procedures Order") establishing bidding procedures (the "Bidding Procedures") which provide for an auction and sale process (with agreed upon bid increments and bidder qualifications).

(ii)    On February 5, 2026, if there is at least one Qualified Bid for the Purchased Assets, then Seller shall hold an auction, solely for the Qualified Bidders, to sell, among other things, the Purchased Assets (the "Auction");

(iii)    Within twenty-four (24) hours after closing the Auction, if Buyer's Bid is determined by Seller to be the highest or otherwise best Bid for the Purchased Assets, Seller shall cause this Agreement, together with all other documents relating to this Agreement and Buyer's Bid, to be filed with, and for the approval of, the Bankruptcy Court;

38

(iv)     On February 10, 2026, the Bankruptcy Court shall hold a hearing to approve the sale of the Purchased Assets pursuant to the terms of this Agreement, subject to any amendments thereto pursuant to the Auction; and

(v)     On or before February 13, 2026, or such later date as Buyer shall agree in writing, the Bankruptcy Sale shall have been consummated, subject to the terms of this Agreement.

### Section 9.06    Disclaimer of Break Up Fee and Expense Reimbursement

(a)     In accordance with the terms of the Bidding Procedures, Buyer disclaims any right to receive any cash amount (a "Break Up Fee") as liquidated damages for the failure of Seller to consummate the transactions contemplated under this Agreement in accordance with the terms of this Agreement.  In no event shall the Seller be required to pay any amounts as a Break Up Fee and the Buyer agrees that the Seller shall not be responsible for any special or consequential damages related to any breach of this Agreement by Seller.

(b)     Buyer disclaims any right to receive any expense reimbursement for fees and expenses of counsel and other related expenses in connection with the diligence, documentation and funding of the transactions contemplated hereby.

### Section 9.07    Auction Procedures; Backup Bidder; Return of Deposit

(a)     In the event of an Auction pursuant to the terms of the Bidding Procedures Order, Seller will notify Buyer if it is a Qualified Bidder (and each other Qualified Bidder) of the highest or otherwise best Qualified Bid for the Purchased Assets, as determined in Seller's reasonable business judgment, and provide copies of the Qualified Bid documents for all Qualified Bids to Buyer (and each other Qualified Bidder). If there is to be a change to the time or location of the Auction, Seller will file a notice of such change and will serve such notice on Buyer (and each other Qualified Bidder) and all parties requesting service under Bankruptcy Rule 2002 at least twenty-four (24) hours prior to the Auction. Seller shall direct and preside over the Auction in accordance with the terms of the Bidding Procedures and all incremental Bids shall be made and received on an open basis with all material terms of such incremental bids fully disclosed to Buyer and all other Qualified Bidders who submitted Bids on the Purchased Assets.

(b)     If Buyer is determined by Seller in its reasonable business judgment to have the next-highest or otherwise second-best Bid at the Auction for the Purchased Assets, Buyer shall be the backup bidder (the "Backup Bidder") for the Purchased Assets in accordance with the terms of the Bidding Procedures. Seller shall announce whether Buyer is the Backup Bidder for the Purchased Assets at the conclusion of the Auction. If Buyer is determined to be the Backup Bidder, then Buyer's Deposit shall be held in escrow until the closing of the transaction for the Purchased Assets with the applicable Third Party that had the successful Bid (the "Successful Bid") at the Auction (the "Successful Bidder"). If the Successful Bidder fails to consummate the transactions contemplated by its Successful Bid, then Seller shall provide written notice to Buyer and file and serve a notice disclosing Seller's intent to proceed with the Transaction pursuant to the terms of this Agreement, in accordance with the terms of the Bidding Procedures.

33979426.5

(c)      If Buyer is neither the Successful Bidder nor the Backup Bidder for the Purchased Assets, then Seller shall return, or cause to be returned, the Deposit on or within five (5) Business Days after the Auction, together with any and all interest that has accrued thereon. If Buyer is determined to be the Backup Bidder, then Buyer's Deposit shall either be (i) returned on or within five (5) Business Days after the closing of the transaction for the Purchased Assets with the Successful Bidder, or (ii) if the Successful Bidder fails to consummate the transactions contemplated by its Successful Bid, and if and only if Seller consummates the Transaction in accordance with this Agreement, retained by Seller and applied to the Purchase Price in accordance with this Agreement.

## ARTICLE X
## MISCELLANEOUS

**Section 10.01  Expenses.**  Except as otherwise expressly provided herein, all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

**Section 10.02  Notices.**  All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent and received by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the day of receipt (or refusal of receipt) when mailed, by certified or registered mail, return receipt requested, postage prepaid.  Such communications must be sent to the respective parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 10.02):

> if to Buyer, then to:                     Troy-CSL Lighting, Inc.
>                                            151 Airport Drive
>                                            Wappingers Falls, New York 12590
>                                            Attention: Malaina Matheus; Milind Madani
>                                            Email: mmatheus@hvlgroup.com;
>                                            mmadani@hvlgroup.com

33979426.5

|                                                     |                                                                                                                                                                                                                        |
| --------------------------------------------------- | ---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
| with a copy (which shall not constitute notice) to: | Couch White, LLP<br>540 Broadway<br>P.O. Box 22222<br>Albany, New York 12201<br>Attention: Brian P. Murphy<br>Email: bmurphy@couchwhite.com<br><br>Whiteman Osterman & Hanna LLP<br>80 State Street<br>Albany, New York 12207<br>Attention: Justin A. Heller<br>Email: jheller@woh.com |
| if to Seller, then to:                              | Food52, Inc.<br>1 Dock 72 Way, 13th Floor<br>Brooklyn, New York 11205<br>Attention: Erika Ayers Badan<br>Email: erika@food52.com;<br>heidi.robinson@food52.com |
| with a copy (which shall not constitute notice) to: | Young Conaway Stargatt & Taylor, LLP<br>Rodney Square<br>1000 North King Street<br>Wilmington, Delaware 19801<br>Attention:Michael R. Nestor, Kara Hammond<br>Coyle and Elizabeth S. Justison<br>Email: mnestor@ycst.com; kcoyle@ycst.com;<br>ejustison@ycst.com |

**Section 10.03  Interpretation.**  For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole.  Unless the context otherwise requires, references herein:  (i) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Disclosure Schedules and Exhibits attached to, this Agreement; (ii) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof; and (iii) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder.  This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.  The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

41

**Section 10.04   Headings.**  The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 10.05   Severability.**  If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties hereto as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 10.06   Entire Agreement.**  This Agreement and the other Transaction Documents constitute the sole and entire agreement of the Parties with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the other Transaction Documents, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

**Section 10.07   Successors and Assigns.**  This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns.  No Party may assign its rights or obligations hereunder without the prior written consent of the other Party; provided, however, Buyer may assign its rights or obligations under this Agreement without consent to any Affiliate of Buyer.  No assignment shall relieve the assigning Party of any of its obligations hereunder.

**Section 10.08   No Third-Party Beneficiaries.**  This Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature under or by reason of this Agreement.

**Section 10.09   Amendment and Modification; Waiver.**  This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each Party.  No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving.  No waiver by any Party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 10.10   Governing Law.**  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware (without application of principles of conflicts of law).  In connection with any controversy arising out of or related to this Agreement, Seller and

42

Buyer hereby irrevocably consent to the exclusive jurisdiction of the Bankruptcy Court, or if, and only if, the Bankruptcy Case has been closed, the courts of the State of Delaware. Seller and Buyer each irrevocably consents to service of process out of the aforementioned courts and waives any objection which it may now or hereafter have to the laying of venue of any action or proceeding arising out of or in connection with this Agreement brought in the aforementioned courts.

**Section 10.11  Specific Performance.**  The Parties agree that irreparable damage would occur and that the Parties would not have any adequate remedy at law in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the Parties shall be entitled to an injunction or injunctions to prevent breaches or threatened breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in the Bankruptcy Court without proof of actual damages or otherwise (and, to the fullest extent permitted by Law, each Party hereby waives any requirement for the securing or posting of any bond in connection with such remedy), this being in addition to any other remedy to which they are entitled at law or in equity.

**Section 10.12  Counterparts.**  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**Section 10.13  Non-Survival of Representations, Warranties and Covenants**.  The respective representations, warranties and covenants of Seller and Buyer contained in this Agreement and any certificate delivered pursuant hereto shall terminate at, and not survive, the Closing; provided that this Section 10.13 shall not limit any covenant or agreement of the Parties to the extent that its terms require performance after the Closing, which shall survive in accordance with their terms.

*[Signature Page Follows]*

43

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**BUYER:**

**TROY-CSL LIGHTING, INC.**

By: _____
Name:    Malaina Matheus
Title:    President

**SELLER:**

**FOOD52, INC.**

By: _____
Name:    Erika Badan
Title:    Chief Executive Officer

*[Signature Page to Asset Purchase Agreement]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**BUYER:**

**TROY-CSL LIGHTING, INC.**

By: _____

Name:   Malaina Matheus

Title:   President

**SELLER:**

**FOOD52, INC.**

By: _____

Name:   Erika Badan

Title:   Chief Executive Officer

*[Signature Page to Asset Purchase Agreement]*

**EXHIBIT A**

**CERTAIN PURCHASED ASSETS**

A.      <u>Other Assets and Related Access Rights</u>

Prior to, at, or immediately following the Closing, Seller shall take the following actions:

**I.      Domain Names & DNS Management**

● Provide complete list of and Admin access to all URLs and registered domains and provide Transfer Authorization Codes (EPP codes) with each domain.

● Provide complete list of and Admin access to all domain registrars and login credentials.

**II.      Social Media**

● Provide complete list of and Admin access to all social media accounts for Schoolhouse, inclusive of but not limited to:

  ○ https://www.facebook.com/Schoolhouse

  ○ https://www.instagram.com/schoolhouse

  ○ https://www.pinterest.com/schoolhouseelec

  ○ https://www.tiktok.com/@schoolhouseliving

  ○ www.youtube.com/@schoolhouseliving

  ○ https://x.com/SchoolhouseElec

  ○ https://www.linkedin.com/company/schoolhouse-electric-co-/

● Remove any personal recovery emails or phone numbers associated with the accounts.

**III.      E-commerce**

● Provide complete list of Admin access to all commerce platforms (e.g. Shopify).

33979426.5

B.      Books and Records

- All digital records regarding the below with respect to the Business:

  ○ Schoolhouse SKU-level sales data (historical and current), customer lists, customer information (e.g., names, addresses, phone numbers, and e-mail addresses), catalog recipient lists (with mailing addresses), email marketing lists, text marketing lists, supplier lists, product data (SKU, family, dimensional description, shipping type, weight, color, etc.), customer complaints and inquiry files, sales material and records (including pricing history, total sales, terms and conditions of sale, sales and pricing policies and practices),

  ○ Product design assets, whether current or archival, including with respect to product development, CAD drawings, sketches, mood boards, specifications, assortment previews and related product design work product

  ○ Marketing documents, guides and files (past and present) (e.g., branding, logos, marketing documents and digital catalog files) and photography and video assets related to, among other things, products, marketing and brand awareness

  ○ Copies or summaries of design licenses or rights and royalty arrangements for Schoolhouse products, including the IBM clock contract

  ○ All Business information and data contained in the access afforded to Buyer pursuant to Section A or Section B of this Exhibit A

  ○ Full access to Schoolhouse Shopify instance

  ○ Transfer of Schoolhouse information from Vercel

2

**EXHIBIT A (cont.)**

**ASSIGNED CONTRACTS**

<u>Assigned Contracts</u>:

<u>Cure Cost Assigned Contracts</u>:

**EXHIBIT B**

**EXCLUDED LIABILITIES**

33979426.5

33874329.15

## DISCLOSURE SCHEDULES

[To be attached.]